# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

*Miguel Angel Sánchez Osorio, et al.,*

Case No.:  07-22693-Civ-HUCK

*v.*

*Dole Food Company, Inc., et al.*

## DECLARATION AND EXPERT REPORT OF OMAR GARCÍA-BOLÍVAR

## TABLE OF CONTENTS

EXECUTIVE SUMMARY .............................................................................................. 3

BACKGROUND ........................................................................................................... 9

METHODOLOGY FOR FORMING THE OPINIONS IN THIS REPORT ...................... 12

OPINION ................................................................................................................... 16

BACKGROUND ON THE NICARAGUAN JUDICIAL SYSTEM ................................. 17

    BRIEF POLITICAL HISTORY ............................................................................. *17*

    BASIC STRUCTURE OF THE COURTS ............................................................. *21*

    LACK OF INDEPENDENCE OF JUDGES ........................................................... *22*

LEVEL OF CORRUPTION AND POLITICAL CONTROL IN THE DAILY OPERATION OF THE
COURTS BETWEEN 2000 AND 2007 ...................................................................... 26

EXAMPLES OF RECENT HIGH PROFILE CASES WIDELY UNDERSTOOD TO INVOLVE
CORRUPTION AND POLITICAL INTERFERENCE ................................................. 28

PARTICULAR CONCERNS REGARDING LACK OF JUDICIAL IMPARTIALITY IN THE DBCP
CASES ...................................................................................................................... 31

OPINION OF GOVERNMENTAL, NON-GOVERNMENTAL, AND NICARAGUAN SOURCES ............. 32

    *THE UNITED STATES OF AMERICA* ................................................................ *32*

    *THE INTERNATIONAL COMMUNITY* ................................................................ *41*

    THE OPINION OF NICARAGUANS ..................................................................... *48*

THE 2005 CASE BEFORE THE INTER-AMERICAN COMMISSION ON HUMAN RIGHTS AT THE OAS
..................................................................................................................................... 54

CONCLUSION .......................................................................................................... 57

I, Omar García-Bolívar, pursuant to 28 U.S.C. § 1746, declare as follows:

## EXECUTIVE SUMMARY

1. It is my opinion that, at least since the underlying lawsuit was filed in Nicaragua in 2002, the Nicaraguan judicial system has not provided impartial tribunals.

2. My professional expertise qualifies me to testify on the Nicaraguan judicial system, as described in paragraphs 13-30. In 2004, I served as a consultant for the United States Agency of International Development (USAID) in the context of the USAID Nicaragua Central America Free Trade Agreement (CAFTA) Assessment, where *inter alia,* I assessed the Nicaraguan judicial system, as explained in paragraphs 31-43. In 2005, I was also called upon by high ranking Nicaraguan government officials to testify on the independence of the Nicaraguan judicial system before the Organization of American States (OAS) affiliated Inter-American Commission on Human Rights in the context of a claim presented by them against the Republic of Nicaragua, as explained in paragraphs 195-204.

3. The remainder of this report explains the basis for my opinions on the Nicaraguan judicial system and demonstrates how those opinions are informed and confirmed by the opinions of the international community, including U.S. governmental entities, non-governmental entities, multilateral organizations and knowledgeable Nicaraguans.

4. The report is organized as follows.  First, because it is highly relevant to understanding the partiality and corruption of the Nicaraguan judicial system, I provide a brief recent political history of Nicaragua: "[I]n contrast to the mid 1990s the current system is universally perceived by Nicaraguans as corrupt and incapable of administering even-handed justice. Thus, instead of improving, the situation began to deteriorate in the late 1990s and, beginning in approximately the year 2000, much changed in Nicaragua that directly and negatively impacted the independence of the judicial system." (*See* paragraphs 53-66)

5. Second, I briefly explain the basic structure of the Nicaraguan judicial system: "In addition to its judicial functions, the Supreme Court has administrative duties such as the appointment and removal of lower-court judges, something that in practice occurs at will." (*See* paragraphs 67-73)

6. Third, I explain in detail how, why, and to what extent there is a complete lack of independence of judges in Nicaragua: "Judges in Nicaragua are appointed according to their political affiliation and loyalty and can be easily dismissed if they fail to respond to powerful political interests." (*See* paragraphs 74-85)

7. Fourth, I describe how corruption and political interference actually work in the day-to-day operation of the judicial system: "Corruption in Nicaraguan courts is widespread, both in the form of bribery and political control.  Given the way in

which judges are appointed and removed and the *feudo* system, Supreme Court justices wield direct influence over lower court judges.  It is widely known that Supreme Court justices call judges to demand that a decision be made in a direction that favors their personal interests or that of the FSLN party, the PLC party, or party allies.  Because their position on the court is often at stake, lower court judges reportedly feel significant pressure to comply with Supreme Court justices' demands." (*See* paragraphs  86-94)

8.      Fifth, I provide examples of several high profile cases in which it was widely perceived that corruption and political interference were at work. For example, in the case against American company Esso, described in paragraph 102, Judge Socorro Toruño Martínez, the District Court judge who issued the judgment in the underlying *Sanchéz Osorio* case, reportedly under pressure by the Ortega administration, ordered seizure of all Esso's facilities in violation of basic principles of due process. The U.S. Ambassador to Nicaragua Paul Trivelli, said "that the action was unjustified, amounted to confiscation and was of great concern."[1] The U.S. Ambassador also urged the Nicaraguan government to respect the rule of law.

9.      Sixth, beginning in paragraph 104, I discuss particular concerns regarding lack of judicial impartiality in the DBCP cases. For example, in 2004 the Nicaragua Country Commercial Guide, published by the Department of State, said:  "The uncertainties of Nicaragua's judicial system were demonstrated in a proceeding ending in December 2002.  In that proceeding, a Nicaraguan judge issued a $489 million judgment on behalf of 583 [sic] plaintiffs under a 2001 law creating a special process for suits against U.S. companies involved in the manufacture or use of the pesticide DBCP.  None of the companies participated in the brief proof process that led to this judgment, and citing the law the court refused to hear their legal arguments or accept contrary proof.  The court also apparently did not take into consideration a non binding opinion circulated earlier that year by Nicaragua's acting Attorney General that cited apparent constitutional flaws in the law.  Several hundred lawsuits claiming billions of dollars of damages under the law are pending."[2]

10.     Seventh, I demonstrate how my opinion is both informed and supported by the other authoritative sources that have studied the Nicaraguan judicial system. To cite only a few examples:

**U.S. Department of State Human Rights Reports:**

---

[1] Eduardo Marenco and Esteban Solís, *"EEUU amenaza,"* El Nuevo Diario, Aug. 21, 2007 (Ex. 45).

[2] Country Commercial Guide (2004) at 23 (Ex. 5c); Country Commercial Guide (2005) at 33 (Ex. 5d).

**2004**: "Rulings in favor of those who are politically connected remained the most visible manifestation of judicial corruption.  Both the PLC and Sandinista (FSLN) parties used the judiciary for political purposes..."[3]

**2005**: "Judges' political sympathies or acceptance of bribes or influence from political leaders often influenced judicial actions and findings."[4]

**2006**: "the judicial system remained susceptible to corruption and politicization..."[5]

**2007**: "[i]n practice [the judicial system] did not function independently."[6]

**109th U.S. House of Representatives in 2005**:

"...Arnoldo Alemán and Daniel Ortega continue to wield near total control over...the Supreme Court."[7]

**The 2005 USAID Nicaragua CAFTA Assessment**:

"The overwhelming need for judicial reform in Nicaragua surpasses all other governmental reform initiatives in its urgency.  Questions regarding judicial independence, impartiality, and substantive and administrative capacities dominate Nicaragua's legal landscape and economic institutions..."[8]

**U.S. Ambassador to Nicaragua Paul Trivelli in 2007**:

"All these examples suggest that there is a true weakness in the institutionalization of democracy in Nicaragua. Taken together, they demonstrate the blurring of the clear line that should exist between the exercise of power by political leaders for party activities versus government administration; the collusion between supposedly independent

---

[3] State Dep't Nicaragua Country Report (2004) at 5 (Ex. 4k ).

[4] State Dep't Nicaragua Country Report (2005) at 3 (Ex. 4l).

[5] State Dep't Nicaragua Country Report (2006) at 5 (Ex. 4m).

[6] State Dep't Nicaragua Country Report (2007) at 3 (Ex. 4n).

[7] Res. 252, U.S. 109th Congress (Ex. 9).

[8] Trade and Commercial Law Assessment – Nicaragua, USAID Report (Jan. 2005) (USAID Nicaragua CAFTA Assessment) at I-1 (Ex. 2) http://www.bizlawreform.com/country_assess/NicaraguaTCLA.pdf.

> government branches; the use of government institutions to penalize
> political enemies and the administration of justice along party lines."[9]

**Nicaraguan Human Rights Group CENIDH in 2005:**

> "The lack of the Judicial Branch's credibility is reflected in a number of
> different public opinion polls…"[10]

**The European Union in 2006:**

> "In the case of the institutes within the judicial system, the existence of
> corruption… implies not only the disturbance of its operation, but also the
> weakness of the State in fighting corruption..."[11]

**Transparency International in 2007:**

> "The impunity generated by the dominance of two parties and the
> consequent risks of corruption that spill over into other powers of the
> State, interfere with access to justice that is efficient, prompt and
> consistent with law." [12]

**Nicaraguan Chief Justice in 2007:**

> "[T]he judicial system is a branch of government that is politicized,
> maneuverable…I have no qualms about admitting that the judicial system
> is controlled for the most part by the FSLN, and this is not a good sign.  A
> Judicial Branch that is dominated by politics is not a Judicial Branch, it's a
> politicized branch, and that is not good for a modern society."[13]

11.     Eighth, beginning in paragraph 195, I describe the case presented by Nicaraguan
high-ranking government officials against the Republic of Nicaragua before the OAS
Inter-American Commission on Human Rights for violation of their rights to due
process of law, judicial protection and non-discriminatory treatment. I was called
upon by these officials to testify about the lack of independence of the judicial
system of Nicaragua. In their petition, these Nicaraguan government officials said:
"The administration of justice is used here as an instrument for coercion that is at the
disposal of certain political and party interests...and more precisely their political
leaders, Daniel Ortega and Arnoldo Alemán...It is impossible for there to be true

---

[9] Paul Trivelli, *"Democracia: en principio y en la práctica,"* El Nuevo Diario, Nov. 6, 2007 (Ex. 46).

[10] CENIDH Human Rights Report (2004-2005) at 11 (Ex. 34a).

[11] European Union Report at 21 (Ex. 22).

[12] Transparency Int'l Nicaragua Report (2007) at 31 (Ex. 27b).

[13] Eloísa Ibarra, *"¡No a dictadura!,"* El Nuevo Diario, Nov. 28, 2007 (Ex. 47).

justice – effective, independent and impartial – if those who administer justice are subordinated to their party allegiances..."[14]

12.     Finally, I conclude that, at least since the underlying lawsuit was filed in Nicaragua in 2002, the Nicaraguan judicial system has not provided impartial tribunals. Five factors were crucial in my arriving at that conclusion:

a.     The procedures of judicial appointment, dismissal, and monitoring are deeply flawed.  In Nicaragua, judges are appointed according to their political loyalty, rather than any measure of merit such as competence, impartiality or experience. The process by which judges are removed is equally problematic—in practice they can be removed at the will of Supreme Court justices who are themselves appointed by the National Assembly based on their political loyalty, and are subject to reappointment only if they satisfy their political bosses.  The monitoring system is such that Supreme Court justices tend to be given responsibility over departments for which their personal interests are highest, creating a situation in which the decisions of lower court judges are based on the personal interests of those meant to monitor those decisions.

b.     There is a general lack of judicial independence.  Judges in Nicaragua do not make decisions independently.  Evidence shows that political factors, and interference by political figures routinely and openly determine the outcome of judicial decisions, including commercial law cases.  In addition, large-scale bribery has been reported to occur for political and for non-political reasons and on behalf of political parties and their bosses, judges and court officers.  Political control is exercised through direct intervention by Supreme Court justices or political bosses to whom judges owe their appointments.  As cases have shown, a failure to follow the instructions of the justices or political bosses automatically brings about dismissal of the objecting judge.

c.     There is an overwhelming consensus in both the local and international community with regard to the lack of impartiality of Nicaraguan courts.  The local community, including business people, lawyers, judges, politicians, and ordinary Nicaraguans, explicitly express distrust for the judicial system.  The international community also believes that Nicaraguan courts are not impartial. Literature from U.S. governmental entities, foreign governments, multilateral organizations, and non-governmental organizations from all around the world all lead to the same conclusion:  Nicaraguan courts are not impartial.

d.     Through the course of my work, I have yet to see a study or report that expresses the contrary view—namely, that there is judicial independence in Nicaragua.

---

[14] September 2005 Petition Before the Inter-American Commission on Human Rights (Ex 39).

e.  Over time, I have not seen any improvements in the Nicaraguan judicial system. There is an apparently unanimous perception that the Nicaraguan judicial system is not independent and virtually every month new developments reveal how political and economic factors interfere directly and openly in the administration of justice.

### Background

13.    I have been asked by counsel for Dole Food Company, Inc., Dow Chemical Company, Shell Oil Company, and Occidental Chemical Corporation to provide my expert opinion on the question of whether the Nicaraguan judicial system provides impartial tribunals in the case of *Miguel Angel Sánchez Osorio, et al., v. Dole Food Company, Inc., et al.*, which concerns the validity and enforceability of a Nicaraguan judgment ("the *Sánchez Osorio* judgment") based on a lawsuit from claimants allegedly exposed to DBCP (dibromochloropropane).

14.    I am over the age of eighteen (18) years, and I am fully competent to make this declaration. Except as otherwise indicated, all facts set forth in this report are based on my personal knowledge, and my opinion is based on my legal expertise and legal and historical knowledge, research and analysis of Nicaragua's judicial system.

15.    I am compensated for my work on this matter at my normal rate of $ 400 per hour. If called to testify in this case, I would provide the following testimony:

16.    I am a lawyer admitted to practice law in Venezuela, New York, the District of Columbia and the United States Court of International Trade. I earned my first law degree as Abogado "cum laude" from the Universidad Católica Andrés Bello in Caracas, Venezuela in 1987. I earned a Masters of Law (LL.M) from Southern Methodist University in Dallas, Texas in May 1992. I also earned a Masters of Philosophy (M.Phil) in International Law of Foreign Investment from the University of Edinburgh in Scotland, United Kingdom in 1997. I am an active member of the Washington DC Bar, where I am chair of the Inter-American Legal Affairs Committee and also a member of the International Dispute Resolution Committee.

17.    I have taught and lectured on law in Latin America, Europe, and North America. From 1993 until 2000, I was a professor of commercial law and corporate law at the Universidad Católica Andrés Bello's Law School in Caracas, Venezuela. I was also a professor of International Law of Foreign Investment at the Universidad Central de Venezuela in Caracas, Venezuela from 1998 until 2000. I was professor of business organizations at the Instituto de Estudios Superiores de Administración in Caracas, Venezuela in 1999 and 2000. I have given lectures on the international law of foreign investment, law and development and Latin America politics at Georgetown University Law Center; Harvard University, the Kennedy School of Government; American University, Washington College of Law; Southern Methodist University; Washington University in St. Louis; and George Washington University in Washington. I am also a professional fellow at the Law Institute of the Americas at Southern Methodist University in Dallas, Texas. I have also lectured in Europe at the Madrid, Spain Bar Association, the University of Edinburgh in the United Kingdom and the University of Oslo in Norway, where I am a fellow of the Academic Network for Legal Empowerment of the Poor.

18.   On January 18, 2005, I presented the results of a Commercial Law assessment of Central America commissioned by the United States Agency for International Development (USAID) at a conference in Guatemala.

19.   I have also published extensively, in both English and Spanish, in Latin America, Europe, and the United States on legal issues.  Since 1993, I have published articles on competition law, the oil and gas sector, mining law, legal reform, telecommunications law, and the international law of foreign investment and arbitration.  I co-authored the "Mergers and Acquisitions in Venezuela" chapter of International Mergers - the Antitrust Process (Rowley & Baker eds.).  Among the journals in which my articles have appeared are: *International Business Lawyer*, published in London, *UK; Mining Journal; World Markets Series- Business Briefing- Latin American Mining & Mineral Extraction; The Journal of World Investment; Oil, Gas and Energy Law Intelligence; Transnational Dispute Management* where I am also an associate editor; *The Interamerican Bar Association Law Review; Latin America Law and Business Report- World Trade Executive; Revista de la Fundación de la Procuraduría General de la República de Venezuela; Revista de la Facultad de Derecho de Universidad Católica Andrés Bello de Venezuela; Revista de la Facultad de Ciencias Jurídicas y Políticas de la Universidad Central de Venezuela; Revista de Derecho Internacional Económico; Revista de Derecho Internacional y MERCOSUR; Revista Iberoamericana de Arbitraje y Mediación; Ensayos de Derecho Mercantil, Libro Homenaje a Jorge Enrique Núñez, Colección Tribunal Supremo de Justicia, Caracas, Venezuela; Northwestern University School of Law, Law and Economics papers; Southwestern Journal of Law and Trade in the Americas, Law and Business Review of the Americas* where I am also member of the board of editors; *Revista Internacional de Arbitraje;* and *Dispute Resolution Journal.*

20.   Since 2000, I have devoted the majority of my practice to conducting assessments of legal systems and studying legal reform in developing countries.  I have worked on projects relating to this subject sponsored by the World Bank, the Interamerican Development Bank (IDB), the Multilateral Investment Fund (an IDB department), the Foreign Investment Advisory Facility (a World Bank and International Finance Corporation joint service), and the United States Agency for International Development (USAID).

21.   In connection with my work for USAID I developed a methodology to assess the judicial systems of developing countries which consists in analyzing the legal structure of the judiciary, the process of appointment and dismissal of judges, and the operation of courts.

22.   I served as an expert witness concerning the judicial system of Nicaragua in the *Shell Oil Company v. Sonia Eduardo Franco Franco* case before the United States District Court, Central District of California in 2005.

23.   In 2005, a group of high-ranking Nicaraguan government officials, including Ministers, Vice-ministers and heads of regulatory agencies, called upon me to

provide testimony concerning corruption and political control of the judicial system of Nicaragua in the context of a human rights claim filed by the officials against the Republic of Nicaragua before the OAS affiliated Inter-American Commission on Human Rights. (*See* paragraphs 195-204).

24.    I am currently President of BG Consulting, Inc., a consulting firm that specializes in providing economic development services to governments and facilitating international business in emerging markets.  As part of my legal/investment climate assessment practice I have been involved, as a consultant or supervisor, in projects in the following countries in the Americas: Belize, Bolivia, Colombia, Costa Rica, Dominica, Ecuador, El Salvador, Grenada, Guatemala, Honduras, Nicaragua, Panama, Paraguay, Peru, Saint Vincent and The Grenadines, and Venezuela. I have also conducted similar work in Africa.

25.    I have been appointed to the roster of arbitrators of the International Center for Settlement of Investment Disputes (ICSID), and the World Intellectual Property Organization (WIPO).  I am listed in the International Chamber of Commerce (ICC) database and am a member of the dispute resolution board of the Panama-Taiwan trade agreement.  I am also a member of the council of advisors for the Gerson Lehrman Group, a London-based business research and knowledge firm with worldwide presence.

26.    Until the year 2000, and prior to becoming President of BG Consulting, Inc., I was an international partner at the Canadian law firm Macleod Dixon, where I specialized in corporate law matters for foreign companies doing business in Latin America.

27.    In 2004, I was hired as a consultant by Booz Allen & Hamilton to undertake work on behalf of USAID assessing, over a period of ten months, the legal systems of the five Central American countries that signed CAFTA with the United States of America. The result of this work was the CAFTA Trade and Commercial Law Assessment (the USAID CAFTA Assessment).

28.    In this capacity, and as discussed more fully below, I assessed the legal systems of five Central American countries—including Nicaragua—with a focus on company law, contract law and real property.  I researched the legal framework and the legal institutions with respect to issues such as contract enforcement and rule of law, both from a theoretical and practical standpoint.  This involved analyzing the fairness and impartiality of the judiciary.  During the consultancy, I also supervised a group of local lawyers in the gathering of data directed at determining the effectiveness of the local legal systems in the countries studied.

29.    Besides the USAID assessment, I have also undertaken research on Nicaragua's rule of law for an article entitled *Dispute Resolution Process and Enforcing the Rule of Law: Is Arbitration a Viable Alternative to Solving Disputes in Central America?* published in the *Southwestern Journal of Law & Trade in the Americas,* which dealt in one of the sections with the judicial system of the Central American countries,

including Nicaragua. In addition, in 2002 and 2004, my firm, BG Consulting, Inc., was involved in two other projects in Nicaragua on behalf of the Interamerican Development Bank.  In my role as President of BG Consulting, Inc., I supervised this work and analyzed reports assessing the legal framework and institutions of that country.

30.   Attached is a copy of my *curriculum vitae*, which provides further details of my experience and a list of my publications.  *See* Ex. 1.

## Methodology For Forming The Opinions In This Report

31.   During the last several years I have studied extensively the institutions, laws and practices that make up the Nicaraguan legal system.  In particular, from March 2004 until January 2005, as a consultant for the United States Agency for International Development (USAID) and as part of a project led by Booz Allen & Hamilton, I was significantly involved in the assessment of the commercial law framework for each of the five Central American countries, including Nicaragua, as a member of a regional legal and trade reform specialist team.  The country reports, including a regional assessment, were first released in December 2004.  The Nicaragua report was released again in January 2005 with some language modifications.  This Report quotes the later version, which is appended to this document as Exhibit 2.[15]

32.   As described in that report:  "At the request of the United States Agency for International Development (USAID), Booz Allen Hamilton conducted an assessment in August 2004 to analyze strengths, weaknesses, and opportunities for change pertaining to two critical areas in Nicaragua:  Commercial Legal and Institutional Reform (CLIR) and trade facilitation."[16]

33.   The methodology that we used, which is described in some detail below, was developed by Booz Allen & Hamilton, has been subjected to field testing and peer review on a regular basis, and is used by that consulting company worldwide.

34.   Each country report, including the USAID Nicaragua CAFTA Assessment, examines 13 commercial law and trade-related areas designated for assessment by USAID: company law, contracts, real property, collateral law, commercial dispute resolution, bankruptcy, competition policy, international trade, flow of goods and services, flow of people, financial crimes, flow of money, and supporting infrastructure.

---

[15] USAID Nicaragua CAFTA Assessment at I-1 (Ex. 2).

[16] *Id.* at I-1.

35.     In order to provide a broad, "360 degree" assessment, each of these topics is in turn analyzed with regard to four areas: Legal Framework, Implementing Institutions, Supporting Institutions, and Social Dynamics.[17]

36.     As stated in the report: "The assessment process was carried out through much of 2004 in each of the CAFTA countries by a team of expatriate specialists.  In order to gain the highest quality information possible, the CLIR portion of the [process] also employed teams of local experts in each country, which included lawyers, judges, government officials and business leaders, to assist in the collection of data.  The process began in March with a methodology seminar where local experts from the region were introduced to the CLIR methodology.  Following this process, the local experts performed the base assessment for the CLIR portion of the analysis.  With the completion of the base assessment, the expatriate team used this information as well as their own research to discern particular areas of focus prior to arrival in each country….While in each country, the team interviewed numerous government officials, nongovernmental organizations, multilateral and bilateral donor agencies, judges, lawyers, notaries, investors, associations, and chambers of numerous industries, trade and customs experts, and other domestic and international businesspeople to assess the trade and commercial legal environment of each country."[18]

37.     As a member of the regional specialist team, I was specifically responsible for assessing the legal framework, implementing institutions including the judicial system, supporting institutions, and social dynamic of each country as they pertained to company law, real property law, and contracts law.

38.     In that capacity, in Nicaragua, I personally conducted more than 50 interviews of lawyers, businesspeople, academics, and governmental officers.  I also surveyed documents, reports, news, and local laws.  In addition, I had extensive discussions with other members of the consulting team who had interviewed other people during the USAID CAFTA Assessment process.  In total, the Nicaragua team interviewed approximately 100 individuals.  I also drafted the sections of the country reports that related to company, real property, and contract law and edited them after USAID's review.  Likewise, I drafted and edited the sections that pertained to rule of law issues.

39.     In the process of interviewing, particular emphasis was placed on collecting data from a broad spectrum of stakeholders to capture a complete picture.  To ensure the consistency and accuracy of gathered information, results were validated by persons from different sectors or having different interests.  For example, input from chambers of commerce was compared to that of workers' unions.

---

[17] *Id.* at I-5-I-6 (describing the "Assessment Methodology:  A 360° Review").

[18] *Id.* at  I-2–I-3.

40.    In Nicaragua, unlike the other Central American countries, USAID prohibited the international team from communicating with current officers and justices of the Nicaraguan Supreme Court or with any current members of the Nicaraguan judiciary, because it believed that the Nicaraguan judiciary was too corrupt to be a reliable source of information. Thus, we validated our findings based on meetings with lawyers, local experts, and former judges instead of current judges. In many respects, this resulted in a more thorough consideration of the Nicaraguan judiciary and judicial system than we performed in the other countries, in part because it meant we conducted many additional interviews in Nicaragua. This was the only aspect in which our work in Nicaragua differed from what we did in other countries.

41.    The assessment concluded in January 2005 with a three-day seminar in which the final regional results were presented to all five CAFTA countries. The participants divided into different groups, including an investors group that I facilitated. Concern about the rule of law in Nicaragua was an overriding theme of our discussion. *See* USAID Nicaragua CAFTA Assessment at I-2 (explaining that a consistent theme in all the sub-groups was "the crisis in Nicaragua's judiciary, attributable to its entrenchment in politics and weak support systems for judges").

42.    All of the work described above—including the conclusions reached and the publication of the USAID CAFTA Assessment—occurred prior to my being contacted about serving as an expert witness in the DBCP cases.

43.    Since being retained in this case, as I examined the Nicaraguan judicial system and considered the questions presented further, I spoke with other experts and surveyed and considered many sources which are, due to their reputation for thoroughness and objectivity, widely used by experts in the assessment of judicial systems. These sources included governmental and non-governmental sources, press accounts, and scholarly books. The materials that I relied upon in preparing this report are listed below and cited throughout this report as exhibits. I describe them in detail in exhibit 3.

a.    U.S. Department of State, Country Reports on Human Rights Practices for the years 1994-2007 (State Dep't Nicaragua Country Reports (year)).

b.    USAID's Nicaragua Country Plan, for the FY 2003-2008 (USAID Nicaragua Country Plan (year)).

c.    U.S. Department of State Commercial Guides 2000-2005 (Country Commercial Guide (year)).

d.    Office of the U.S. Trade Representative, National Trade Estimate Report on Foreign Trade Barriers, Nicaragua 2001-2006 (USTR Trade Barrier Report (year)).

e.    USAID Congressional Budget Justification for Nicaragua 2001-2006 (USAID Budget Justification (year)).

f.    U.S. Department of State, Country Reports on Terrorism 2000-2007 (State Dep't Country Report on Terrorism).

g.    U.S. Department of State, Bureau of Western Hemisphere Affairs, Background Note-Nicaragua 2005-2007.

h.  U.S. Department of State, Bureau of International Narcotics and Law Enforcement Affairs 2005-2008 (State Dep't Bureau of Int'l Narcotics and Law Enforcement Affairs (year)).

i.  U.S. 109th Congress, 1st Session, House of Representatives, Resolution 252, September 27, 2005 (Res. 252, U.S. 109th Congress ).

j.  Justice in Nicaragua, European Union report of August 2006 (European Union Report).

k.  Swedish Agency for International Development Report 2003 (Swedish Report).

l.  Governance Research Indicator Country Snapshot, World Bank for 1996-2006 (World Bank Governance Indicators (year)).

m.  World Bank Corporate and Public Ethics Indices for 2002 and 2005.

n.  World Bank Enterprise Surveys on Courts 2003.

o.  United Nations Development Program (UNDP), 2000 Human Development Report, Chapter 9 (2000 UNDP Report).

p.  Transparency International, Global Corruption Report—Corruption in Judicial Systems 2007 (Transparency Int'l Global Corruption Report).

q.  Transparency International Global Corruption Barometer 2005 (Corruption Barometer).

r.  Transparency International, National Integrity System Report on Nicaragua 2003.

s.  Transparency International Nicaragua Country Report 2007 (Transparency Int'l Nicaragua Report).

t.  Heritage Foundation Index of Economic Freedom, (Heritage Foundation Index of Economic Freedom (year)).

u.  Heritage Foundation, Backgrounder, *Help Nicaraguan Democrats Block "Creeping Coup"*, Stephen Johnson, November 7, 2005 (*Help Nicaraguan Democrats Block "Creeping Coup"*).

v.  Global Integrity, Country Report, Nicaragua 2006 (Global Integrity Nicaragua Report).

w.  Freedom House, Country Report—Nicaragua 2006 (Freedom House Nicaragua).

x.  The Center for Justice and International Law (CEJIL) 2004 Report (CEJIL Report).

y.  The Due Process of Law Foundation (DPLF), 2007 Report on Judicial Corruption in Central America, (DPLF Report).

z.  Bertelsmann Transformation Index, Nicaragua Report 2006, 2008 (Bertelsmann Transformation Nicaragua Index (year)).

aa.  Business Anti-Corruption Portal, Nicaragua Country Profile 2007 (Business Anti-Corruption Portal).

bb.  Latinobarómetro, Table on Trustworthiness of the Judicial System in Latin America 2000-2006 (Latinobarómetro).

cc.  Instituto Internacional de Estudios Anticorrupción 2005-2006 (INEA).

dd.  International Commission of Jurists, press release on the visit of the International Commission of Jurists to Nicaragua, October 27, 2006 (International Commission of Jurists).

ee.  Professor Alejandro Miguel Garro's declaration presented in the *Shell Oil Company v. Sonia Eduarda Franco Franco, et al.* case on March 14, 2005 at the United States District Court, Central District of California (Garro Report).

ff.   Manuel Arauz and Ma. Asunción Moreno, *Imagen de Justicia* (2001) (Image of Justice).

gg.   David R. Dye, Patchwork Democracy: Nicaraguan Politics Ten Years After the Fall, Hemisphere Initiatives (Nov. 2000) (Patchwork Democracy).

hh.   David R. Dye, Democracy Adrift: Caudillo Politics in Nicaragua (2004) (Democracy Adrift*)*.

ii.   Civic Group Ethics and Transparency, Citizens' Perception of Justice in Nicaragua 2004 (Perception of Justice).

jj.   Movimiento Nicaragua (Nicaragua Movement), presentation to the Inter-American Commission on Human Rights, October 10, 2005 (Movimiento Nicaragua Presentation).

kk.   Petition by some Governmental Ministers to the Inter-American Commission on Human Rights, September 25, 2005 (September 2005 Petition Before the Inter-American Commission on Human Rights.).

ll.   Nicaraguan Center on Human Rights (CENIDH), presentation to the Inter-American Commission on Human Rights, October 14, 2005 (CENIDH Presentation).

mm.   Omar García-Bolívar, *"LA IMPARCIALIDAD DEL SISTEMA JUDICIAL NICARAGÜENSE: ¿CUÁLES SON LOS HECHOS, CUÁLES SON LOS INDICADORES, CUÁL ES LA OPINIÓN DEL MUNDO Y DE LOS NICARAGÜENSES?"*, September 2005 (García-Bolívar Testimony)

nn.   Nicaraguan Center on Human Rights (CENIDH) Human Rights Report 2004-2006 (CENIDH Human Rights Report (year)).

oo.   Institute of Strategic Studies and Public Policies Survey on Perceptions on Security 2007.

pp.   Documents from the Week for Judicial Independence (Document for Judicial Independence Week (author)).

qq.   Various newspaper articles about Nicaragua and its judicial system, including ones that appeared in the *Washington Post*, *Miami Herald*, *The Economist*, and Nicaraguan newspapers such as *La Prensa*, *El Nuevo Diario*, and *Confidencial*.

rr.   The Economist Intelligence Unit, Nicaragua Report 2003-2004.

ss.   Statements from government officials, including  statements by the United States Ambassadors to Nicaragua from 2003 and from 2006-2007.

## Opinion

44.   Based on the data set forth in the remainder of this declaration, the sources discussed above, interviews conducted, and knowledge I obtained in the course of my work on the CAFTA Trade and Commercial Law assessment process for USAID, it is my opinion that, at least since the underlying lawsuit was filed in Nicaragua in 2002, the Nicaraguan judicial system has not provided impartial tribunals.

45.   At every judicial level, judges are appointed based on political party loyalty and are ultimately accountable for their rulings to the country's political bosses.  The lack of impartiality of judges is both created by and exacerbated by the ease with which lower court judges can be removed without just cause.

46. Evidence of the pervasive lack of impartiality is found in the overwhelming number of cases in which judges failed to make judicial decisions based upon legal merits, but instead apparently based their decisions on political control and/or bribery.

47. For reasons discussed below in this report, since the year 2000, the level of political control and corruption in the Nicaraguan judiciary has been at a high point in the country's recent history.

48. The lack of independence of the judicial system in Nicaragua is widespread. Political control and corruption are present in all type of cases, including civil and criminal cases.

49. There is an overwhelming consensus in both the local and international community with regard to the lack of impartiality of Nicaraguan courts.

50. Nicaragua's judicial system ranks among the weakest in the Central American region. Foreigners and Nicaraguans alike are victims of this fundamentally flawed judicial system.

51. Over time, I have not seen any improvements in the Nicaraguan judicial system. On the contrary, the conditions required for an independent judiciary have deteriorated over time and have worsened recently with undisputable evidence of direct and open political interference with the appointment of judges and the outcome of their decisions.

52. Accordingly, it is my professional opinion that Nicaragua's judicial system is not fair and is not impartial.

## Background on the Nicaraguan Judicial System

### *Brief Political History*

53. The judicial system of Nicaragua is substantially influenced by the country's political history. Prior to 1979 there was an authoritarian regime run by the Somoza family. In 1979, a group of rebels called Sandinistas (after the late nationalist leader Augusto César Sandino) violently ousted the Somozas, following a bloody and lengthy revolution. For the next ten years (1979-1990), the country was ruled by the communist Frente Sandinista de Liberación Nacional (FSLN) headed by Daniel Ortega. During this period, the FSLN placed its party members in positions throughout government institutions.

54. In particular, before leaving power in 1990, the FSLN placed many faithful followers in the judiciary. Through political deals, they have continued to control

the selection of a great many judges. Since at least 2001, it has been reported that more than 70% of the judges in Nicaragua are affiliated with the FSLN party.[19]

55.   In 1990, in a surprise victory, Nicaraguans democratically elected a non-military and non-FSLN President, Mrs. Violeta Chamorro.  With the election of Chamorro, there was optimism that healthy democratic institutions, including an independent judiciary, would take hold in Nicaragua.[20]  At the same time, the country elected a National Assembly, the legislative body empowered to, among other things, pass laws and appoint justices to the Supreme Court.  Since 1990, two political parties, the Partido Liberal Constitucionalista (PLC) and the FSLN, have largely controlled Nicaraguan politics.  In 1996, President Arnoldo Alemán, a member of the PLC, succeeded President Chamorro.

56.   Although in the mid 1990s there were problems of inefficiency, backlog, and intermittent bias in the Nicaraguan judicial system, there was hope at the time that the system was improving.  In contrast, the system has gotten markedly worse with a far higher and more pervasive level of corruption and political influence beginning in the late 1990s and continuing currently.  Moreover, in contrast to the mid 1990s the current system is universally perceived by Nicaraguans as corrupt and incapable of administering even-handed justice. Thus, instead of improving, the situation began to deteriorate in the late 1990s and, beginning in approximately the year 2000, much changed in Nicaragua that directly and negatively impacted the independence of the judicial system.[21]

57.   In 2000, Alemán, who was head of the PLC and President of Nicaragua, and Daniel Ortega, the leader of the FSLN, a former guerrilla commander and former President, struck a deal whereby they established partisan control of key institutions, such as the Supreme Court, dividing control according to their respective political influence. This deal was dubbed by the media and the public as *The Pact*.[22]

58.   The Pact establishes joint party control of three key institutions: the Comptroller General's Office, the Supreme Court of Justice and the Supreme Electoral Council.  In order to effectuate the Pact, the parties passed certain constitutional changes whereby, *inter alia*, they expanded the number of Supreme Court justices from 12 to 16, of which 8 were to be loyal to PLC and 8 to the FSLN.  They then appointed 4 additional justices; two were selected by the PLC and two by the FSLN.  The FSLN appointees were:  Armengol Cuadra, who headed the revolutionary tribunals during

---

[19] *See* State Dep't Nicaragua Country Report (2003) at 6 (Ex. 4j); *see also* Ary Neil Pentoja, "*Sandinistas Controlan Tribunales*," La Prensa, Jun. 11, 2001 (Ex. 48) (indicating that 22 of 27 appellate court judges are Sandinista).

[20] *See* Patchwork Democracy at 3 (Ex. 43).

[21] Democracy Adrift at 44 (Ex. 44).

[22] Patchwork Democracy at 7 (Ex. 43).

the 10 years of the Sandinista Revolution, and Rafael Solís, discussed at paragraphs 80- 83.

59. After the Pact of 2000, the FSLN increased and consolidated its control over the judicial system, creating the system of today which is systemically corrupt and lacking in impartiality. Before the Pact, although at lower levels the judicial system was weak, at the Supreme Court level, some justices were independent and not vulnerable to political control.  Since the Pact, the two main political parties have appointed justices based primarily on party loyalty and political entrenchment and corruption is at a significantly higher level.[23]

60. In 2002, then President of Nicaragua, Enrique Bolaños, a member of the PLC who was Vice President during the Alemán administration, was elected.  Among the first things he did was launch an anti-corruption campaign that targeted former President Alemán.  This had two results.  First, former President Alemán went to prison and then house arrest. Second, the PLC remained loyal to Alemán and, as a result, President Bolaños lost all political power within his own party, the National Assembly, and the country at large.

61. In 2004, the Bolaños administration was virtually paralyzed by the maneuvering orchestrated by Alemán and Ortega. In particular, in October 2004, Alemán and Ortega used their control over the legislative and judicial branches in an effort to remove Bolaños from office. The National Assembly, comprised overwhelmingly of Alemán and Ortega supporters, proclaimed itself "the only organ of government having legal standing" and "invested with hierarchical superiority."[24] In addition, the National Assembly attempted to remove from office high ranking members of Bolaños's cabinet by stripping them of their immunity and initiating criminal proceedings against them in local courts. This situation produced a constitutional crisis that moved the U.S. House of Representatives to pass a resolution condemning the "continued operation of the Alemán-Ortega Pact as detrimental to democracy in the Republic of Nicaragua, the future of democracy in Nicaragua, and the stability in the entire region."[25] Cabinet members subsequently brought a human rights claim against the Republic of Nicaragua in the Inter-American Commission of Human Rights. This is the proceeding in which I was asked by high ranking Nicaraguan government officials to testify on the issue of judicial corruption, as discussed in paragraphs 195-204.

62. As a result of the Pact and until March 15, 2005, the FSLN members of the Supreme Court held the Presidency of the Supreme Court and chaired the powerful disciplinary commission, which was empowered to recommend to the full Supreme

---

[23] Democracy Adrift at 44 (Ex. 44).

[24] "Help Nicaraguan Democrats Block 'Creeping Coup'" at 3 (Ex. 49).

[25] Res. 252, U.S. 109th Congress (Ex. 9).

Court the removal of judges.[26] In practice, when the disciplinary commission made such a recommendation, the full Supreme Court invariably voted to remove.

63.   In August 2005, in implementation of the Pact, the Nicaraguan Supreme Court approved a "medical parole" for and ordered the government to release former President Arnoldo Alemán, although his convictions for fraud and money laundering remained in effect.  The order of the court allowed Alemán to freely move around the country and report periodically to the penitentiary.[27]

64.   On November 5, 2006, FSLN's Daniel Ortega returned to office as President of Nicaragua for a five-year term. He was elected with 38% of the popular vote.[28] Ortega's election was a direct result of the "Pact". Whereas previously any candidate who had obtained less than 50% of the popular votes would have been forced into a runoff, changes to the Constitution orchestrated by Ortega and Alemán as part of the "Pact" allowed Ortega to avoid a second round of elections.[29]

65.   Recent events demonstrate that the strength of the "Pact" and its influence on the judiciary persist to this very day. In 2007, Alemán violated the terms of the "Pact" by failing to support a political initiative by Ortega involving the creation of civic entities known as Councils for Citizens Power (CPC)[30] (discussed below at paragraph 103). In December 2007, in a move widely perceived as a retaliation for Alemán's transgression, a FSLN-controlled court returned Alemán to house confinement.[31] In January 2008, when Alemán instructed PLC-affiliated Supreme Court Justices to support the constitutionality of Ortega's CPCs initiative, a trial judge reinstated Alemán's "medical parole" privilege.[32]

---

[26] In October 2004, a judicial career law was passed by the National Assembly.  Under this law, which entered into effect on March 15, 2005, the Supreme Court remains the entity in charge of appointing judges and recommending removal.  However, the committee charged with this responsibility is now called the National Council of Administration and Judicial Career. The National Council of Administration and Judicial Career is composed of four Supreme Court Justices. On March 15, 2005, the PLC and the FSLN appointed two justices each. Rafael Solís, the former head of the disciplinary committee, was appointed as substitute member. Mirna Velásquez Sevilla, "*Liberales asumen mando en la Corte Suprema de Justicia,*" La Prensa, Mar. 16, 2005 (Ex. 50).

[27] Eloísa Ibarra and Esteban Solís, "*Asalto a la Justicia,*" El Nuevo Diario, Jul. 26, 2005 (Ex. 51).

[28] "*Ortega declarado Presidente,*" El Nuevo Diario, Nov. 7, 2006 (Ex. 52).

[29] Democracy Adrift at 13 (Ex. 44).

[30] María José Uriarte, Eduardo Cruz Sánchez, "*El Chile por cárcel, otra vez,*" La Prensa, Dec. 14, 2007 (Ex. 53).

[31] Eloísa Ibarra, "*Sentencia del TAM cortó rabo y oreja,*" El Nuevo Diario, Dec. 14, 2007 (Ex. 54).

[32] Ludwin Loáisiga López y Eduardo Cruz Sánchez, "*Corte sirve combo a Ortega y Alemán,*" La Prensa, Jan. 11, 2008 (Ex. 55).

66.   The 2007 Nicaragua Report produced by the international NGO Transparency
      International highlights the impact of the Pact on the lack of independence of
      Nicaraguan judicial system. It states: "In Nicaragua there is a serious problem,
      because two fundamental institutions, the judicial branch and the electoral system
      function on the basis of partisan interests...however, beyond any doubt, the latter
      refuse to reform a Judicial system and a Supreme Electoral Council so that they will
      renounce to the tyranny of a two party system. The result has been a generalized
      institutional crisis that severely impacts the credibility of the Judicial Branch (The
      Supreme Court of Justice)...The Supreme Court of Justice is in charge of organizing
      and directing the administration of justice. Unfortunately, on account of the pact
      between the Liberals and the Sandinistas, this branch is one of the entities, according
      to the opinion polls, that has the least credibility, because it has been involved in acts
      of corruption."[33]

### *Basic Structure of the Courts*

67.   The Judicial System of Nicaragua is governed by the Organic Law of the Judiciary.
      The highest judicial authority is the Supreme Court, which is composed of 16
      justices who are appointed for 5-year terms.  The Supreme Court is divided into four
      chambers, each of which deals with criminal, civil, constitutional, or administrative
      law.  Supreme Court decisions are final.

68.   Below the Supreme Court there are 9 appellate courts composed of at least 5 judges
      and divided into at least two chambers.  The appellate courts review the trial court
      decisions in civil, labor, and criminal cases.  Judges of the appellate courts are
      appointed and can be removed by the Supreme Court.

69.   There are also 21 trial courts for civil and commercial matters.  These are one-judge
      courts also appointed and subject to removal by the Supreme Court.  There are also
      municipal courts in each municipality to try cases in which the maximum penalties
      are less than three years imprisonment.  Altogether, there are 242 courts in the
      country.  These include, among others, 9 appellate courts, 21 civil trial courts, and
      24 criminal trial courts.

70.   In addition to its judicial functions, the Supreme Court has administrative duties
      such as the appointment and removal of lower-court judges, something that in
      practice occurs at will.  Until March 15, 2005, the Supreme Court had three
      commissions responsible for administering these functions:  the Administrative
      Commission, the Judicial Career Commission and the Disciplinary Commission.
      The Disciplinary Commission had the authority to recommend the removal of
      judges; given that such recommendations were followed by the Supreme Court as a
      matter of course, the commission was considered the most powerful of the
      administrative bodies.  The Disciplinary Commission was made up of three justices

---

[33] Transparency Int'l Nicaragua Report (2007) at 60 (Ex. 27b).

and headed by Justice Rafael Solís, who is discussed in greater detail below (*See* paragraph 80).

71.     In March 2005, the Law on Judicial Career entered into effect. On its face, the Law purports to create a merit system for the appointment of judges. However, the Law has never been implemented. The necessary implementing regulations have not come into effect.[34] On August 17, 2007, more than 1100 prominent Nicaraguans issued a statement protesting the situation: "In our country, it is vital to apply really and effectively the Law on Judicial Careers, a statute that since it was enacted (in 2005) has not been implemented in any effective way.  There still continue to be appointments of judges and justices based on criteria other than ability, transparency, public competition and merit."[35]

72.     The 2006 U.S. State Department Report on Human Rights on Nicaragua is paradigmatic of the state of affairs in the judiciary after the enactment of the Law on Judicial Career: "On September 26, FSLN Deputy Chief Justice of the CSJ Rafael Solis appointed 10 judges to the trial bench. He acknowledged that he made these appointments in violation of the provisions of the Judicial Career Law."[36]

73.     The Law on Judicial Career creates a new body, the National Council of Administration and Judicial Career, to be responsible for the appointment and discipline of the judges. However, because the Law has never been implemented, the Council is operating entirely at the discretion of its members who continue to appoint and remove judges based on party loyalty rather than merit.[37]  Noticeably, the Council is composed of  four Justices, two from the FSLN and two from the PLC, and is headed by Chief Justice Manuel Martínez, the same Justice who authorized the release of US $ 609,000 in the "Narco Dollars" case discussed below at paragraph 101.

### *Lack of Independence of Judges*

74.     Judges in Nicaragua are appointed according to their political affiliation and loyalty and can be easily dismissed if they fail to respond to powerful political interests.

---

[34] Mirna Velásquez Sevilla, "*Pacto entra en crisis en la Corte,*" La Prensa, Jul. 7, 2007 (Ex. 56); Mirna Velásquez Sevilla, "*Corte se burla de Ley de Carrera Judicial,*" La Prensa, June 12, 2007 (Ex. 57); Eloísa Ibarra, "*Continúan dedazos y normativa esperando,*" El Nuevo Diario, June 12, 2007 (Ex. 58); Mirna Velásquez Sevilla, "*CSJ elegirá a los jueces de familia,*" La Prensa, Oct 15, 2007 (Ex. 59). I recently learned that early this month a divided Supreme Court approved the implementing regulations for the Law on Judicial Career, but they have not been published and have not come into effect.

[35] "*Declaración Ciudadana por la Independencia Judicial y el Estado de Derecho,*" Aug. 17, 2007 (Ex. 60).

[36] State Dep't Nicaragua Country Report (2006) at 5 (Ex. 4m).

[37] State Dep't Nicaragua Country Report (2007) at 3 (Ex. 4n).

They are also paid little and afforded few marks of respect, thus increasing the likelihood of corruption. Nicaragua's constitutional structure and electoral system contribute to the politicization of its judges.

75.   Nicaraguans elect members of the National Assembly by selecting candidates from inflexible lists presented by political parties. As a result, the members of the Assembly are accountable to political parties and their bosses—Alemán and Ortega—far more than to voters. In turn, Assembly members appoint Supreme Court justices based on party loyalty.[38] Supreme Court justices appoint the lower court judges using that same criterion—political loyalty.[39] In practice, only those lower court judges approved by the party leadership are appointed. During an interview in connection with the USAID Nicaragua CAFTA Assessment, a senior Nicaraguan official told me that the political climate of the country is such that the Assembly need not gather to appoint justices; rather, the real decisions can be made in a Volkswagen Beetle, since only two people really matter: the leaders of the two main political parties.

76.   Supreme Court justices serve for fixed 5-year terms, and their re-appointment is handled in the same politicized fashion.[40] Thus, to maintain their positions, they must continue to please the party bosses to whom they owe their appointments.

77.   ***The Feudal ("Feudo") System.*** Independence in the judiciary is further undermined due to an informal feudal system (in Spanish, "feudo") that has been established. Formally, each Supreme Court justice is assigned to monitor all judges within one of Nicaragua's geographical/political departments. In practice, the manner in which departments are allocated to a Supreme Court justice is often based on the degree to which a justice has personal interests in a particular department. Justices are more likely to be given monitoring responsibilities for departments to which they have personal ties. This creates a situation of judicial fiefdoms where Supreme Court Justices, seen by lower court judges as "*padrinos,*" *i.e.*, godfather-like "protector" figures, often monitor the courts in which they are most likely to interfere due to bias or personal interests.[41] Commonly, justices in charge of specific departments are called "*dueños de feudo,*" *i.e.*, fiefdom owners.

---

[38] In March 2007, the National Assembly appointed 4 new Justices to the Supreme Court. It was evenly divided between the FSLN and the PLC. Two of the Justices whose terms had expired were appointed for additional five year terms. "*Sandinistas y liberales se reparten cargos públicos,*" El Nuevo Diario, March 28, 2007 (Ex. 61).

[39] Janelys Carillo Barrios, "*Padrinazgos y Feudos en CSJ,*" La Prensa, May 6, 2001 (Ex. 62); *see also* "*Magistrados Confirman Proteccionismo,*" La Prensa, May 6, 2001 (Ex. 63).

[40] USAID Nicaragua CAFTA Assessment at IX-7 (Ex. 2).

[41] *See* Patchwork Democracy at 22 (Ex. 43).

78.  As *"padrino"* for a particular lower court judge, the supervising justice is responsible for protecting the judge from removal.  If he or she chooses to withdraw his protection, however, it will virtually guarantee the lower court judge's removal. This power affords a strong opportunity to control the lower court judge's rulings.[42] Judges without *"padrinos"* are usually subject to arbitrary treatment.  For example, reports indicate that Judge Guillermo Estrada of Managua had a reputation as a serious and independent judge.  However, because he lacked *"padrinos,"* he was transferred to the Atlantic coast, where living conditions are poor.  He considered the transfer an indirect termination and resigned. [43]

79.  In 2008, Nicaraguan political analyst Valentín Barahona Mejías wrote: "A justice dedicates the five years he is on the bench to tending his flock, which is a department of the country, assigned by his peers on the CSJ, in which territory he acts as a feudal [lord], having sufficient authority to appoint or dismiss any Civil, Criminal, or Substitute Judge... In the Department, nothing moves without the authorization and will of the justice. If a justice or judge does not work due to ineptitude, or inefficiency, even though there are well-founded complaints of corruption, this is not of interest to the justice; because of that laziness the image of the Judicial Branch deteriorates more and more daily in the eyes of the Nicaraguan people and internationally With the current system of electing justices, it is proven ad nauseam that that model is completely marred. It is prone to corruption; the justices do not have independence and the public official is a prisoner of politics and politicians. Under the current system, there are no conditions for imparting justice fairly, equitably, and expeditiously, where the guide is the Constitution and the Law. If the CSJ, as head of the Judicial Branch, is in a deplorable state, the rest of the body (lower judges) is also in terrible condition."[44]

80.  ***Supreme Court Justice Rafael Solís.***  Appointed to the Supreme Court solely on basis of his affiliation to the FSLN,[45] he is widely known to exert control over significant portions of the judicial system. He was head of the Supreme Court disciplinary commission from 2002 until March 15, 2005, and has been Deputy Chief Justice (Vice President) since then.[46] Supreme Court Justice Rafael Solís is considered a linchpin in a small network of individuals who enable power over the

---

[42] *Id.*

[43] José Adán Silva, *"Magistrado del TAM Renuncia,"* La Prensa, Mar. 5, 2005 (Ex. 64).

[44] Valentín Barahona Mejía, *"Elección de magistrados a la Corte Suprema de Justicia,"* EL Nuevo Diario, Feb. 25, 2008 (Ex. 65).

[45] Edgard Barberena S., *"Dos para vos...Dos para mí,"* El Nuevo Diario, Mar. 2, 2000 (Ex. 66).

[46] In March 16, 2005, Rafael Solís was elected Deputy Chief Justice of the Nicaraguan Supreme Court, Mirna Velásquez Sevilla, *"Liberales asumen mando en la Corte Suprema de Justicia,"* La Prensa, Mar. 16, 2005 (Ex. 50).

judiciary to converge at Daniel Ortega,[47] and Solís has himself previously represented DBCP claimants.[48]

81.   Solís, a former *guerrilla,* National Assembly member, legal practitioner and an active member of the FSLN, is widely reputed to be a profoundly corrupt figure. Indeed, according to a report, the United States State Department in 2004 revoked Solís' U.S. visa pursuant to "§ 212(f) of the U.S. law of Immigration and Nationality, which bars entry into the U.S., [of] persons that have committed or benefited from corruption in the performance of public functions."[49]

82.   The 2004 State Department Report on Nicaragua stated: "[T]he Supreme Court's disciplinary commission, which is charged with overseeing judges' ethics and conduct, was chaired by Rafael Solís, a corrupt Supreme Court justice with close ties to the FSLN."[50]

83.   At the time of his appointment to the Supreme Court, Solís vowed publicly to defend the interests of the FSLN in the Supreme Court.[51]

84.   ***Reports on judicial independence.*** The impact of the judicial appointment system on the independence of judges was highlighted by Transparency International in its 2007 Report on Nicaragua: "Justice is the weakest point within the democratic institutions in Nicaragua, because the Judicial Branch is directly influenced by the pact....'the partisanship and the political subservice of the judges has their origin in the appointment of the magistrates that compose the Supreme Court of Justice...,'"[52] which are appointed according to political party quotas between the two main parties PLC and FSLN.[53] "[T]he image of corruption concerning the four branches of the State is highest for the Supreme Court of Justice...[d]espite the fact that there is a Law on Judicial Career, the mechanisms provided therein for appointments, promotions and demotions are not duly implemented....For this reason, there persists patent subjectivity in these processes, which in turn generates a

---

[47] *See* Democracy Adrift at 48 n.179 (Ex. 44).

[48] *See infra* ¶ 108.

[49] Mario Jose Moncada, "*Revocan Visa de E.E.U.U. al Magistrado Rafael Solís,*" La Prensa, May 6, 2004 (Ex. 67); *see also* Ludwin Loaisiqa, "*Revocan Visa a Otro Magistrado de la Suprema,*" La Prensa, Feb. 26, 2005 (Ex. 68).

[50] State Dep't Nicaragua Country Report (2004) at 5 (Ex. 4k).

[51] Edgard Barberena S., "*Dos para vos...Dos para mí,*" El Nuevo Diario, March 2, 2000 (Ex.66).

[52] Transparency Int'l Nicaragua Report (2007) at 60 (Ex. 27b).

[53] *Id.* at 29.

replication, within the Judicial Branch, of the same vices of political interference that are observed in the appointment of the high court."[54]

85.     Nicaraguan op-ed writer and political analyst María José Zamora summarized the situation as follows: "One of the main problems affecting democracy in Nicaragua is precisely the political party intervention in the branches of government, of which the judicial branch is not excluded…justices are elected based on their unconditional loyalty and obedience to the leaders of some parties and not based exclusively on their capacity and honorability…This has brought about the degradation of the States institutions, which instead of serving the interests of the citizens…become instruments of repression, coercion, corruption and bribery…The justice in Nicaragua is not granted with independence and impartiality, for which it is not true that in this country there is respect for the rule of law."[55]

## Level of Corruption and Political Control in the Daily Operation of the Courts between 2000 and 2007

86.     Corruption in Nicaraguan courts is widespread, both in the form of bribery and political control.  Given the way in which judges are appointed and removed and the *feudo* system, Supreme Court justices wield direct influence over lower court judges. It is widely known that Supreme Court justices call judges to demand that a decision be made in a direction that favors their personal interests or that of the FSLN party, the PLC party, or party allies.  Because their position on the court is often at stake, lower court judges reportedly feel significant pressure to comply with Supreme Court justices' demands.

87.     In addition to the incident involving Solís and Gutierrez discussed at paragraph 100, other examples of political control over lower court judges are regularly discussed in the press and the literature examining the Nicaraguan judiciary.[56]

88.     The political corruption of the Nicaraguan judicial system can be summarized as follows:  the bosses of the FSLN party (Ortega) and the PLC party (Alemán) firmly control the legislature.  The legislature, in turn, appoints and removes Supreme Court justices.  Thus, Supreme Court justices are also tightly controlled by Ortega and Alemán.  Supreme Court justices, in turn, control lower court judges through the *feudo* system.

---

[54] *Id.* at 60.

[55] Document for Judicial Independence Week (Zamora) (Ex. 36c).

[56] Image of Justice at 71-72 (2001) (quoting a judge who received calls from two Supreme Court justices asking her to "be flexible when considering the facts" and to be "nice to a friend" and who was subsequently dismissed for failing to give in to this pressure) (Ex. 32).

89.     To be clear:  the political control to which I am referring should not be understood merely as *ideological* or partisan influence.  Rather, corrupt Supreme Court justices (and the party bosses through them) unilaterally dictate the outcome of cases without regard to the facts and law.

90.     In addition to—and interconnected with—this political corruption, there is bribery, which is also ubiquitous.  It has been repeatedly reported that some Supreme Court justices are paid by interested parties to exert influence over lower court judges.  It is widely believed that many of the recent notorious and high profile, biased, civil law decisions are the result of Supreme Court justices affiliated with the FSLN receiving significant amounts of money meant ultimately to be contributions to the FSLN.[57]

91.     There are also systemic factors that make the corruption discussed above likely to flourish.  For example, judges are not well trained or well-paid.  Many lack knowledge regarding international business transactions and the international laws to which Nicaragua is a party.  Moreover, judges' salaries are low and often are supplemented by other employment.  It has been reported that some judges sell various items to parties in the cases before them in order to supplement their primary income.  Other judges are reported to ask parties openly for money to cover personal matters such as weddings.  Practicing lawyers understand that to refuse to buy the products being sold by judges in court or to refuse to contribute to the judges' personal needs would undermine the lawyers' chances of prevailing.

92.     Judicial personnel are also typically poorly trained and poorly compensated.  It is common practice for clerks to ask for extra money in order to process requests such as supplying an attorney with a copy of a writ or service of process notifications.  Corruption in the form of "speed money" is widely requested by court officers.  It has also been reported that clerks serve as intermediaries, asking for money on a judge's behalf in exchange for a favorable decision.

93.     Judicial corruption has historically been a serious problem in Nicaragua.  There was, however, optimism and hope that reforms would take hold in the 1990's.  These hopes have been dashed; based upon my research; it is the widely held view that in recent years corruption in the judiciary has reached an all-time high in Nicaragua.

94.     This point is particularly well summarized by journalist and author David Dye: "Nicaraguans have never known a judicial system free from political interference and manipulation…. Despite these realities, tepid reforms in the late 1990's managed to clean out some of the most incompetent and corrupt elements and put the whole system on a sounder legal footing… Since 2000, however, politicization has reportedly become much more pervasive and pernicious…. Moreover, the tendency for Supreme and appellate court magistrates to interfere in and direct the decisions of judges in specific cases has become widespread and flagrant, to the

---

[57] *See* Democracy Adrift at 46-47 (Ex. 44).

point recently of sparking a subdued protest from among the lower ranks ('they call you for anything at all," one unnamed judge exclaimed).'[58]

## Examples of Recent High Profile Cases Widely Understood To Involve Corruption and Political Interference

95.     Since the 2000 Pact, the level of corruption in Nicaragua's judicial system has deepened.  In addition to the discussion of this in the literature, it is further demonstrated by many recent high-profile civil cases that are widely considered to have been decided based upon political influence and corruption.  Although there are many examples, a few of the cases discussed extensively in Nicaragua and reported in the press and literature include:

96.     The Parmalat Case:  During a suit between a banker named Montealegre and Bancentro's owner, Zamora, in which Montealegre sought to recover $6 million in debt from Zamora, the judge appointed Montealegre as an intervener to the Nicaraguan subsidiary of the Italian company, Parmalat, presumably to allow Montealegre to recover his debt from Parmalat, which was one of Bancentro's debtors. It is widely believed that the judicial action in this case had nothing to do with the law or facts of the case, but instead was the result of the politically motivated interference of Justice Rafael Solís.[59]

97.     The INETER Case:  Public suspicion of the Supreme Court was again aroused in March 2005, when the Supreme Court ruled in favor of a government official who was widely considered to be corrupt.  The officer had issued fake certificates, which resulted in revocation or transfer of the land titles of 250 families in Managua.  The officer was terminated as a consequence, but the Supreme Court ruled in favor of the officer and ordered his reinstatement and payment of income lost due to his termination.[60]

98.     The BANIC Case:  In 1999, a group of private investors bought a state-owned bank, BANIC.  Although the Comptroller General ruled the purchase invalid, the Supreme Court upheld the sale, relying on a repealed law.  It later became public that one of the investors was a close friend of President Alemán, and it is widely believed that political control determined the outcome of the case.[61]

---

[58] See, e.g., id.

[59] Mirna Velázquez Sevilla and Jorge Lodisiga, "Juez Entrega Acciones de Parmalat a Montealegre," La Prensa, Jun. 24, 2004 (Ex. 69).  Shortly after the court's ruling, the prevailing party was seen celebrating with Supreme Court Justice Solís. Jose Adan Silva, and Amparo Aguilera, "Solis y Montealegre Niegan 'Celebracion,'" La Prensa, Aug. 20, 2004 (Ex. 70).  For an extended discussion of the Parmalat case, see also Democracy Adrift at 51-52 (Ex. 44).

[60] Jose Loaisiga Mayorga, "Suprema Falla Contra INETER," La Prensa, Mar. 4, 2005 (Ex. 71).

[61] Patchwork Democracy at 24 (Ex. 43).

99.   The ENITEL Case:  In 2001, the Supreme Court upheld the privatization of the State
      Telephone Company ENITEL.  It is reported that in order to reach this result, a lack
      of quorum of the Constitutional Chamber of the Supreme Court was improperly
      overcome by bringing in selected justices from other chambers who would vote for a
      result that favored President Alemán.[62]

100.  Judge Altamirano: Judge Rosario Altamirano was presiding over the criminal trial of
      Walter Gutierrez, a friend and protégée of Supreme Court Justice Rafael Solís.
      According to the public statement Solís called her to "recommend" Mr. Gutierrez.
      Judge Altamirano, also said publicly that she had been threatened by Supreme Court
      Justice Rafael Solís in order to force her to issue a decision in favor of Gutierrez.[63]
      Two days after she spoke publicly about these threats, the judge was terminated by
      the Supreme Court and forced into retirement.[64]

101.  The "NARCO DOLLARS" Case:  On the morning of September 28, 2005, two
      Supreme Court Justices, including Chief Justice Manuel Martínez, released U.S. $
      609,000 that had been confiscated from an alleged drug dealer convicted for money
      laundering from a Supreme Court bank account to four lower level judges, without
      justification. After much public outcry the lower judges were removed --although the
      funds were not returned-- but no sanctions were imposed on the Supreme Court
      Justices; instead they were reappointed for another term.[65] This scandal was widely
      criticized by the U.S. Government. The 2007 International Narcotics Control
      Strategy Report of the Bureau of International Narcotics and Law Enforcement
      Affairs of the U.S. State Department said: "Corruption within the judiciary is a
      serious problem; judges often let detained drug suspects go free after a short
      detention, a practice that puts drug traffickers back on the streets and thus increases
      the threat of money laundering. In a recent high profile, case judges released over
      $600,000 of funds from a suspected drug trafficker. From all indications, a number
      of judges may have been involved in the case and may have received payoffs…. Due
      to the rampant corruption in the Nicaraguan judiciary, the United States has cut off
      direct assistance to the Nicaraguan Supreme Court."[66]

---

[62] Image of Justice at 74 (Ex. 32).

[63] Mirna Velazquez Sevilla, *"Todo Fue un Mal Entendido," Payo*, La Prensa Jan. 15, 2005 (Ex. 72).

[64] Mirna Velazquez Sevilla, *"Corte no Vio 'el Fondo' en Caso Altamirano,"* La Prensa Jan. 20, 2005 (Ex. 73); Mirna
Velazquez Sevilla, *"Sacan 'Trapos' a Solís,"* La Prensa Jan. 20, 2005 (Ex. 74); Heberto Rodríguez, *"Una juez que
cayó por no entregar dólares,"* El Nuevo Diario, Nov. 9, 2005 (Ex. 75).

[65] Octavio Enríquez, *"Arguello explica su jugada,"* La Prensa, Dec. 18, 2005 (Ex. 76); Mirna Velásquez, Miguel
Flores, Carlos Martínez, *"Investigan a Magistrados,"* La Prensa, Nov. 30, 2005 (Ex. 77); Mirna Velásquez Sevilla,
*"Sandinistas ceden en Narcodólares,"* La Prensa, Dec. 13, 2005 (Ex. 78); CENIDH Human Rights Report (2006) at
24 (Ex. 34b).

[66] State Dep't Bureau of Int'l Narcotics and Law Enforcement Affairs (Ex. 79).

102.   The "ESSO" Case: In 2007, based on a complaint filed by the Nicaraguan Customs Authority alleging that American oil company Esso Standard Oil was late in paying its customs duties, Judge Socorro Toruño Martínez, the District Court judge who issued the judgment in the underlying *Sanchéz Osorio* case, ordered seizure of all the company's facilities. The judicial measure was taken without requesting that the Customs Authority post a bond, as required by law, and without affording Esso other due process guarantees, such as service of process.[67] Reportedly the court appointed a government officer to act as a temporary administrator of Esso's assets on behalf of the Customs Authority. The government officer leased some of Esso's tanks to the Nicaraguan State owned Petroleum Company, which needed them to store petroleum.[68] Subsequently, the facilities were returned to Esso, but remained subject to the government-imposed lease with the Nicaraguan State owned Petroleum Company.[69] Under political pressure Esso settled with the Government of Nicaragua and allowed it to use its facilities[70] but outrage for violation of basic principles of rule of law was widely expressed.[71] The U.S. Ambassador to Nicaragua, Paul Trivelli, said "that action was unjustified, amounted to confiscation and was of great concern."[72] The U.S. Ambassador also urged the Nicaraguan government respect the rule of law.[73]

103.   The "CPC" Case:  In November 2007, in response to a request from President Ortega, Justice Rafael Solís convened a secret, midnight meeting of FSLN supporting Justices on the Supreme Court's Chamber on Constitutional Matters, packing the court with FSLN supporting Justices from other chambers to achieve quorum.  Following the secret meeting, the Chamber on Constitutional Matters issued an order upholding a highly controversial political initiative by Ortega

---

[67]Eduardo Marenco and Esteban Solís, *"EEUU amenaza,"* El Nuevo Diario, Aug. 21, 2007 (Ex. 45).

[68] Luis Galeano and Erving Sánchez, *"Rappacioli confiesa,"* El Nuevo Diario, Aug. 24, 2007 (Ex. 80). This article contains an interview with Mr Emilio Rappacioli who is the Nicaraguan Minister of Energy.

[69] Luis Galeano and Róger Olivas, *"Entrega de mentira y prevaricato de verdad,"* El Nuevo Diario, Aug. 30, 2007 (Ex. 81).

[70] Léster Juárez, Octavio Enríquez and EFE, *"Triunfa chantaje a Esso"*, La Prensa, Aug. 27, 2007 (Ex. 82); Oliver Bodán and Mauricio Miranda, *"FSLN negocia con 'pistola en la cabeza,'"* El Nuevo Diario, Aug. 27, 2007 (Ex. 83); Roger Olivas, *"Jueza no ha recibido orden de devolver Esso,"* El Nuevo Diario, Aug. 27, 2007 (Ex. 84); Carol Mungía, *"Corinto Uno bajo control de la Esso,"* La Prensa, Sept. 14, 2007 (Ex. 85); Roger Olivas, *"Plantel vuelve a Esso, arriendo y coseguridad,"* El Nuevo Diario, Sept. 14, 2007 (Ex. 86).

[71] *"Asalto al Estado de Derecho,"* La Prensa, Aug. 28, 2007 (Ex. 87); Mirna Velásquez, Carol Mungía and Amparo Aguilera, *"Juez viola ley y Corte calla,"* La Prensa, Aug. 29, 2007 (Ex. 88).

[72] Eduardo Marenco and Esteban Solís, *"EEUU amenaza,"* El Nuevo Diario, Aug. 21, 2007 (Ex. 45).

[73] Amparo Aguilera, Carol Munguía y Mirna Velásquez, *"Esso rechaza teatro legal,"* La Prensa, Aug.30, 2007 (Ex. 89).

concerning the creation of so-called Councils for Citizens Power ("CPCs"). [74]
Approximately two weeks later, after a political compromise was struck between
Ortega and Alemán (as described in paragraph 65), the Supreme Court unanimously
issued a decision supporting the political initiative.[75]

### Particular concerns regarding lack of judicial impartiality in the DBCP Cases

104.   It is my understanding that Nicaraguan courts have issued DBCP judgments for over
$ 1 billion against several American companies. There are several factors that raise
concerns about the lack of judicial impartiality in these DBCP cases.

105.   First, the DBCP judgments were decided under Nicaraguan Law 364, a law
criticized by the U.S. Government. For example, the 2004 U.S. State Department
Nicaragua Country Report said: "The enactment of a 2001 law aimed at foreign
companies prompted the filing of lawsuits on behalf of thousands of individuals
claiming to be banana workers affected by exposure to the pesticide DBCP in the
1970s and 1980s when its use was legal. In 2002, a judge issued the first decision on
one suit, a $489 million (7.599 billion cordobas) judgment on behalf of 583
plaintiffs. None of the companies named as defendants participated in the short
evidentiary process that led to this judgment, and the court, citing the law, refused to
hear their legal arguments or accept contrary evidence.."[76]

106.   Likewise, the DBCP cases have been used as examples in U.S. governmental reports
of the lack of impartiality and fairness in the Nicaraguan judicial system. For
example, the 2004 Nicaragua Country Commercial Guide, published by the
Department of State, states: "The uncertainties of Nicaragua's judicial system were
demonstrated in a proceeding ending in December 2002. In that proceeding, a
Nicaraguan judge issued a $489 million judgment on behalf of 583 [sic] plaintiffs
under a 2001 law creating a special process for suits against U.S. companies
involved in the manufacture or use of the pesticide DBCP. None of the companies
participated in the brief proof process that led to this judgment, and citing the law the
court refused to hear their legal arguments or accept contrary proof. The court also
apparently did not take into consideration a non binding opinion circulated earlier
that year by Nicaragua's acting Attorney General that cited apparent constitutional
flaws in the law. Several hundred lawsuits claiming billions of dollars of damages
under the law are pending."[77]

---

[74] Mirna Velásquez, Nohelia González y Ludwin Loáisiga, *"Golpe Orteguista en CSJ,"* La Prensa, Dec. 6, 2007
(Ex. 90); Eloísa Ibarra y Tania Sirias, *"Justicia en guiñapos,"* El Nuevo Diario, Dec. 6, 2007 (Ex. 91).

[75] Ludwin Loáisiga López y Eduardo Cruz Sánchez, *"Corte sirve combo a Ortega y Alemán,"* La Prensa, Jan. 11,
2008 (Ex. 55).

[76] State Dep't Nicaragua Country Report (2004) at 16 (Ex. 4k).

[77] Country Commercial Guide (2004) at 23 (Ex. 5c); Country Commercial Guide (2005) at 33 (Ex. 5d).

107. Second, these cases share an important characteristic with other previous commercial law cases in Nicaragua in which corruption has occurred: they involve large quantities of money. When lawsuits are associated with large amounts of money, the FSLN has an incentive to encourage the direction of a decision and then obtain a monetary reward, part of which routinely ends up in the party coffers.

108. Third, Deputy Chief Justice Rafael Solís, in addition to his corrupt reputation and control generally over judicial decision-making,[78] likely has direct personal interests in these cases, because of his previous representation of Nicaraguan claimants in DBCP litigation. In particular, prior to his appointment to the Supreme Court in 2000, Justice Solís was a lawyer representing the Nicaraguan claimants in one of the cases.[79]

109. In addition, the fact that the judge in this case was Judge Socorro Toruño Martínez, an FSLN judge who was widely criticized for her handling of the case against another American company, ESSO,[80] discussed above at paragraph 102, further suggests the possibility of bias and lack of impartiality in the DBCP cases assigned to her.

110. Finally, as DBCP judgments arguably benefit Nicaraguans at the expense of U.S. companies, the FSLN party reaps not only financial gain, but also scores political points as it fosters its agenda: the growth of populism and increased anti-US/anti-capitalism sentiment.

## Opinion of Governmental, Non-Governmental, and Nicaraguan Sources

111. The opinions stated above are uniformly shared by the informed members of the international community, who have been strong critics of the lawless and partial way in which the law is administered in Nicaragua.

### *The United States of America*

112. Significantly, the United States Department of State reports on human rights practices have continuously expressed strong concerns about the judicial system of Nicaragua. These reports provide a uniquely good source of comparative information because they are produced annually using a consistent, thorough, and highly respected methodology. I conducted an in-depth review of these reports for the years 1994 through 2007.

---

[78] *See supra* ¶ 80.

[79] *See* Power of Attorney granted to Rafael Solís on April 1, 1998, before Notary Lucia Martinez Arguello (Ex. 92).

[80] Roger Olivas, "*Juez no ha recibido orden de devolver ESSO,*" La Prensa, Aug. 27, 2007 (Ex. 84) .

113. ***Department of State reports on human rights****.* In the 2000 report the Department of State stated: "The judiciary also is subject at times to political influence and corruption."[81]  It then elaborated: "The Constitution provides for an independent judiciary; however, the judiciary is susceptible at times to corruption and political influence. The judiciary is hampered by arcane legal codes, prosecutors who play a passive role, an under funded, and understaffed defender's office, judges and lawyers who often lack sufficient training or education, and corruption. In the past, many judges were not lawyers.  Judges' political sympathies or acceptance of bribes reportedly often influenced judicial actions and findings… Judges appeared susceptible to corruption and political influence.  The shelving of politically charged cases or ruling in favor of the politically connected party remained the most common manifestations of judicial corruption."[82]

114. The tone of the U.S. State Department reports on Human Rights on the judicial system of Nicaragua has been changing over the years.

115. In the mid 1990s, the reports did not speak to the overall lack of independence and corruption in the judicial system.  Instead, the reports commented on specific instances of injustice, particularly with regard to human rights violations, and discussed inefficiencies and backlog in the system.  For example, in 1994 and 1995 the reports contained a general discussion of the structure of the Nicaraguan judiciary and provided specific examples of injustices.  However, the primary evaluative statement about the judicial system was that "[a] weak judiciary continued to hamper prosecutions of human rights abusers."[83]  Similarly in 1996, the primary evaluative statement was this:  "The judiciary is independent but weak."[84]

116. Beginning in 1997, however, the focus of the State Department reports begins to change.  For the first time, the 1997 report specifically mentions political influence: "The judiciary is independent but continues to be susceptible to *political influence*."[85]  Moreover, for the first time, statements such as these can be found: "Judicial actions and findings were reportedly often influenced by judges' political sympathies or acceptance of bribes;" "Nicaragua lacks an effective civil law system;" "As a result, cases more properly handled in a civil proceeding are often transmuted into criminal proceedings.  One party is then effectively blackmailed, being jailed due to action by the party wielding greater influence with the judge."[86]

---

[81] State Dep't Nicaragua Country Report (2000) at 6 (Ex. 4g).

[82] *Id.*

[83] State Dep't Nicaragua Country Report (1994 and 1995) at 2 (Ex. 4a and 4b).

[84] State Dep't Nicaragua Country Report (1996) at 6 (Ex. 4c).

[85] State Dep't Nicaragua Country Report (1997) at 7 (Ex. 4d) (emphasis added).

[86] *Id.*

117.   Very similar language is found in the 1998 report, but it goes further and specifically mentions *corruption* for the first time: "The judiciary attempts to provide citizens with a fair and efficient judicial process, but is hampered in doing so by arcane legal codes, judges and lawyers who often lack sufficient training or education, and corruption."[87]

118.   The corruption-focused language intensified in 1999: "Judges' political sympathies or acceptance of bribes reportedly often influenced judicial actions and findings;" "Judges appear susceptible to corruption…Judges at times appear to be susceptible to political influence."[88]

119.   By the year 2000, the corruption-focused language is even stronger.  While previous years reported that judges appeared "at times" susceptible to corruption and political influence, by 2000 the State Department concluded that "[j]udges appeared susceptible to corruption and political influence;" and noted for the first time that "[t]he shelving of politically charged cases or ruling in favor of the politically connected party remained the most common manifestations of judicial corruption."[89] It also reported that civil cases often end up in criminal proceedings as a means of extortion.  "Despite improvements to the criminal law system, the country still lacks an effective civil law system.  As a result, cases more properly handled in a civil proceeding often are transmuted into criminal proceedings.  One party then effectively is blackmailed, being jailed due to action by the party wielding greater influence with the judge."[90]

120.   Similarly, although in previous reports the State Department had found that the judiciary is "at times" susceptible to corruption and political influence, by the years 2001 and 2002, once again the caveat "at times" was removed.[91]  The 2002 report also pointed out that "[t]he Supreme Court's campaign to reduce incompetence and corruption in the judiciary slowed during the year."[92]  In the 2003 report, it also stated that "[i]n June (2000), the National Assembly elected 8 of 16 Supreme Court (CSJ) magistrates in what was widely reported to be a back-room political deal.  All

---

[87] State Dep't Nicaragua Country Report (1998) at 6-7 (Ex. 4e).

[88] State Dep't Nicaragua Country Report (1999) at 6 (Ex. 4f).

[89] State Dep't Nicaragua Country Report (2000) at 6-7 (Ex. 4g).

[90] *Id.* at 7.

[91] State Dep't Nicaragua Country Report (2001) at 6 (Ex. 4h) ("The Constitution provides for an independent judiciary; however, the judiciary is susceptible to corruption and political influence."); State Dep't Nicaragua Country Report (2002) at 5 (Ex. 4i).

[92] State Dep't Nicaragua Country Report (2002) at 6 (Ex.4i).

eight magistrates had strong political loyalties, either to former President Alemán or the FSLN."[93]

121.   The same report stressed that: "The justice system was in the hands of the FSLN, to which approximately 70 percent of the judges belonged, and the FSLN used the judiciary to serve its political purposes."[94]

122.   By 2003, the language was even stronger: "[t]he judiciary was *highly* susceptible to corruption and political influence."[95]   And rather than stating that judges "appeared" to be susceptible to corruption, the 2003 report states emphatically that "[j]udges were susceptible to corruption and political influence."

123.   By the year 2004, the corruption and political control language is carried over from previous years but is supplemented with statements such as the following: "Both the PLC and Sandinista (FSLN) parties used the judiciary for political purposes.  The FSLN especially used its control of the judiciary to impede the resolution of property claims;" "In July, the Supreme Court…divided 16 appeals court positions among judges with political loyalties either to Arnoldo Alemán or Daniel Ortega.  As in the past, the Supreme Court ignored lists of experienced and politically neutral candidates proffered by civil society and the Bolaños Administration;" "Also in July, the FSLN-dominated judiciary dismissed all charges or threw out the defendants' convictions in each of three different corruption cases against associates of former President Alemán.  Both the media and government officials alleged that the verdicts were part of an ongoing deal between Alemán and Ortega."[96]

124.   The same 2004 report on Human Rights practices in Nicaragua also said:  "Rulings in favor of those who are politically connected remained the most visible manifestation of judicial corruption.  Both the PLC and Sandinista (FSLN) parties used the judiciary for political purposes.  The FSLN especially used its control of the judiciary to impede the resolution of property claims…."[97]

125.   The 2005 report reiterated the statement on the susceptibility of the judicial system to corruption and political influence. The Department of State also added: "Judges' political sympathies or acceptance of bribes or influence from political leaders often influenced judicial actions and findings."[98]

---

[93] State Dep't Nicaragua Country Report (2003) (Ex. 4j).

[94] *Id.*

[95] *Id.* at 5 (Ex. 4j) (emphasis added).

[96] State Dep't Nicaragua Country Report (2004) at 5 (Ex. 4k).

[97] *Id.* at 3.

[98] State Dep't Nicaragua Country Report (2005) at 3 (Ex. 4l).

126.    The 2006 Department of State report expressed: "The judicial system remained susceptible to corruption and politicization…once appointed many judges were subject to political and economic pressures that affected their judicial independence."[99]

127.    Finally, in the 2007 report the Department of State reiterated earlier statements concerning the ongoing weaknesses in the judiciary and concluded: "[i]n practice [the judicial system] did not function independently."[100]

128.    ***Opinions by other United States Governmental entities.*** The U.S Department of State commercial guides on Nicaragua for 2000 and 2001 state: "The major roadblocks to doing business are:  Unpredictability of enforcement of contracts and a cumbersome legal system.  The enforcement of the judicial rulings is sometimes uncertain.  Although the government is working to establish clear rules applicable to all, the rules of the game are sometimes changed by sudden government decree or political considerations, which can significantly disrupt business planning.  Requests for bribes do occur."[101]  The U.S. Commercial Service made the same finding on Nicaragua in 2002 and 2004, as did the economic section of the U.S. embassy in Nicaragua.[102]

129.    The 2004 Nicaragua Country Commercial Guide, which is published by the Department of Commerce and republished by the Department of State and the United States Embassy in Nicaragua, stated:  "Overall, the legal system is weak and cumbersome.  Many members of the judiciary, including those at high levels, are widely believed to be corrupt or subject to outside political pressures.  Enforcement of court orders is uncertain and frequently subject to non-judicial considerations.  Foreign investors are not specifically targeted but are often at a disadvantage in disputes against nationals with political connections.  Misuse of the criminal justice system sometimes results in individuals being charged with crimes arising out of otherwise civil disputes, often in order to pressure those targeted into accepting a civil settlement."[103]

130.    The United States Trade Representative report on Nicaragua Foreign Trade Barriers for 2004, mentioned:  "The Nicaraguan legal system is weak and cumbersome.  Many members of the judiciary, including those at high levels, are widely believed to be corrupt or subject to outside political pressures.  Recognizing Nicaragua's

---

[99] State Dep't Nicaragua Country Report (2006) at 5 (Ex. 4m).

[100] State Dep't Nicaragua Country Report (2007) at 3 (Ex. 4n).

[101] Country Commercial Guide (2000) at 3 (Ex. 5a).

[102] Country Commercial Guide (2002 and 2004) at 3 (Ex. 5b and Ex.5c).

[103] Country Commercial Guide (2004) at 23 (Ex.5c).

reputation for problems with corruption, President Bolaños has made anti-corruption a centerpiece of his administration's domestic policy… Enforcement of court orders is uncertain and frequently subject to non-judicial considerations… Rulings in favor of those who are politically connected are a visible manifestation of political corruption."[104] Similar language has been used in the reports of the subsequent years.[105]

131.    The 2005 Nicaragua Country Commercial Guide stressed that "[t]he selection of magistrates and judges has always been political, and the judiciary exercises scant independence from political parties. A judicial career system based on merit was legislated in 2004 but has yet to be tested. The training of judges is highly deficient, and public confidence in the fairness of judicial processes is extremely low. Corruption and influence-peddling in the judicial branch put foreign investors at a sharp disadvantage in any litigation or dispute, and legal security for business in general is among the lowest in Latin America."[106]

132.    The U.S Department of State 2007 Nicaragua report on terrorism stated "Nicaragua's court system was politicized and mired in corruption that reached right up to the Nicaraguan Supreme Court."[107]

133.    The U.S. Department of State 2008 International Narcotics Control Strategy Report on Nicaragua mentioned weak adherence to the rule of law, judicial corruption, and politicization of the Supreme Court as factors that make Nicaragua an attractive target for money laundering. The report concluded: "Due to the rampant corruption in the Nicaraguan judiciary, the United States has cut off direct assistance to the Nicaraguan Supreme Court."[108]

134.    ***U.S. Congress.*** In September 2005, the 109th U.S. House of Representatives passed a resolution in which it said that "the practical effect of the Pact remains largely intact as Arnoldo Alemán and Daniel Ortega continue to wield near total control over…the Supreme Court."[109]

---

[104] USTR Trade Barrier Report (2004) at 350 (Ex. 6a).

[105] USTR Trade Barrier Report (2005, 2006, 2007). The 2005, 2006 and 2007 reports all state that "the Nicaraguan legal system is weak and cumbersome. Many members of the judiciary, including those at high levels, are widely believed to be corrupt or subject to outside political pressures." (Ex. 6b) at 440; (Ex. 6c) at 471 ; (Ex. 6d) at 422.

[106] Country Commercial Guide (2005) at 43 (Ex. 5d).

[107] State Dep't Country Report on Terrorism (2007) at 8 (Ex. 7).

[108] State Dep't Bureau of Int'l Narcotics and Law Enforcement Affairs (2008) at 184 (Ex. 8).

[109] Res. 252, U.S. 109th Congress (Ex. 9).

135.   ***U.S. Embassy***. On November 26, 2003, the United States Ambassador to Nicaragua, Barbara C. Moore, issued a statement in which she declared: "Reforming the current judicial system, which is widely known as corrupt and politicized, is equally important so that Nicaragua can attract foreign investment and afford justice to its citizens."[110]

136.   In August 2005 when former President Alemán was released from house arrest under "medical parole", the U.S. Embassy issued the following statement: "[T]he decisions issued today by the Supreme Court of Justice are another example of political manipulation and the completely partisan nature of the Nicaraguan judicial system … This is an attempt to suffocate the institutional order in Nicaragua … This represents the worst of a judicial system with no way out, which is strangling the people of Nicaragua."[111]

137.   On September 2, 2005, then acting United States Ambassador Oliver Garza said that the Nicaraguan judicial system controlled by Sandinistas and Liberals "is a totally discredited system that tries to suffocate the institutional order in the country and suffocate the management of President Bolaños."[112]

138.   Current United States Ambassador to Nicaragua Paul Trivelli has criticized the polarization, corruption and lack of independence of the Nicaraguan Judicial system on many occasions.[113] Noticeably he said "It is something that should be reformed, in the sense that the administration of justice here obviously has its problems: it is a polarized and politicized system and it does not work well."[114] He also stated that "the pact enormously weakens the judicial system, which simply put is not impartial."[115]

139.   In an op-ed article published in November 6, 2007, Ambassador Trivelli highlighted the need to satisfy democratic principles not only in form but also in substance. Making references to notorious cases where the institutions, including the judiciary have not worked or have been manipulated for political purposes, he stressed how

---

[110] Statement by United States Ambassador Barbara C. Moore on the current situation in Nicaragua. Nov. 26, 2003 (Ex. 10).

[111] *"Sistema Judicial asfixia al pueblo,"* El Nuevo Diario, Aug. 31, 2005 (Ex. 93).

[112] *"EE.UU preocupado por democracia nicaraguense,"* La Prensa, Sep. 2, 2005 (Ex. 94).

[113] Ludwin Loáisiga López, *"Los liberales desilusionan a Estados Unidos,"* La Prensa, Sep. 29, 2005 (Ex. 95); Mirna Velásquez Sevilla y Carlos Martínez Morán, *"Asusta libertad de supuestos narcos,"* La Prensa, Jul. 3, 2007 (Ex. 96); Heberto Rodríguez, *"Lenidad judicial preocupa al ejército",* El Nuevo Diario, Jul. 3, 2007 (Ex. 97).

[114] Luis Felipe Palacios, *"Bolaños urge cambios en el sistema judicial,"*La Prensa, Jan.19, 2006 (Ex. 98).

[115] Ludwin Loáisiga López and Léster Juárez, *"Paul Trivelli: ojo con dinero narco en campaña electoral,"* La Prensa, March 10, 2006 (Ex. 99).

those basic principles of a functional democracy are not fulfilled in Nicaragua. "All these examples suggest that there is a true weakness in the institutionalization of democracy in Nicaragua. Taken together, they demonstrate the blurring of the clear line that should exist between the exercise of power by political leaders for party activities versus government administration; the collusion between supposedly independent government branches; the use of government institutions to penalize political enemies and the administration of justice along party lines."[116]

140.   **_The United States Agency for International Development (USAID)._** The United States Agency for International Development (USAID) Nicaragua Strategic Objectives for year 2002 stated: "Establishing a credible, equitable and efficient judicial system based on rule of law is necessary to encourage productive investment in Nicaragua."[117]

141.   The USAID Country Strategy for Nicaragua 2003 describes the poor state of contract law, stating: "The inability to enforce contracts and the lack of transparency and reliability in judicial decisions are the most serious obstacles to investment in Nicaragua. The justice system in general is inefficient and politicized and additional reforms are needed to establish the legal framework required for transparent government."[118]

142.   Likewise former director of U.S. Agency for International Development in Nicaragua, James Vermillion said in 2004 that "it became clear the decisions of some judges were being politically manipulated...Do I think one party is controlling the courts and doesn't want to give that up, and that that's bad? Yes...There is a widespread perception that justice is for sale."[119]

143.   The 2005 USAID Nicaragua CAFTA Assessment stated: "The overwhelming need for judicial reform in Nicaragua surpasses all other governmental reform initiatives in its urgency. Questions regarding judicial independence, impartiality, and substantive and administrative capacities dominate Nicaragua's legal landscape and economic institutions. If the absence of political will and commitment to change in this area continues to negate the impact of reform efforts, lasting economic development will be threatened in the long run. Judicial reform must encompass not only current initiatives in human rights and criminal law but also whole-cloth

---

[116] Paul Trivelli, "_Democracia: en principio y en la práctica,_" El Nuevo Diario, Nov. 6, 2007 (Ex. 46).

[117] USAID Budget Justification (2004) (Ex. 10a).

[118] USAID Nicaragua Country Plan (2003) at 3 (Ex. 11).

[119] Frances Robles, "_A Tug of war over judges and their politics,_" The Miami Herald, Jan. 13, 2004 (Ex. 100).

improvements in the part that Nicaragua's courts play in addressing commercial law and institutional competencies."[120]

144.    The 2005 USAID Nicaragua CAFTA Assessment also states: "Corruption at all levels of the judiciary has been reported to be a common occurrence. Recently there have been well-publicized cases in which firms were issued unfair rulings by courts." [121]

145.    The USAID Congressional Budget Justification for Nicaragua for year 2005 mentioned: "Juxtaposed on this economic landscape are a justice and institutional system in disarray. While the country has seen three technically satisfactory presidential elections since 1990, it suffers from extremely weak institutions that continue to be manipulated by political bosses for personal gain and power. Observance of the rule of law is fragmented... The justice system, in general, is inefficient and politicized, and dramatic reforms are needed to establish the legal and institutional framework that promotes transparency, rule of law, and business and investor confidence."[122]

146.    Using stronger words the USAID Congressional Budget Justification for Nicaragua for year 2006 mentioned: "By far the most serious obstacle to progress in Nicaragua, affecting the economy and the welfare of the people, is the extremely politicized and weak judicial system... The situation reached a crisis level in November 2003, and the U.S. Government responded by suspending direct assistance to the Nicaraguan judicial system, based on a series of events that placed the efficacy of that assistance in question."[123]

147.    ***U.S. newspapers***. Major newspapers in the United States such as the Washington Post and the Miami Herald have mentioned that Nicaraguan judicial officials cannot "see beyond their own unacknowledged corrupted interests" and instead "have chosen to undermine their last and best hope for redemption"[124] and that "Nicaragua's courts are so packed with leftist Sandinistas...that lawmakers want to revamp the entire judiciary."[125] In connection with a widely publicized case

---

[120] USAID Nicaragua CAFTA Assessment at I-1 (Ex. 2).

[121] *Id* at IV-3.

[122] USAID Budget Justification (2005) (Ex. 10b).

[123] USAID Budget Justification (2006) (Ex. 10c).

[124] Marcela Sanchez, *"Crucifying Nicaragua's Redeemer,"* Washington Post (Dec. 9, 2004) (Ex. 101); *see also* Filadelfo Alemán, *"Nicaragua Congress Grants Itself Powers,"* Charlotte Observer (Nov. 26, 2004) (Ex. 102).

[125] Frances Robles, *"A Tug of war over judges and their politics,"* The Miami Herald, Jan. 13, 2004 (Ex. 100); USAID Nicaragua CAFTA Assessment at pg. VII-1 (Ex. 2); *see also*, Felipe Palacios, *"USAID condiciona ayuda a la Corte,"* La Prensa, Sep. 1, 2004 (Ex. 103); Carlos F. Chamorro, *"Percepcion CSJ: Hay que 'Pagar' para Ganar*

involving an American charged with murder in Nicaragua, the New York Times stated: " ...the case has laid bare the deficiencies in Nicaraguan justice. Decisions are believed to be bought and sold. Politics infiltrates judges' chambers. Confidence in the system is as low as it can be."[126]

148.    The reputation for corruption of the Nicaraguan judiciary is well known in international business circles, where it has provided a strong deterrent to investing in Nicaragua.  Thus, for example, in an interview I conducted for the USAID CAFTA Assessment, a Nicaraguan attorney reported to me that his client—an investor with a syndicated loan of $21 million to build a mall in Managua—stopped the project due to concerns about legal and judicial uncertainty.

## _The International Community_

149.    "Nicaragua's judicial system is regarded by seasoned observers of politics as the weakest and most corrupt institution in the country.  They regard its weaknesses as so grave and tangled that it is usually impossible to distinguish whether the system is failing to act in a credible manner due to its intrinsic capacity, to political interference, or to corruption."[127]

150.    Leaders of many developed countries have expressed serious concern about corruption in the Nicaraguan judiciary.  They include, for example, Sweden, Germany, Norway and Italy.[128]

151.    Furthermore, the United Nations Development Program Human development report on Nicaragua for 2000, stated:  "A significant majority of citizens perceived there is corruption or a poor level of service in the courts and in the administration of justice generally…it is not surprising that the general perception about the state of the judicial system is severe."[129]

---

_Fallos,_" Confidencial, No. 404, Sep. 5-11, 2004, http://www.confidencial.com.ni/2004-404/politica2-404.htm (Ex. 104).

[126] Marc Lacey, "_Killing in Nicaragua makes spectacle of the courts,_" New York Times, Jan 6, 2008 (Ex. 105).

[127] Patchwork Democracy at 22 (Ex. 43).

[128] Noel Hernandez Ramos, "_Embajador Sueco Lamenta Falta de Seguridad Juridica,_" La Prensa, Sept. 7, 2001 (Ex. 106); _see also_ "_Grupo de los 5 Repudia a Jerez,_" El Nuevo Diario, Jun. 10, 2000 (Ex. 107).

[129] 2000 UNDP Report, Chapter 9 at 4-5 (Ex. 12).

152.  On June 4, 2002, the United Nations Development Program issued a press release that said: "The commission's report indicates that the difficulties that Nicaragua faces stem not only from inadequate laws, but also from problems in the administration of justice. In this regard, opinion polls have found that most Nicaraguans believe that the judicial system is subject to political influence and undermined by corruption."[130]

153.  A 2003 report commissioned by the Government of Sweden expressed that the main problem with justice in Nicaragua is "the control played by the political elite over the government's institutions, one of which is the judiciary…Two sub problems arise from that problem: i) lack of independence of the hierarchy of the institutions in charge and ii) negative effects for the installation of accountability mechanisms …the dependency of the justices to other political agents generates foreign control over the judicial decisions, which in turn generates impunity…The Judicial System in Nicaragua is part of a larger context in which failure to comply with the principle of separation of powers impedes its independence from outside forces; that is, in relation to political agents. At the same time its vertical structure makes it impossible to have internal independence for the judges.."[131]

154.  In addition, the World Bank governance indicator for Latin America and the Caribbean in 2002 in the area of rule of law was 52. The indicator for Nicaragua was 32.[132] It was 23.8 in 2006, which shows it is worsening.[133] The indicator assessed the extent to which agents have confidence in and abide by the rules of society; the effectiveness and predictability of the judiciary; and the enforceability of contracts. Likewise, the World Bank Judicial/Legal effectiveness index for Nicaragua in 2004 was 16.3, out of a possible score of 100. This assessed, among other things, judicial independence, judicial bribery, and the quality of legal framework. By contrast with the very low scores given to Nicaragua, the United Kingdom had a score of 92.1, and the United States, 83.7.[134]

155.  The 2004 Center for Justice and International Law (CEJIL) Report stated: "Nicaragua's party politics have played a significant role in undermining the respect for human rights over the past twenty-four months. The lack of independence of branches of government, especially the judiciary, from political party machination

---

[130] United Nations Dev. Program, *"President Puts Judicial Reform on the Agenda in Nicaragua,"* United Nations Development Program Newswire, Jun. 4, 2002 (Ex. 13).

[131] Swedish Report at 18 (Ex. 14).

[132] World Bank Governance Indicators (2002) (Ex. 15a).

[133] World Bank Governance Indicators (2006) (Ex. 15c).

[134] Daniel Kaufmann, "Corruption, Governance and Security: Challenges for the Rich Countries and the World, in Global Competitiveness Report 2004/2005, http://www.worldbank.org/wbi/governance/pdf/Kaufmann_GCR_101904_B.pdf (Ex. 15b).

and the corruption that permeates all levels of government have led to a constant state of instability in Nicaragua that led to what has been called the worst institutional crisis in that country in recent years."[135] In 2006 CEJIL presented a claim before the Inter-American Commission on Human Rights for lack of judicial independence in Nicaragua.[136] It argued it was presenting a claim "for the progressive deterioration of the administration of justice that characterizes Nicaragua and, during the latest corruption scandals, has seen increasingly worse politicization and partisan use of the jurisdictional agencies… due to the Pact entered into by the leadership of the Sandinista National Liberation Front (FSLN) and the Liberal Constitutionalist Party, which has occasioned serious legal and institutional changes, and has even affected the administration of justice in Nicaragua."[137] In a 2007 statement, CEJIL expressed concern about the politicization of the Nicaraguan judicial system: "We cannot confirm here, that this is an independent and impartial administration of justice, and in this sense, it is a right established in the American Convention, that everyone has the right to be guaranteed a fair trial and judicial protection. In a context like this one, the fact that there are complaints that the judicial system is not impartial and independent, affects the entire population… [Accordingly] politicized courts are widespread in Nicaragua, and there are no guarantees for the common person to be able to go before the courts and get a fair trial."[138]

156.   The 2004 Nicaragua Report of the Economist Intelligence Unit said:  "The selection of magistrates and judges has always been political and judicial independence from executive and legislative pressures is slight…corruption and influence-peddling in the judicial branch put foreign investors at a sharp disadvantage in any litigation or dispute."[139]

157.   Different Latin America-focused organizations specializing in the measurement of democracy and corruption variables have found that few people trust the Nicaraguan judicial system. Latinobarómetro surveys from 2000 to 2005 show that on average only 20% of those interviewed in Nicaragua trusted the Nicaraguan judicial system.[140]  In 2005, 82% had little or no trust in the judicial system.[141] Likewise,

---

[135] CEJIL Report at 18 (Ex. 16).

[136] The case is pending.

[137] CETIL Report, *"Se denuncia deterioro de la administración de la justicia en Nicaragua ante la CIDH,"* Mar. 7, 2006 (Ex. 17).

[138] María José Uriarte, *"Organismo confirma retardación de justicia,"* La Prensa, Oct. 15, 2007 (Ex. 108).

[139] The Economist Intelligence Unit, Ltd, *"Politics:  The 2000 Reforms: Main Elements of the PLC-Sandinista Pact,"* EIU Country Profile, Jan. 15, 2004 (Ex. 18).

[140] Latinobarómetro (Ex. 19).

[141] *Id.* (Ex.19).

Corrupciómetro 2006 reported 10 cases of judicial corruption investigated in Nicaragua; more than any other Latin America country.[142]

158.    In a report presented by Prof. Alejandro Miguel Garro in 2005 in the *Shell Oil Company v. Franco Franco* case as expert witness for Nicaraguan DBCP claimants, Prof. Garro stated: "Although the Constitution of Nicaragua provides for a judicial branch that is meant to be independent from the other branches of government, in reality the administration of justice has been vulnerable to political influence and corruption."[143] He also said that "[i]mpartial observers of the Nicaraguan justice system today are likely to agree in that the courts in Nicaragua continue to be weak, inefficient, susceptible to political influence and corruption."[144] Finally he singled out Justice Solís, discussed at paragraph 80 as a key example of the systemic problems in the Nicaraguan judiciary.  Prof. Garro stated:  "[The U.S. State Department Report on Human Rights Practices] points out that the Supreme Court's disciplinary commission in charge of overseeing judges' ethics and conduct was chaired by a justice of the Supreme Court with close ties to an influential political party who was himself charged with corruption."[145]

159.    In 2006, Swedish Ambassador to Nicaragua Eva Zetterberg said: "the (Nicaraguan) judicial system does not work well in this country and (this) concerns me a great deal, because obviously there are political problems there."[146]

160.    The 2006 report commissioned by the European Union said: "[T]here is no doubt that this constitutes a problem for the State that requires integral solutions as proposed by the National Development Plan, since the justice system is a sector that is very sensitive to this subject... In the case of the institutes within the justice system, the existence of corruption...  implies not only the disruption of its operation, but the weakness of the State in fighting corruption, because it is in the area of the judiciary where one gambles with the possibility that this problem exist or remains."[147] The same report also stresses that 45.7% of the judges themselves do not believe that the Nicaraguan Supreme Court is independent and 72% of them considered that there were improper interferences inside the

---

[142] INEA (Ex. 20).

[143] Garro Report at ¶5 (Ex. 21).

[144] *Id.* at ¶22.

[145] *Id.* at ¶20.  As noted, Solís previously represented DBCP claimants.  *See supra* ¶ 109.

[146] Léster Juárez, *"Alarma por fallos judiciales,"* La Prensa, Mar. 9, 2006 (Ex. 109).

[147] European Union Report at 21 (Ex. 22).

judicial system.[148]  The report then concluded: "There are perceptions in the country that the justice is not independent."[149]

161.    Similarly the 2006 Global Integrity Report—Reporter's Notebook on Nicaragua stated: "The courts are frequently implicated in new corruption scandals and judicial decisions are the subject of constant scrutiny by journalists and independent analysts."[150]

162.    The 2006 Freedom House country report on Nicaragua said: "The lack of judicial independence from political influence is one of Nicaragua's most severe problems. The two FSLN-PLC pacts[151] have put the Supreme Court under tight political control by the big party caudillos, Ortega and Alemán, who choose the magistrates through the assembly... The independence of the lower-court justices is therefore minimal, as the upper ranks interfere ever more pervasively in decisions." [152]

163.    The 2006 Nicaragua report by the German publication Bertelsmann Transformation Index said: "The judicial branch is institutionally differentiated and formally independent, but it is subject to political influence and corruption. It demonstrates considerable functional deficiencies. Appointments of judges to the Supreme Court are a political issue and are decided according to political considerations." [153] The 2008 report said: "There is a formal balance of power, but this balance is compromised by the blatant politicization of state institutions. Due to the weak judiciary, checks and balances are mainly performed through the executive and legislative branches of government...The judicial branch...is subject to strong political influence and corruption...The political influence of the pacto político worsened the already low performance of the judiciary system...The Sandinistas exerted their influence over the Supreme Court to allow Alemán to serve his

---

[148] *Id.* at 191.

[149] *Id.* at 207.

[150] Global Integrity Nicaragua Report at 3-4 (Ex. 23).

[151] Freedom House Nicaragua  (Ex. 24) at introduction. The Freedom House report refers to two Pacts, assuming one took place in 2000 and the other one in 2004. Most commentators believe that it is on going deal that is still taking place. "Making matters worse, stalemate between these parties [FSLN and PLC] and their leaders (locally called caudillos) has twice, in 2000 and 2004, led them into power-sharing pacts at the expense of other forces, making the development of democratic institutions even more difficult.  In these pacts, which involved reforms to the constitution, the two caudillos divided up power in the Supreme Court, the electoral branch, and the Office of the Comptrollers General, providing them with impunity from prosecution. The first of the two arrangements also restricted the elections law in order to limit the formation of rival parties. Not surprisingly, faith in the institutions affected by these pacts has withered."

[152] *Id.* at 7(Ex. 24).

[153] Bertelesmann Transformation Nicaragua Index (2006) at 8 (Ex. 25a).

sentence at his home…This example reveals the extent to which politics—rather than the rule of law—determines the prosecution of corrupt officeholders."[154]

164.    The October 27, 2006 press release of the International Commission of Jurists, issued after a site visit to Nicaragua, expressed concern by the lack of independence of the Nicaraguan judiciary. "The partisan politicization of Nicaraguan justice begins with the appointment of magistrates of the Supreme Court of Justice, in which…partisan considerations prevail and the assignment of positions is made according to the political affiliations of the candidates…The inordinate influence of factors that are extraneous to the administration of justice within the heart of the judiciary, among which partisan politics and economic interests are two notable examples, constitute a great obstacle for judges to administer justice impartially and based on the law. The absence of impartiality results in placing certain people above the law or relegating them to its margins, with the consequent weakening of the right to equality before the law…serious deficiencies persist in Nicaragua in the administration of justice, which affect the strength of the rule of law and weaken democracy. These shortcomings primarily flow from widespread practices that are contrary to international standards, and which impede justice from being served independently and impartially."[155]

165.    The Transparency International 2007 Global Corruption Report on judicial systems stated that there is a "perception…[that]… the judiciary…[is]…corrupt and politicized in most Central American countries, with the exception of Costa Rica," adding that,"[i]n Nicaragua, the disappearance of a large sum of money from a Supreme Court bank account resulted in a public outcry" and that"[t]here are certainly Supreme Courts [in Latin America] that have done just as badly [despite judicial reform] (Nicaragua, Honduras) using their powers to install their protégés and control their further actions."[156]

166.    The 2007 Transparency Nicaragua report stated clearly: "The impunity generated by the dominance of two parties and the consequent risks of corruption that spill over into other powers of the State, interfere with access to justice that is efficient, prompt and consistent with law." [157] Likewise, its Corruption Barometer showed that the judicial system of Nicaragua was one of the most corrupt institutions in Nicaragua with an evaluation of 4.4 where 5 was the worst possible score. Only the political parties obtained a worse score with 4.6. [158]

---

[154] Bertelesmann Transformation Nicaragua Index (2008) (Ex. 25b).

[155] *See* International Commission of Jurists (Ex. 26).

[156] Transparency Int'l Global Corruption Report at 116-17, 144 (Ex. 27a).

[157] Transparency Int'l Nicaragua Report (2007) at 31 (Ex. 27b).

[158] Corruption Barometer (Ex. 27c).

167.     The 2007 Heritage Foundation Report on economic freedom in Nicaragua stated: "The judicial system is rudimentary, inconsistent in contract enforcement and subject to political interference."[159]  The 2008 report said: "[t]he judiciary is politicized and subject to corruption…Corruption and political deal-making…in the judiciary, are viewed as pervasive."[160]

168.     According to the 2007 Due Process of Law Foundation (DPLF) Report, Nicaraguans have the highest perception of corruption of their public officials, including judges, when compared with citizens of other Central American countries: 83.5% believe judges are corrupt. Likewise, 22.9% are aware that bribes are given in courts as opposed to 3.0 % in Costa Rica. The report also provides data related to interviews of judges regarding interference by other authorities. Nicaragua registered the highest percentage of political interference within the judiciary, with 60% of the judges surveyed stating that there was substantial interference by the political parties.[161] The comparative regional report states: "There is no discrepancy that the corruption in the judicial system is an actual phenomenon". The main reasons being: "(i) Control of the political parties over the judicial system; (ii) lack of independence of judges and justices *vis-à-vis* political actors; (iii) lack of independence of judges *vis-à-vis* the hierarchy of the Supreme Court…"[162]  The Nicaraguan report stated: "The excessive presence is a factor that is erected as a fundamental obstacle to the creation and development of a system that imparts real and efficient justice…the workings of the system are based on loyalty and submission and not on the principles of merit and legality…Political operatives subject judges and magistrates to fear of a massive displacement through general measures, such as, for example, transfers without their consent to other cities, municipalities or regions, or even, through the recent Constitutional changes, to dismiss them or cut their terms short… There is no doubt that the vertical exercise of power by political parties is a factor that has an impact on judicial corruption and perverts the system, as it creates in certain operators of the judicial system a confidence that they may act with impunity…."."[163]

169.     The 2007 Danish Business Anti-Corruption Portal Nicaragua country profile pointed out that: "Business operations are complicated and investment discouraged by a corrupt judicial system which primarily serves political interests. In cases of disputes against Nicaraguans with personal or political connections, foreign companies will not be able to rely on fair and transparent treatment by the courts," adding

---

[159] Heritage Foundation Index of Economic Freedom (2007) (Ex. 28a).

[160] Heritage Foundation Index of Economic Freedom (2008) at 2 (Ex.28b).

[161] DPLF Report (Ex. 29).

[162] *Id.* at 62.

[163] *Id.* at 345-347, 371.

that"[j]udges at all levels have become involved in cases of corruption or other crimes."[164]

### The Opinion of Nicaraguans

170.   It is the overwhelming view of Nicaraguans that the judiciary is not impartial in its handling of either civil or criminal cases.  This belief is shared by high-ranking politicians, judges, business people and common Nicaraguans.

171.   According to reports, in May 2000, the German Foundation Fredrich Ebert conducted a survey of 140 Nicaraguan business people.  Ninety percent of those interviewed said that in Nicaragua there is no respect for the law.  The survey also showed that 74% of those interviewed said that there is tolerance for corruption. The belief among those interviewed was that corruption was part of the system and it was due to lack of rule of law.[165]

172.   Many high ranking Nicaraguan officers have spoken openly about the lack of rule of law in Nicaragua.  The First Secretary of the National Assembly in 2000, Mr. Pedro Joaquín Ríos Castellón, stated that the judicial system of Nicaragua was corrupt.[166] Supreme Court Justices Guillermo Selva and Iván Escobar Fornos have admitted that there is corruption in the Nicaraguan judicial system. In 2003, the latter said: "The problem of demanding bribes has always existed within the Judicial Branch, it has always been found in judges, in courts, payments for deeds and for everything..."[167] During the 2004 constitutional crisis then President Bolaños had public confrontations with the other branches of the government, including the judiciary which he publicly criticized for its level of corruption.[168] Similarly, in August 2006, the Minister of Defense Avil Ramírez said: "as long as politics dictates the rules in the judicial branch 'we will hardly be able to have an administration of justice that meets the ideal.'"[169]

173.   The local business community has also expressed concern about the lack of rule of law in Nicaragua.  In a letter dated August 26, 2001, the Association of Chambers of Commerce called Consejo Superior de la Empresa Privada (COSEP) stated:  "the

---

[164] Business Anti-Corruption Portal (Ex. 30).

[165] Eduardo Enriquez, "*Encuesta Revela que empresarios rechazan corrupción,*" La Prensa, June 16, 2000 (Ex. 110).

[166] Edgar Barberera S., "*Siguen Ataques de Directivo de Asamblea a Poder Judicial,*" El Nuevo Diario, Mar. 21, 2000  (Ex. 111).

[167] Consuelo Sandoval, "*Magistrados reconocen corrupción,*" La Prensa, Mar. 24, 2003 (Ex 112).

[168] Ary Neil Pantoja, "*Bolaños desata polémica con Poder Judicial,*" La Prensa,  Feb. 10, 2004 (Ex. 113).

[169] Informe Pastrán, "*Titular de defensa critica al poder judicial,*" Aug. 23, 2006 (Ex. 114).

fact that legal uncertainty has become a common denominator in our country, decidedly undermining its stability and, hence, the economic and property rights of Nicaraguans, is cause for great concern to private enterprise."[170]

174.   On February 21, 2002, then President Bolaños appointed an Executive Justice Reform Commission "with the mandate to lay the foundations for the construction of democratic, honest and independent justice and to prepare its justice administration systems for the great challenges of our century."[171]   The commission was composed of more than 30 senior Nicaraguan lawyers.

175.   On April 23, 2002, all of the members of the Reform Commission approved the "Working Agenda for the Transformation of Justice in Nicaragua." Subsequently, the document was made public. A copy of it is attached to this report. It states in relevant part: "there is a unanimous consensus in Nicaraguan society that the lack of independence in the exercise of the Judicial Branch, the dependence of judges and magistrates on their functions, influences and pressures of political parties and other power groups, in particular, political groups, is one of the most serious problems of justice in Nicaragua."[172]

176.   The same report also states: "the group has concluded that there is a need to concretely indicate that the problems currently faced by justice in the country, that being the purpose of setting up this commission, not only have to do with a lack of suitable laws but also deficiencies in the administration thereof and of the persons responsible for doing so."[173]

177.   The report continues: "In that regard, there is

a.   A high perception of corruption in the administration of Justice, as reflected in various polls that have been taken.

b.   A generalized perception by the population that the Judicial Branch, as a whole, is politicized, which constitutes one of the most serious problems of justice in Nicaragua.

---

[170] Image of Justice at 95 n. 191 (citing COSEP letter) (Ex. 32); Benjamín Blanco, *"Dura Crítica el COSEP a la Corte,"* La Prensa, Aug. 29, 2001 (Ex. 115). The Spanish content of that paragraph of the COSEP letter is as follows: "que es motivo de profunda preocupación para la empresa privada el hecho de que la inseguridad jurídica se ha vuelto un denominador común en nuestro país, que mina de manera determinante su estabilidad y, por ende, los derechos económicos y de propiedad de los nicaragüenses." Image of Justice at 95 n. 191 (citing COSEP letter) (Ex. 116).

[171] Legal Commission of Nicaragua, working Agenda for the Transformation of Justice in Nicaragua, Draft report of Apr. 23, 2002 at 1 (Ex. 31).

[172] *Id.* at 1.

[173] *Id.* at 2.

     c.   In the current system to appoint judges and magistrates, the dependence of the judges on their links to specific political parties or persons, which compromises their judicial decisions.

     d.   A high percentage of the population expresses its mistrust in the administration of justice."[174]

178.    The commission also reported that: "With respect to the appointment of Supreme Court magistrates, the Commission agrees to urge the President of the Republic to step up the process of consultations that has already begun so that elections of new Supreme Court magistrates in July of this year will be done on the basis of clear criteria of recognized honorability, prestige and the professional careers of the candidates, instead of being based on partisan political interests."[175]

179.    Commenting on the judicial system of Nicaragua, Former President Bolaños has called it a "garbage dump" in 2004, while in office, and an "empty cart." [176]  He has also said that Nicaragua guarantees security in the streets but not in the courts.[177]  "A sick judicial system has weakened our ability to govern the country … Surveys say clearly that the judicial system is corrupt, that the system is biased, that it's politicized and that the source of these ills are found in the coalition pact."[178] Referring to a trial court decision against a state-owned insurance company, where allegedly the judge ruled in favor of the plaintiff and awarded $7 million relying on factors different than the law and the merits, President Bolaños stated publicly that that decision was an attack against the State, private property, and the rule of law.[179] Finally, in a radio address, President Bolaños, commenting on corruption within the judiciary, said that the banks are no longer robbed by masked men, now the justices do so.[180]

180.    Judges themselves have admitted that the system is corrupt and lacks independence. For example, Judge Luz Amparo Caldera, a criminal trial judge in Managua,

---

[174] *Id.*

[175] *Id.* at 3.

[176] Ary Neil Pantoja, "*Bolaños Desata Polémica con Poder Judicial,*" La Prensa,  Feb. 10, 2004 (Ex. 113).

[177] Eduardo Marenco Tercero, "*No Amaina Pleito Entre los Poderes,*" La Prensa, Sep. 6, 2004 (Ex.117).

[178] "*Bolaños dice que justicia nica causa ingobernalibilidad,*" La Prensa, Sep. 2, 2005 (Ex. 118).

[179] Mirna Velázquez Sevilla y María José Uriarte R., *Contragolpe a Agroinsa,* La Prensa, Dec. 23, 2003 (Ex. 119).

[180] I heard President Bolaños deliver this address while in Nicaragua in connection with the USAID CAFTA Assessment and reported this remark to USAID.

advocated for changes in the judiciary, stating that "with a judicial power dependent and biased, it is impossible to say that there is Rule of Law in Nicaragua."[181]

181.     In September 2004, the Civic Group Ethics and Transparency conducted a survey of 1,921 people throughout Nicaragua. Approximately 91% said that the judicial system was not fair. More than 90% said there was corruption in the judicial system and 86% said that one's political, economic, or social position was what determined one's ability to obtain justice.[182]

182.     Local Human Rights group CENIDH'S 2004-2005 report described how the credibility on the Nicaraguan judicial system was affected: "[CENDIH] has been able to record cases in which the Judicial Branch is used for different purposes: 1. For political exclusion or persecution 2. to advance the financial interests of the highest levels of the Liberal Constitutionalist Party (PLC) - Sandinsta National Liberation Front (FSNL) (sic) coalition. All of those situations are in clear violation of Access to Justice for al Nicaraguans, regardless of gender. Influence trafficking and delayed justice in court proceedings are the situations most often denounced by the populace. The lack of the Judicial Branch's credibility is reflected in a number of public opinion polls, and the lack of judicial security caused by its erratic proceedings is a greater cause for fear than violence...."[183] The section on access to justice concluded: "In order to ensure that human rights are respected in a democratic State, it is essential to have an independent, impartial and professional judiciary. In Nicaragua, the Judicial Branch must be urgently depoliticized, so that it will cease trafficking in court rulings…"[184]

183.     CENIDH's 2006 human rights report pointed out that "the Judicial Branch has been losing credibility… because many of the court officers of both genders are intimately involved with political parties and, on occasion, have ties to the financial interests of one group or another. Because of the coalition between the Sandinista National Liberation Front (FSLN) and the Liberal Constitutionalist Party (PLC), these two parties control enough power to appoint government employees and/or influence

---

[181] Image of Justice at 25 (Ex. 32). Former Supreme Court Justice Alba Luz Ramos, for example, speaking about the critical condition of the judicial system suggested, among other things, the implementation of a Code of Ethics for judges and better salaries. *Id.* at 18 (Ex. 32). Supreme Court President Yadira Centeno, in an August 2004 newspaper interview, admitted the existence of a problem with the judicial system although she accused the country's bankers of corrupting it. Eloisa Ibarra A., *"Bancos fomentan corrupción,"* El Nuevo Diario, August 24, 2004 (Ex. 120).

[182] Perception of Justice (Ex.33).

[183] CENIDH Human Rights Report (2004-2005) at 11 (Ex. 34a).

[184] *Id.* at 8, 16.

their decisions. That fact gives rise to corrupt acts, as it leaves court officers of both genders beholden to the political party and the respective party leaders..."[185]

184.   The 2007 Institute of Strategic Studies and Public Policies survey on security found that only 20% of Nicaraguans interviewed trusted the judicial system, where 13.2% of those interviewed trusted the Supreme Court. The survey also stated that those percentages could worsen due to the perception of political influence in the judiciary.[186]

185.   Likewise, in a report presented by a local scholar during five days of conferences sponsored by nongovernmental organizations called "Week for Judicial Independence" in August 2007, it was shown that almost 50% of those interviewed believed that money and political connections are the main determinants to succeed in their judicial system.[187] Another report presented by a different local scholar stated that 34.5% of the people surveyed in Nicaragua attributed the lack of judicial independence to the lack of stability of the judges which in turn is determined by the political interference in their appointments.[188]

186.   In August 2007, newspaper writer and political commentator Fernando Centeno Chiong wrote: "The dismissal of various officials in the Judicial Branch and the investigation of others for alleged connections to criminal groups where there is blatant influence trafficking demonstrate once again the vulnerability of an institution when faced with sudden attacks due to political interests or misuses of power.  Consequently, serious problems arise such as lack of independence for officials in the judicial system and their affects on users of that system."[189]

187.   In a shocking statement Nicaraguan Chief Justice said in November 2007: " [T]he judicial system is a branch of government that is politicized, maneuverable … I have no qualms about admitting that the judicial system is controlled for the most part by the FSLN, and this is not a good sign… A Judicial Branch that is dominated by politics is not a Judicial Branch, it's a politicized branch, and that is not good for a modern society."[190] In December 2007 he said that "there should be no Courts" in

---

[185] CENIDH Human Rights Report (2006) at 23 (Ex. 34b).

[186] Strategic Studies and Public Policies Survey at 21-22 (Ex 35).

[187] Document for Judicial Independence Week (Solís) at 8 (Ex. 36a).

[188] Document for Judicial Independence Week (Gaitán) at 6 (Ex. 36b).

[189] Fernando Centeno Chiong, "*Independencia Judicial*," La Prensa, Aug. 13, 2007 (Ex. 121).

[190] Eloísa Ibarra, "¡*No a dictadura*!," El Nuevo Diario, Nov. 28, 2007 (Ex. 47).

Nicaragua, due to the fact that it is evident that the judicial system in the country is dominated by the political parties." [191]

188.    On December 1, 2007, Nicaraguan legal commentator Valentín Barahona Mejía wrote: "Judges and justices certainly and effectively do not enjoy any independence... Citizens do not trust or believe in the current system.  Most Nicaraguans believe and resent that judges basically respond to political and party interests.  On the one hand, the Justices of the Supreme Court of Justice are elected by the National Assembly after being proposed by the political parties... therefore the candidate chosen must reliably demonstrate his loyalty and faithfulness to the party... This vicious cycle repeats itself in the election of appeals court justices and other judges, since the ability to appoint and dismiss judges lies with the Supreme Court of Justice... The Judicial Branch as it currently is does not work, is not effective, is inoperative, and requires that the whole system be reengineered in order to rescue independence for judges and justices.  It is evident and clear that those administering the law apply justice rapidly and speedily, when the case has political relevance."[192]

189.    In January 2008, Nicaraguan Supreme Court Justice Alba Luz Ramos, who is affiliated with the FSLN, said: " ... [I]n the Judicial Branch not only the political parties but also groups with economic, social and even religious power want to exercise influence ... I see, and I cannot close my eyes, there are corrupt judges ..."[193]

190.    The scholarly study authored by two respected Nicaraguan lawyers and academics, Image of Justice, states:  "It is well known to everyone that the administration of justice in Nicaragua is slow, expensive, partisan and uncertain from the legal point of view, because as we have stated above, the Judicial Branch is one of the branches of the State that is least respected by society.  The crisis of recent years reveals, as some people have asserted, that we are faced with the weakest and most corrupt institution of the State."[194]

191.    The Image of Justice report went on to note:  "[T]he perception of politicization or partisan sympathies or preferences on the part of the judges or justices of the Judicial Branch constitutes one of the most serious problems in the justice system in Nicaragua.  Together with appointment and promotion procedures that have nothing to do with ability and merit, and in the absence of knowledge of the reasons

---

[191] Eduardo Cruz Sánchez, "*Martínez: no debería existir corte en Nicaragua*," La Prensa, Dec. 14, 2007 (Ex. 122).

[192] Valentín Barahona Mejía, "*Independencia del Poder Judicial*," El Nuevo Diario, Dec.1, 2007 (Ex. 123).

[193] Eduardo Cruz Sánchez, "*Poder Judicial entre lo más corruptos*," La Prensa, Jan. 21, 2008 (Ex. 124).

[194] Image of Justice at 95 (Ex. 32).

justifying appointment, or of open public exams, this results in subjective or partisan connections that have an effect on judicial judgments, and is causing an increasing lack of confidence in State institutions in general, as well as an alarming lack of respect for the Judicial Branch in particular." [195]

192.   The report further stated: "It has been demonstrated that one of the most serious problems faced by the Rule of Law in Nicaragua is the lack of independence of judges and justices.  The current crisis in the justice system caused by political postures and battles shows that the Judicial Branch is the center of ideological controversies and partisan positions, with the result that its decisions are made for political and not legal reasons." [196]

193.   As an example of the lack of independence, "[t]he statements of certain Justices to the communications media have repeatedly stated that they are in the Supreme Court to represent the interests of their party." [197]

194.   In sum, as the book concludes, "[i]t is impossible to talk about justice with a Judicial Branch that is held hostage by outside interests, in a system in which judges and justices, rather than obeying only the Constitution and the law, are subject to the designs of their hierarchical superiors and the latter for their part, to the interests of the party to which they belong." [198]

## The 2005 case before the Inter-American Commission on Human Rights at the OAS

195.   In the last quarter of 2005, Nicaragua suffered an unprecedented constitutional crisis when the legislative and the judicial branches threatened to usurp authority from the executive branch. This series of events dramatically illustrates the endemic problems in Nicaragua with the lack of independence and political control of the judiciary, which I have described throughout my report.

196.   In an editorial entitled "Nicaragua's creeping coup," the Washington Post described these events: "The left-right alliance [between Ortega and Aleman] has used its majority in the National Assembly to rewrite the constitution and stack the Supreme Court. In the past week it has begun stripping the members of Mr. Bolanos's cabinet of immunity so that they can be prosecuted before Sandinista judges on bogus charges. If this power play succeeds, Mr. Bolanos will be next. Meanwhile, Mr.

---

[195] *Id.* at 95-96.

[196] *Id.* at 97.

[197] *Id.* at 97 n.197.

[198] *Id.* at 98.

Aleman, who stole tens of millions from one of Latin America's poorest countries, was freed from house arrest last week."[199]

197.   The crisis motivated a general international outcry, including from the U.S. Government.[200] U.S. Deputy Secretary of State Robert B. Zoellick said: "Nicaragua's promising future is threatened by a creeping coup. It's threatened by corruption…This is the way of the corrupt pact." [201] The U.S. Department of State issued a statement saying: "The United States condemns the actions taken on spurious political grounds by the National Assembly on September 22 to lift the immunity of senior officials of the legitimately elected government of Nicaragua. This could expose members of the democratic government to politically motivated prosecution and harassment and will weaken the rule of law. The ongoing assault by the Nicaraguan National Assembly on Nicaraguan democracy and on the Bolaños administration undermines the freely expressed wishes of the Nicaraguan people." [202]

198.   On September 9, 2005, the Permanent Council of the OAS passed a resolution stating, *inter alia*: "…that the escalation of the institutional and political crisis in Nicaragua threatens the country's democratic governance, the legitimate exercise of power, and the rule of law, with serious social and economic consequences, both now and in the future, for the people of Nicaragua" and urged "the immediate cessation of any action that could aggravate the political crisis in Nicaragua."[203] Similarly the OAS Secretary General José Miguel Insulza expressed his concern and demanded that President Bolaños be allowed to end the term for which he was elected.[204] Then Guatemala President Oscar Berger said: "[I]n Nicaragua there is a "concentration of forces between two factions which are limiting the free actions of the Executive Branch. We regret this, we condemn it and we call on the international community to do whatever it can to avoid this trampling of democracy."[205]

---

[199] *"Nicaragua's creeping coup"*, The Washington Post, Oct. 3, 2005 (Ex. 125).

[200] *See* Res. 252, U.S. 109th Congress at ¶ 134, expressing the sense of Congress that the Government of the United States should support democracy, the rule of law, and human rights in the Republic of Nicaragua and work cooperatively with regional and international organizations to bolster Nicaraguan efforts to establish the requisite conditions for free, fair, transparent, and inclusive presidential and legislative elections in 2006 (Ex. 9).

[201] *"World in brief,"* Washington Post, Oct. 5, 2005 (Ex. 126).

[202] U.S. Department of State, statement of September 23, 2005, Latest Assault on Nicaraguan Democracy by Nicaraguan Assembly, http://www.state.gov/r/pa/prs/ps/2005/53939.htm (Ex. 37).

[203] Organization of American States, Permanent Council, Resolution CP/RES. 892 (1507/05), SUPPORT FOR NICARAGUA, http://www.oas.org/consejo/resolutions/res892.asp (Ex. 38).

[204] María José Uriarte R., *"Insulza propone un 'acuerdo histórico,'"* La Prensa, Oct. 4, 2005 (Ex. 127).

[205] *"Presidente de Guatemala llama a evitar Golpe,"* La Prensa, Oct. 3, 2005 (Ex. 128).

199.    Later in September 2005, in response to efforts to strip them of their immunity and prosecute them for allegedly being involved in electoral crimes, a group of six Ministers, Vice Ministers and heads of regulatory agencies presented a petition to the OAS Inter-American Commission on Human Rights against the Republic of Nicaragua.[206] They claimed that their rights to due process of law, judicial protection and non-discriminatory treatment had been violated. They also argued that they were not required to exhaust local remedies, as normally required by the American Convention on Human Rights, because Nicaragua's judicial system could not guarantee due process, and exhaustion therefore would be futile.[207]

200.    In their petition, these Nicaraguan government officials said: "The administration of justice is used here as an instrument for coercion that is at the disposal of certain political and party interests … and more precisely their political leaders, Daniel Ortega and Arnoldo Alemán… It is impossible for there to be true justice – effective, independent and impartial – if those who administer justice are subordinated to their party allegiances and ideological affiliations."[208]

201.    For purposes of the proceeding before the Commission, the Nicaraguan government officials asked me to testify about corruption and the lack of independence in the Nicaraguan judicial system. In sum, in my testimony, I said: "…it is concluded that the Nicaraguan judicial system does not provide impartial tribunals…The procedures for judicial appointment, dismissal and supervision are deeply flawed…There is a general lack of judicial independence…"[209]

202.    Other witnesses were presented. The local NGO Nicaragua Movement presented its declaration in the procedure and said: "The lack of integration of the Judicial Branch due to the lack of impartiality from the legal authorities given their high degree of partisanship is reflected ….on the sentences it rules…."[210]

203.    The Nicaraguan Human Rights group CENIDH was also called upon to present a declaration before the Inter-American Commission on Human Rights in which they stated that: "[the judicial system] crisis is not only caused by material and human limitations but by the lack of independence…the judicial system is directly influenced by political, economic and religious sectors and its members are receptive to those influences…In Nicaragua when a judge is to decide a case, it is already known the way the decision will be issued due to the political affiliation of the

---

[206] Ludwin Loásiga López, *"Retornan ministros desaforados,"* La Prensa, Oct. 3, 2005 (Ex. 129).

[207] September 2005 Petition Before the Inter-American Commission on Human Rights (Ex. 39).

[208] *Id.*

[209] García-Bolívar Testimony (Ex. 40).

[210] Movimiento Nicaragua Presentation (Ex. 41).

judges, which shows their lack of independence and impartiality …[the credibility is so affected] that even when the decisions are taken according to the merits, there is a perception that the decisions are influenced by political parties."[211]

204.   On October 6, 2005, an *in locus* visit was made by the Inter-American Commission on Human Rights Executive Secretary to confirm the allegations made by the high ranking officers.[212] Subsequently, the PLC and the FSLN allowed Bolaños to finish his term. Before the Inter-American Commission on Human Rights could rule on the petition, the charges against the officials were dismissed by a Nicaraguan court.

## Conclusion

205.   Based on my academic and professional expertise examining judicial systems in Latin America, the information I gathered and analyzed in my role assessing the Nicaraguan legal system for USAID, the information and evidence that I have found in all major sources studying the Nicaraguan judiciary and interviews I have conducted with relevant Nicaraguan lawyers and researchers, I conclude that, at least since the underlying law suit was filed in Nicaragua in 2002, the Nicaraguan judicial system has not provided impartial tribunals.

206.   Five factors were crucial in my arriving at this conclusion:

a.   The procedures of judicial appointment, dismissal, and monitoring are deeply flawed.  In Nicaragua, judges are appointed according to their political loyalty, rather than any measure of merit such as competence, impartiality or experience. The process by which judges are removed is equally problematic—in practice they can be removed at the will of Supreme Court justices who are themselves appointed by the National Assembly based on their political loyalty, and are subject to reappointment only if they satisfy their political bosses.  The monitoring system is such that Supreme Court justices tend to be given responsibility over departments for which their personal interests are highest, creating a situation in which the decisions of lower court judges are based on the personal interests of those meant to monitor those decisions.

b.   There is a general lack of judicial independence.  Judges in Nicaragua do not make decisions independently.  Evidence shows that political factors, and interference by political figures, routinely and openly determine the outcome of judicial decisions, including commercial law cases.  In addition, large-scale bribery has been reported to occur for political and for non-political reasons and

---

[211] CENIDH Presentation (Ex. 42).

[212] María José Uriarte y Ludwin Loásiga López, *"CIDH indaga sobre desafueros,"* La Prensa, Oct. 6, 2005 (Ex. 130).

on behalf of political parties and their bosses, judges and court officers. Political control is exercised through direct intervention by Supreme Court justices or political bosses to whom judges owe their appointments. As cases have shown, a failure to follow the instructions of the justices or political bosses automatically brings about dismissal of the objecting judge.

c. There is an overwhelming consensus in both the local and international community with regard to the lack of impartiality of Nicaraguan courts. The local community, including business people, lawyers, judges, politicians, and ordinary Nicaraguans, explicitly express distrust for the judicial system. The international community also believes that Nicaraguan courts are not impartial. Literature from U.S. governmental entities, foreign governments, multilateral organizations and non-governmental organizations from all around the world all lead to the same conclusion:  Nicaraguan courts are not impartial.

d. Through the course of my work, I have yet to see a study or report that expresses the contrary view—namely, that there is judicial independence in Nicaragua.

e. Over time, I have not seen any improvements in the Nicaraguan judicial system. There is an apparently unanimous perception that the Nicaraguan judicial system is not independent and virtually every month new developments reveal how political and economic factors interfere directly and openly in the administration of justice.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Omar García-Bolívar

Executed June 27th, 2008 in Washington, DC

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 30, 2008, this document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that this document is being served this day on the below-listed counsel in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

Steven C. Marks
Ramon A. Rasco
PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130

PROVOST UMPHREY, LLP
490 Park Street
P.O. Box 4905
Beaumont, TX 77704

BENTON MUSSLEWHITE, P.A.
1705 West Gray, Suite A
Houston, TX 77019

*Attorneys for Plaintiffs*

By: _/s/_Ronald P. Weil_____
LAW OFFICES OF RONALD WEIL, PA
Ronald P. Weil (FBN 169966)
E-mail: rpw@weillaw.net
Wachovia Financial Center, Suite 900
200 South Biscayne Boulevard
Miami, Florida  33131
Office:  305-372-5352
Fax:  305-372-5355

*Attorneys for The Dow Chemical Company*