UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 07-22693-CIV-HUCK/O'SULLIVAN

MIGUEL ANGEL SANCHEZ OSORIO, et al.,

      Plaintiffs,

vs.

DOLE FOOD COMPANY, a Delaware
Corporation; THE DOW CHEMICAL
COMPANY, a Delaware Corporation;
OCCIDENTAL CHEMICAL
CORPORATION, a New York Corporation;
SHELL OIL COMPANY, a Delaware
Corporation,

      Defendants.

_____/

### ORDER ON CHEMICAL COMPANY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT BASED ON TRADITIONAL PERSONAL JURISDICTION DEFENSES

      Plaintiffs seek the recognition and enforcement of a Nicaraguan judgment.  On February 2, 2002, Plaintiffs, former banana workers in Chinandega, Nicaragua, filed a lawsuit in the Second Civil District Court for Chinandega, Nicaragua (the "Nicaraguan Court"), asserting claims for personal injury against several defendants, including The Dow Chemical Company ("Dow"), Occidental Chemical Corporation ("Occidental") and Shell Oil Company ("Shell") (collectively, the "Chemical Company Defendants").[1]  The foreign judgment they seek to recognize was issued on August 8, 2005 by the Nicaraguan Court in the amount of $97,398,060.00  in favor of the Plaintiffs (the "Nicaraguan Judgment").[2]   The Chemical Company Defendants have each filed motions to for summary judgment based on a lack of personal jurisdiction over them by the Nicaraguan Court.  Because this Court finds that the Nicaraguan Court lacked personal jurisdiction over Defendants Occidental and Shell, Defendants Occidental and Shell's Motions for Summary

---

1 The Dole Food Company is also a defendant in this case, but has not moved for summary judgment based on lack of personal jurisdiction by the Nicaraguan Court.

2  The parties dispute whether the judgment entered in the Nicaraguan Court was a final, conclusive and enforceable judgment for reasons other than personal jurisdiction.  This opinion will respond only to the parties' arguments that the judgment is not enforceable based on a lack of personal jurisdiction over the parties by the Nicaraguan court.

Judgment based on Lack of Personal Jurisdiction [D.E. #65 and 68] are granted.  Because this Court finds that the Nicaraguan Court properly exercised personal jurisdiction over Dow, Dow's Motion for Summary Judgment based on Lack of Personal Jurisdiction [D.E.# 63] is denied.

## I.  <u>Procedural Posture</u>

On August 13, 2007, Plaintiffs filed a complaint in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 07-25521-CA-04, seeking recognition and enforcement of the Nicaraguan Judgment pursuant to Florida's Uniform Out-of-Country Foreign Money- Judgment Recognition Act, Fla. Stat. §§55.601, *et seq.* ("Recognition Act").  The Recognition Act permits a plaintiff to enforce any foreign monetary judgment that is "final and conclusive and enforceable where rendered."  Fla. Stat. § 55.603.  The foreign judgment, however, is unenforceable if the foreign court lacked personal jurisdiction over the defendant.  Fla. Stat. § 55.605(1)(b).

On October 12, 2007, this case was timely removed from state court based on diversity jurisdiction.  On January 31, 2008, this Court ruled that it would first consider summary judgment on the threshold question of whether the Nicaraguan Court had personal jurisdiction over the Chemical Company Defendants.  Subsequently, Dow, Occidental and Shell each moved for summary judgment based on lack of personal jurisdiction over them by the Nicaraguan Court.[3]  This matter has now been fully briefed.

## II.  <u>Background</u>

The underlying case in this action for enforcement of a foreign judgment was filed in Nicaragua in February 2002 by 201 banana plantation workers allegedly injured by a pesticide called 1,2 –Dibromo-3-chloropropane, commonly referred to as "DBCP," which was designed to control nematode infestation of certain crops, including bananas.  Specifically, Plaintiffs alleged that they suffered irreversible physical injury and psychological damages, including partial or total sterility, gastrointestinal edema, kidney problems, emotional distress, sorrow and loss of consortium as a result of prolonged exposure to DBCP during the years 1970 to 1982 at various banana plantations throughout the Chinandega area of Nicaragua. Compl., ¶9.

### A.  DBCP

The Chemical Company Defendants all manufactured DBCP in the 1970's.  *Dow Statement of Facts ("Dow SOF"), ¶5, Shell Statement of Facts, ("Shell SOF"), ¶1, Occidental Statement of*

---

3 Subsequently, the parties have filed cross-motions for summary judgments on other grounds, which motions are not addressed in this opinion.

*Facts ("Occ SOF")*, ¶2.   Toxicological studies performed by Dow and Shell in the late 1950's through 1961 demonstrated that DBCP had harmful effects on laboratory animals.  *Sanchez Osorio, et al., Statement of Additional Facts* ("*Sanchez Osorio SOAF*"), ¶2-3 citing Exhs. 1-4, Exh. 6 and Exh. 46.   In 1961, Dow and the University of California published a study of DBCP effects in *Toxicology and Applied Pharmacology*.  *Sanchez Osorio SOAF,* ¶5 citing to Exh.8.   The report described the harmful effects to laboratory animals, including damage to kidneys and testes, and recommended that the concentration of DBCP be "kept below 1 ppm if repeated, prolonged exposure is likely," and that "[u]ntil further experience is obtained, close observation of the health of people exposed to this compound should be maintained."  *Id.*  At that time, the U.S. Department of Agriculture proposed stringent labeling requirements and requested information regarding health records of individuals exposed to DBCP for extended periods of time.  *Sanchez Osorio SOAF*, ¶6. DBCP was applied on banana plantations in Nicaragua in the 1970's.  *Sanchez Osorio SOAF*, Exh. 41, p.229.

On September 8, 1977, after reports of sterility of some workers at Occidental's factory, the U.S. Environmental Protection Agency ("EPA") issued an initial, conditional suspension of registrations of DBCP products based upon "recently disclosed information showing that male chemical plant workers exposed to relatively low levels of DBCP have become sterile."  *Sanchez Osorio SOAF*, ¶19 citing Exh. 22.  The EPA issued its order suspending the registration of DBCP products for 19 specific crops on October 27, 1977.  *Sanchez Osorio SOAF*, ¶21 citing to Exh. 40. Relief from the suspension was possible if an applicant submitted an amended registration that provided for restricted use by certified applicators wearing protective clothing and respirators. *Sanchez Osorio SOAF*, ¶21 citing Exh. 22.  Two years later, on October 29, 1979, the EPA unconditionally suspended the use of all pesticide products containing DBCP and prohibited the further sale, use or distribution of pesticides containing DBCP in the United States.  *Sanchez Osorio SOAF*, ¶23 citing Exh. 40.

**B. Nicaraguan Proceeding**

Plaintiffs filed an action for personal injury resulting from the use of DBCP pesticides in Nicaragua in August 2002.  The lawsuit was brought pursuant to Nicaraguan Special Law No. 364, formally titled, "Special Law to Prosecute Lawsuits Filed by People Affected by the Use of Pesticides Manufactured with DBCP" ("Special Law 364").  Compl., ¶10.  On May 16, 2005, following a request by Plaintiffs for appointment of common counsel for the Defendants, the Nicaraguan Court appointed counsel for the Defendants. Compl., ¶13.  The Chemical Company Defendants each state that they did not request or accept the representation of the court appointed

common counsel and, in contrast, that each sent its own counsel to the Nicaraguan Court solely for the purpose of contesting jurisdiction. The Nicaraguan Court entered judgment in favor of 150 plaintiffs against the Defendants named in this case for a total of $97,398,060.00 on August 8, 2005.   Five other defendants were found not liable and fifty-one plaintiffs were awarded no recovery.

## III.  <u>Standard for Summary Judgment</u>

Summary judgment shall be granted if the pleadings, discovery and disclosure materials on file, together with any affidavits show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).   An issue is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *See Allen*, 121 F.3d at 646.

On a motion for summary judgment, all evidence must be viewed in the light most favorable to the non-moving party to determine whether that evidence could reasonably sustain a jury verdict. *Id*.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970), *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir. 1993).

When the movant has satisfied his initial burden under Rule 56©, the burden shifts to the opposing party to present affirmative evidence demonstrating that there is indeed a material issue of fact.   *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is "merely colorable or not significantly probative," is not enough. *Anderson,* 477 U.S. at 252; *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).   But, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Allen v. Tyson Foods, Inc.*, 121 F. 3d 642, 646 (11th Cir. 1997) quoting *Anderson,* 477 U.S. at 255 (internal quotations removed).

**IV.** **Requirements under the Recognition Act for Valid Exercise of Personal Jurisdiction by a Foreign Court**

A federal court sitting in diversity jurisdiction applies state law of the state in which it sits.

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).   Thus, this Court applies the law of the State of Florida when considering recognition and enforcement of the Nicaraguan Court's judgment.   Under the Florida Recognition Act, unless one of the grounds for non-recognition listed in Fla. Stat. § 55.605 is present, a foreign judgment, which is final where rendered, is conclusive between the parties to the extent that it grants a recovery of a sum of money and is enforceable in the same manner as the judgment of a sister state. Fla. Stat. §§ 55.601, *et seq.*   One exception found in § 55.605 is that a court cannot recognize a foreign judgment if the issuing court did not have personal jurisdiction over the defendant in the foreign forum.  Fla. Stat. § 55.605(b)(1).

While there is no case specifically addressing the requirements for a foreign court to validly exercise personal jurisdiction so that its judgment is enforceable in Florida courts, courts in other jurisdictions that have enacted similar versions of the Uniform Out-of-Country Foreign Money-Judgments Recognition Act have found that foreign judgments are enforceable where the foreign court's jurisdiction was established by contacts that would be acceptable to U.S. courts and where the exercise of jurisdiction complies with traditional notions of fair play and substantial justice under the Due Process Clause.  *See, e.g., Bank of Montreal v. Kough*, 430 F. Supp. 1243, 1247 (N.D. Cal. 1977), *aff'd* 612 F.2d 467, 471 (9th Cir. 1980) (finding that Canadian court's personal jurisdiction over defendant must have been, "at a minimum, in compliance with the requirements of traditional notions of fair play and substantial justice under the due process clause of the United States Constitution"); *Somportex, Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 443 (3d Cir. 1971) (applying U.S. Supreme Court's *International Shoe* due process analysis to English court's exercise of judgment in an action to enforce that judgment in the United States); *Nippo-Emo Trans. Co. v. Emo-Trans., Inc.*, 744 F. Supp. 1215, 1230-31 (E.D.N.Y. 1990) (holding that Japanese judgment could be enforced under New York's version of the Uniform Foreign Money-Judgments Recognition Act where, even though bases for jurisdiction articulated by Japanese court were insufficient for jurisdiction under New York law, jurisdiction could properly have been asserted in Japan under New York and federal constitutional law).

**V.** **Applicable Standard for Meeting the U.S. Constitution's Due Process Requirements**

Determining whether the Nicaraguan Court's exercise of personal jurisdiction over the Chemical Company Defendants comports with U.S. Constitutional Due Process requirements

requires a two-part analysis.  First, the Chemical Company Defendants must have established sufficient minimum contacts with Nicaragua to satisfy due process requirements.  *See Madara v. Hall*, 916 F. 2d 1510, 1514 (11th Cir. 1990) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1940)).  Second, the Nicaraguan Court's exercise of jurisdiction must not offend traditional notions of fair play and substantial justice.  *Madara*, 916 F. 2d at 1514.

### A.       Minimum Contacts

Plaintiffs allege that the Nicaraguan Court had specific jurisdiction[4] over the Chemical Company Defendants because of their production of DBCP products and subsequent sales in Nicaragua during the 1970s.  There is a three-part inquiry to determine whether a defendant had the requisite contacts with a forum state such that the courts there could properly exercise specific jurisdiction over a defendant.  The defendant's contacts with the forum must (1) be related or have given rise to the plaintiff's cause of action, (2) involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum, and (3) be such that the defendant should reasonably anticipate being haled into court there. *Sloss Industries Corp. v. Eurisol*, 488 F. 3d 922, 925 (11th Cir. 2007).

The first prong is satisfied here because the action arises out of injuries related to the sale and use of DBCP pesticides in Nicaragua.  With respect to what actions are required to determine whether a defendant has "purposefully availed" itself of the forum state or should "reasonably anticipate" its activities would result in being haled into court, the current state of the law as applied in this circuit is somewhat unsettled.  In *Vermeulen v. Renault, U.S.A., Inc., et al.*, the Eleventh Circuit surveyed the current status of minimum contacts under recent Supreme Court decisions, particularly the "purposeful availment" and "reasonable anticipation" elements of the test, through its consideration of the "stream of commerce" theory of personal jurisdiction. 985 F.2d 1534, 1548 (11th Cir. 1993).

The first articulation of the "stream of commerce" theory was in *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).  In that case*,* two injured motorists claimed that Oklahoma courts had jurisdiction over a New York-based wholesale distributor and a New York automobile retailer which had sold them the defective automobile. The plaintiffs had purchased the

---

4  None of the parties dispute that the Nicaraguan court did not have general jurisdiction—that is, jurisdiction not related to the incident but arising out of a defendant's "continuous and systematic" contacts with the forum—over the Chemical Company Defendants.  Defendant Occidental does a minimal amount of continuing business with Nicaragua; however, that minimal amount of business does not rise to the level required for general jurisdiction, and Plaintiffs do not allege that it would be a basis for general jurisdiction.

car in New York and were injured in Oklahoma en route to Arizona. Neither defendant conducted any business in Oklahoma, shipped or sold any products to or in the state, or sought in any way to take advantage of the Oklahoma market. Nevertheless, plaintiffs claimed that the defendants could have foreseen that the plaintiffs would drive their vehicle to Oklahoma and suffer injury there, and that such foreseeability provided sufficient basis for Oklahoma's exercise of jurisdiction over the defendants. *Id.* at 295. The Court rejected this argument, emphasizing that foreseeability alone could not provide a basis for jurisdiction. *Id.* Instead, the Court held that "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum state. Rather it is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Id.* at 297. The Court continued, "…if the sale of a product of a manufacturer…is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States." *Id.* at 297-98. The Court held that the defendants*,* New York corporations without any association with Oklahoma, had not delivered their products into the stream of commerce with the expectation that they would be purchased in Oklahoma, and that therefore the "stream of commerce" analysis did not provide a basis for Oklahoma's exercise of jurisdiction over the defendants.

The Supreme Court revisited its "stream of commerce" analysis in *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102 (1987). That case involved an indemnification action brought in California by a Taiwanese tire manufacturer, against Asahi, a Japanese valve manufacturer that had sold a defective component part to the Taiwanese tire manufacturer. Asahi *was aware* that its tire valves were incorporated into tires that were sold in California. The Court divided three ways on the minimum contacts issue, with no opinion receiving a majority of votes. Justice O'Connor, joined by three other justices, set forth the most stringent test of whether a non-resident party has sufficient contacts with another forum to justify that forum's assertion of jurisdiction. Her opinion states that mere "awareness that the stream of commerce may or will sweep the product into the forum State" is not enough to establish jurisdiction. *Id.* at 112. Justice O'Connor provided four examples of additional conduct which could indicate sufficient intent to serve the market in the forum state: (1) designing the product for the market in the forum state, (2) advertising in the forum state, (3) establishing channels for providing regular advice to customers in the forum state, and (4) marketing the product through a distributor who has agreed to serve as a sales agent in the forum state. *Id.*

Justice Stevens, in a concurrence joined by two other justices, concluded that the O'Connor plurality misapplied its announced test to the facts of the case. Justice Stevens suggested that it is difficult to draw the line between "mere awareness" that a component will find its way into the forum state and "purposeful availment" of the forum's market. He suggested that to determine whether conduct rises to the level of purposeful availment requires a constitutional determination focusing on the volume, the value, and the hazardous character of the goods introduced into the stream of commerce. *Id.* at 122.

Justice Brennan, joined by three other justices, wrote a separate concurrence. He concluded that placing a product into the stream of commerce is sufficient to constitute purposeful activity directed toward the forum state "as long as a participant in this process is aware that the final product is being marketed in the forum State" because "the possibility of a lawsuit there cannot come as a surprise . . . nor will the litigation present a burden for which there is no corresponding benefit." *Id.* at 117. Justice Brennan's test is the broadest of the minimum contacts tests articulated in *Asahi*.

It is not clear which *Asahi* test, if any, has been adopted in the Eleventh Circuit. In *Vermeulen*, the plaintiffs' injuries from a car accident in Georgia were allegedly the result of negligent design and manufacture by Renault, a French company. 985 F. 2d at 1534-36. The court found that Renault had sufficient minimum contacts with Georgia because Renault had: (1) designed the car for the U.S. market, (2) advertised its product in the United States, (3) established channels for advising U.S. customers, (4) taken an active role in training U.S. dealership employees in repair, servicing, and preparation of Renault products, and (5) created and controlled the distribution network that brought its products into the United States. *Id.* at 1549-51. The *Vermeulen* court explicitly did not adopt any of the tests enunciated in *Asahi*. *Id.* at 1548. Other courts have cited to *Madara v. Hall*, 916 F. 2d 1510, 1519 (11th Cir. 1990) for the proposition that the Eleventh Circuit had adopted Justice O'Connor's test. *See, e.g., Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 683 (1st Cir. 1992); *Pennzoil Prods. Co. v. Colelli & Assocs.,* 149 F.3d 197 (3d Cir.1998). However, in *Vermeulen*, which is the more recent opinion (decided in 1993), the Eleventh Circuit explicitly does not adopt any of the *Asahi* tests; rather, the court determined that Renault's contacts with the United States were sufficient for O'Connor's test in *Asahi*, the most stringent test articulated by the Supreme Court, and thus the court did not need to determine whether the less stringent tests articulated by Stevens and Brennan should be applied. *Vermeulen*, 985 F.2d at 1548.

In an even more recent minimum contacts case, the Eleventh Circuit examined the defendant's contacts without reference to any *Asahi* test. *Sloss Industries Corp.*, 488 F. 3d at 925 (finding sufficient contacts where defendant, the manufacturer of a wool product, had initiated contact with plaintiff in forum state, had representatives visit plaintiff's manufacturing plant in forum state to discuss production, proposed exclusive supplier arrangement, and sent containers to forum state for use in shipping product to defendant in France). It therefore appears that the standard in this circuit is somewhat unsettled,[5] but that in a circumstance where the contacts meet O'Connor's most stringent standard, there is no need to consider whether the contacts would meet the other standards.

### B. Effect of Hazardous Character of DBCP Pesticides on Jurisdictional Analysis

The Eleventh Circuit has also used Justice Steven's concurrence in *Asahi* regarding consideration of the "hazardous" nature of a product when analyzing minimum contacts. *Morris v. SSE, Inc.*, 843 F.2d 489, 494 (11th Cir. 1988). In *Morris v. SSE*, the Eleventh Circuit considered Justice Steven's "hazardous product" category as a factor in determining the existence of minimum contacts. 843 F.2d 489, 494 (11th Cir. 1988). The court found jurisdiction appropriate, using Justice Stevens' "hazardous product category," where the defendant, who had manufactured faulty skydiving equipment, "was aware that it was sending a hazardous product to Gulf Coast Air Sports in Alabama and that the hazardous product would be used in Alabama." *Id.* In that case, the hazardous character of the product was just one of three factors considered by the court; the court also considered: (1) that the defendant had repaired a device and returned it to Alabama and (2) that the court could make a reasonable inference that the defendant had advertised in Alabama because it had advertised in national trade magazines. The court found that those two factors, together with the placement of a hazardous product into the stream of commerce, warranted a finding of personal jurisdiction over the manufacturer defendant. Thus, this Court will consider the hazardous nature of the DBCP product manufactured and sold by the Chemical Company Defendants as a factor, together with their other contacts, in determining whether those defendants had the requisite minimum contacts with Nicaragua.

---

5

There is no consensus among the circuits about whether it is necessary to adopt one of the *Asahi* tests. *See, e.g., Pennzoil Prods. Co. v. Colelli & Assocs.*, 149 F.3d 197, 206-207 (3d Cir.1998) (declining to expressly adopt any of the *Asahi* tests); *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 613-15 (8th Cir. 1994) (adopting a position consistent with that of Justice Brennan); *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 420 (5th Cir.1993) (same); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 683 (1st Cir. 1992) (finding that the *Asahi* opinions did not undermine a prior First Circuit decision holding that mere awareness of product's destination does not constitute purposeful availment, and adopting Justice O'Connor's test); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994) (reading *Asahi* and *World-Wide Volkswagen* to require "activity purposefully directed toward the forum state"); *Bridgeport Music, Inc. v. Still N The Water Publ.*, 327 F. 3d 472, 480 (6th Cir. 2003) (expressly adopting Justice O'Connor's test).

**VI.  Analysis of Minimum Contacts of Each Chemical Company Defendant and the Effect of Fair Play and Substantial Justice**

Evaluating the Chemical Company Defendants' contacts with Nicaragua requires an inquiry into the "nature and quality" of those contacts. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). With that in mind, what follows is an analysis of the contacts of each Chemical Company Defendant in Nicaragua related to DBCP production and sales, and established by the parties through the evidence submitted, to determine whether any of the Chemical Company Defendants purposefully availed itself of the privilege of conducting activities within Nicaragua such that the defendant should have reasonably anticipated being haled into court there. *Sloss Industries Corp. v. Eurisol*, 488 F. 3d 922, 925 (11th Cir. 2007).  Because these are Motions for Summary Judgment, the Court has reviewed the evidence in the light most favorable to the non-moving party, here the Plaintiffs, and has determined whether that evidence could reasonably sustain a jury verdict.   *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).  In considering these contacts, the Court also considered the hazardous nature of DBCP pesticides as a factor.  *Morris v. SSE, Inc.*, 843 F.2d at 494.

**A.  Dow**

Dow is a U.S. corporation that manufactured pesticide products containing DBCP from 1957 through August 11, 1977.  *Dow SOF*, ¶5.  Dow's DBCP pesticide product carried the brand name "Fumazone." *Dow SOF*, ¶7.  Dow's wholly owned subsidiary, Dow Chemical International ("Dow International"),[6] negotiated and entered into "requirements" contracts and related documents, like purchase orders for the sale of Fumazone, directly with Castle & Cooke.[7] *Dow SOF*, ¶¶10, 14-15.    Dow International entered into its first requirements contract to supply Fumazone to Castle & Cooke in late 1970 or early 1971.  *Dow SOF, ¶10*. The term of that contract

---

6 Dow International is neither a defendant in this case nor a judgment debtor in the Nicaraguan case.  The facts presented do not allege conduct such that the Court should pierce the corporate veil between Dow and Dow International. The Eleventh Circuit has held that "[i]t is well established that as long as a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other." *Consol. Dev. Corp. v. Sherrit, Inc.,* 216 F.3d 1286, 1293 (11th Cir. 2000); *see also Sun Trust Bank v. Sun Int'l Hotels, Ltd.*, 184 F.Supp.2d 1246, 1267 (S.D.Fla. 2001) ("to 'pierce the corporate veil' and impute the [] subsidiaries' activities directly to the [parent], plaintiffs would have to allege (a) that the subsidiaries' activities are mere instrumentalities of the parent, and (b) that the defendants engaged in 'improper conduct' in the formation or use of the corporations"). The Plaintiffs here have not alleged any such improper conduct, such as comingling, in the use or formation of these Dow entities. Thus, the Court only examines the conduct of Defendant Dow in evaluating contacts with Nicaragua.

7 Standard Fruit Company was a subsidiary of Standard Fruit and Steamship Company.  In the mid-to-late 1960's, Castle & Cooke, which also owned Dole, purchased Standard Fruit and Steamship Company and its subsidiaries.  In 1991, Castle & Cooke was sold and renamed Dole Food, Inc. *Dow SOF*, Exh. 8.  This opinion, where possible, specifies the Dole-predecessor that the Chemical Company Defendant's were involved with in regard to their DBCP sales and use.

was from January 1, 1971 to October 31, 1973. *Dow SOF*, ¶13. Dow International entered into a second contract to supply Fumazone to Castle & Cooke, the term of that contract was from November 1, 1973 to October 31, 1976. *Dow SOF*, ¶14. On May 5, 1975, Dow International entered into a third contract with Castle & Cooke to supply all of its DBCP requirements for Nicaragua, and other foreign destinations, from May 5, 1975 - Oct. 31, 1979 ("1975 Contract"). *Sanchez Osorio SOAF*, Exh. 52.

Dow claims that it had no involvement with sales of Fumazone to Castle & Cooke for use in Nicaragua nor did it have any other contacts with Nicaragua. However, upon review of the evidence in a light most favorable to the Plaintiffs, the Court finds that: (I) Dow participated in the sale of DBCP to Castle & Cooke for use in Nicaragua, (ii) Dow monitored the use of DBCP on banana plantations in Central America and created procedures for use of the product after it had been sold to Castle & Cooke, and (iii) Dow worked closely with Standard Fruit Company in developing DBCP products that were subsequently used in Nicaragua.

### i.   Dow was involved in the sale and negotiations of DBCP to Castle & Cooke for use in Nicaragua

First, Dow participated in the sale of DBCP to Castle & Cooke for use in Nicaragua. To arrange delivery of the Fumazone purchased under the contracts, including the 1975 Contract that specified the product destination of Nicaragua, Castle & Cooke issued purchase orders to Dow International. *Dow SOF*, ¶17. Those purchase orders stated the ultimate destination, including Chinandega, Nicaragua. *Dow SOF*, Exh. 3 (Brem Decl.), (Exhibit D to Brem Decl. includes purchase orders dated May 7, 1978 and August 18, 1978, specifying "mark all packages and shipping documents…SFNIC, NAT'L DEPT., CHINANDEGA, NICARAGUA"). Dow International would then place an order for Fumazone with Dow. *Dow SOF*, ¶18 and Exh. E to Exh. 3 (Brem Decl.). Pursuant to that request, Dow would then send Fumazone directly to Castle & Cooke in Louisiana and Mississippi. *Dow SOF*, ¶20.

Next, Plaintiffs have introduced evidence that Dow was involved in negotiations with Dow International and Castle & Cooke and/or Standard Fruit Company[8] regarding the sale of DBCP. First, there is an indemnification letter agreement on Dow letterhead and signed by Dow executive vice president E.B. Barnes on February 6, 1978 which serves to "confirm the Agreement reached amongst The Dow Chemical Company (DOW), Dow Chemical International Inc. of Delaware (DOWINTAL) and Standard Fruit Company (STANDARD FRUIT COMPANY) in respect of the

---

8 *See supra*, Note 7 discussing corporate structure of the Dole-predecessor companies.

purchase of 'Fumazone' Brand Dibromochloropropane ('Fumazone') from DOWINTAL." *Sanchez Osorio SOAF*, Exh. 29 ("Indemnification Agreement").   In the Indemnification Agreement, Standard Fruit Company agreed to indemnify both Dow and Dow International from any losses arising out of sale or use of Fumazone purchased from Dow International.   *Id.*   Standard further acknowledged "receipt from DOW of certain information pertaining to the toxicity and use of 'Fumazone'" and agreed to only purchase the Fumazone for use "outside of the U.S.A."   *Id.*

    Castle & Cooke and Dow correspondence provides further evidence of Dow's involvement with the sale of Fumazone to Castle & Cooke for use in Nicaragua.  In a January 26, 1978 memo, Castle & Cooke distributed policies and practices related to the handling, storage and use of Fumazone that were prepared by the Agricultural Department of "Dow Chemical" and confirmed that "Dow has made their [sic] product available to Standard Fruit for use in our operations or operations that are under contract to us [sic]." *Sanchez Osorio SOAF*, Exh. 30.    Next, a letter dated February 23, 1978 on Dow International letterhead reads,

> Pursuant to the recent transactions between representatives of The Dow Chemical Company, hereafter called "DOW" and Castle & Cooke Foods, hereafter called "CASTLE", CASTLE has agreed to purchase quantities of DOW'S 1,2-dibromo-3-chloropropane pesticide hereafter called "PRODUCT".  In consideration of the purchase of PRODUCT by CASTLE from DOW and the desire of CASTLE to use certain of DOW'S proprietary information in the preparation of formulations of said PRODUCT where necessary, DOW hereby agrees to provide CASTLE with proprietary information pertaining to the formulation of PRODUCT, hereafter called "INFORMATION", under the following terms and conditions…

*Sanchez Osorio SOAF*, Exh. 34 ("Secrecy Agreement"). The Secrecy Agreement goes on to describe the Castle and Cooke's agreement to use its best efforts to maintain Dow's proprietary information about DBCP in secrecy. *Id*.  The Indemnification Agreement and Secrecy Agreement both indicate that Dow, not just its subsidiary Dow International, was involved in the negotiations, sales and servicing the contracts for sale of Fumazone to Standard Fruit and/or Castle and Cooke for use in Nicaragua.

     ii.    **Dow created manuals for DBCP use on banana plantations**

    Dow claims that once Castle & Cooke took title to the pesticide in the United States,[9]

---

9 The deliveries of the product were arranged F.O.B. to Castle & Cooke in the United States.   It is well-settled that the F.O.B. term does not affect the exercise of jurisdiction where the contacts with the forum country are otherwise sufficient. *See, e.g., Luv N'Care, Ltd. v. Insta-Mix, Inc.* 438 F.3d 465, 471-72 (5th Cir. 2006), *Kaplan v. Daimler Chrysler, A.G.,* 99 F.Supp.2d 1348, 1352 (M.D.Fla. 2000).

neither Dow nor Dow International had further participation in the sale, distribution or use of the pesticide.  However, evidence submitted by Plaintiffs demonstrates that Dow worked closely with Castle & Cooke in Central America and participated in creating manuals for the safe use of the pesticide on banana plantations in Central America. First, a February 8, 1978 draft statement regarding the sale of DBCP inventory from "Dow Chemical U.S.A.," identified elsewhere as "an operating unit of The Dow Chemical Company,"[10] to Castle & Cooke states that "Dow" had completed the sale of its product to Castle & Cooke.  *Sanchez Osorio SOAF*, Exh. 33.  The letter notes that Dow concluded that sale

> only after Dow participated with Castle and Cooke in a thorough review of the type of personnel, methods and procedures to be employed by Castle and Cooke in the field application of DBCP as a nematicide to banana crops in the Philippines and Centra[sic] America.  Following on-site inspections at Castle and Cooke properties in Central America, Dow personnel have recommend specific thing[sic], boots, gloves and respirators to be used in the application of DBCP by the sprinkler techniques, using water as the medium, employed in the banana operations.  Dow is also satisfied that the DBCP will be applied by Castle and Cooke personnel who are skilled and knowledgeable in the proper use of DBCP.  *Id*.

That document also indicates that possible sterility of workers handling DBCP due to overexposure was specifically covered in the information provided by Dow.  *Id*.

Next, the Plaintiffs present additional evidence of visits to banana farms in Honduras by Dow employees to assist in developing safe handling procedures for use of DBCP products.  In 1977, Francis O'Melia, a Dow employee, travelled with Steve Randall Johnson, an employee of Dow Chemical Latin America, S.A., to meet with Dole employees at Dole banana plantations in Honduras.  There, O'Melia and Johnson monitored DBCP application, so that they could subsequently put together safe handling guidelines and to instruct Dole employees on how to implement those guidelines.  *Sanchez Osorio SOAF*, Exh. 55 (Randall deposition), Exh. 56 (O'Melia deposition).  Further, several times during 1973-74, Steve Randall Johnson visited banana plantations and met with at least one Standard employee in Nicaragua. *Sanchez Osorio SOAF*, Exh. 55.

Francis O'Melia wrote a December 21, 1977 letter with the subject line "Fumazone 86E Soil

---

10 *See, Sanchez Osorio SOAF*, Exh. 35 ("Fumazone Brand Soil Fumigants Safety Guide," the first page of which indicates authorship by "Dow Chemical U.S.A.[,] An Operating Unit of The Dow Chemical Company[,] Agricultural Products Department[,] Midland, Michigan 48640"); Exhs. 59 and 60 (letters on Dow Chemical U.S.A. letterhead with footer reading "an operating unit of The Dow Chemical Company").

Fumigant Use on Bananas," which stated:

> The attached requirements for the safe handling and application of
> FUMAZONE 86E soil fumigant to banana plantations was prepared after
> reviewing the ETS (Emergency Temporary Standard) established by the
> EPA, OSHA and the FDA for safe handling of DBCP and reviewing the
> available toxicology information on DBCP and Industrial Hygiene
> monitoring data.  The requirements sent [to] you [on] September 23,
> 1977 have been modified appropriately after an on-site inspection and
> vapor monitorings of actual sprinkler applications of FUMAZONE 86E to
> bananas were made in Honduras, Central America in October,
> 1977…The attached requirements describes in detail the activities and
> equipment necessary to provide the workers with adequate protection
> against the liquid and chemical vapors.  <u>I recommend that Dow
> personnel provide technical assistance where needed to implement these
> practices</u>. *Sanchez Osorio SOAF*, Exh. 27 (emphasis added).

The procedures attached to that letter are quite detailed and include specific information about the
type of protective clothing to be worn (including supplier of such clothing), the manner of
application of the product (including that such application should occur at night and shall not be
made if wind is above 10 mph), directions for training employees, instructions for emergency
procedures if exposure occurs, and an emergency assistance number for Dow ("For emergency
assistance call collect: The Dow Chemical Company (517) 636-4400").  *Id.*  Dow appears to have
also created "Fumazone® Brand Soil Fumigants Safety Guide" with a cover page that indicates it
was promulgated by "Dow Chemical U.S.A.[,] An Operating Unit of The Dow Chemical
Company" and with a handwritten notation that reads "Received Costa Rica June 22, 1978."
*Sanchez Osorio SOAF*, Exh. 35.

### iii. Dow's coordination with Standard Fruit Company and/or Castle & Cooke in developing and advocating use of DBCP

Dow was also involved with Standard in the development of DBCP products and advocating
its use in foreign countries, including Nicaragua. *Sanchez Osorio SOAF*, ¶11.  In 1972, Dow
worked with Standard in testing DBCP, apparently in the United States. *Id.* at ¶¶10-12. Plaintiffs
have submitted a Standard Fruit Company memo dated May 27, 1972  with a subject line that reads
"Samples of projects 41-34-25 and 41-34-27 to be sent to Dow Chemicals Co."  Subsequently in
the memo,  Project 41-34-25 is identified as "a comparison of the Nelson and Rippy guns in relation
to DBCP loses."  The memo further notes that "from this project, 20 samples are being sent."
Project 41-34-27 is identified as "a study of DBCP losses in relation to inyection [sic] time."
*Sanchez Osorio SOAF*, Exh. 12.  It further appears that after the EPA issued its initial temporary
suspension of registration of DBCP products, Dow worked with Castle & Cooke to advocate

DBCP's continued use on banana plantations in Central America.  On December 6, 1977, Dow revised and sent a report prepared by Castle & Cooke to the EPA regarding the benefits of using DBCP on bananas. *Sanchez Osorio SOAF*, Exhs. 60-61. That report evaluated the impact that prohibiting DBCP use would have in Central American countries, specifically naming and discussing Nicaragua. *Id.*, Exh. 60.

### iv.   Conclusion Regarding Dow's Contacts with Nicaragua

Thus, viewing the evidence in the light most favorable to the non-movants, the Plaintiffs present evidence that (i) Dow delivered its DBCP product Fumazone directly to Standard Fruit Company and/or Castle & Cooke for use in Nicaragua pursuant to purchase orders placed with Dow International; (ii) Dow, not just its subsidiary Dow International, signed the Indemnification Agreement with Standard concerning the toxicity of Fumazone, its sale to Standard, and an indemnification related to such sale; (iii) Dow signed the Secrecy Agreement with Standard ; (iv) Dow employees were present in Honduras and worked with Standard Fruit Company and/or Castle & Cooke to create usage manuals for Fumazone on banana plantations in Central America, (v) Dow worked with Standard Fruit Companies and/or Castle & Cooke to develop DBCP products and advocate its continued use in Central America to the EPA; and (vi) products containing DBCP were hazardous, and Dow was aware that such products were hazardous.

Here, Dow has engaged in the type of additional conduct beyond merely putting their product into the stream of commerce that the Eleventh Circuit has previously held to be sufficient to find minimum contacts. *See, e.g., Sloss Industries Corp.*, 488 F. 3d at 925, *Morris v. SSE*, 843 F.2d at 494.  Thus, when examining those contacts with the Nicaragua, the Court concludes that Dow has participated in sufficient additional conduct, beyond mere awareness that its product entered into the stream of commerce, that indicates an intent to serve the market in Nicaragua.  Therefore, the Court finds that the Nicaraguan Court properly exercised personal jurisdiction over Dow.

### B. Shell

Shell produced a DBCP pesticide that carried the brand name "Nemagon." *Shell SOF*, ¶2. In the 1970s, Shell sold Nemagon to Standard Fruit Company, and later to Castle & Cooke, for use on plantations in Honduras and Costa Rica. *Sanchez Osorio SOAF*, ¶10. Shell did not sell Nemagon to Standard Fruit Company for use in Nicaragua, ship its product to Nicaragua or direct its sales to Standard towards Nicaragua.  *Shell SOF*, ¶4.   The Plaintiffs contend that the product was sent to Nicaragua after arriving by boat in Honduras and then shipped via truck to Nicaragua.  *Sanchez Osorio SOAF*, ¶18.   The Plaintiffs argue that because Shell did not limit or restrict the use of Nemagon to Honduras or Costa Rica, it was reasonably foreseeable that Nemagon would end up in

bordering Nicaragua. *Sanchez Osorio, Resp. to Mot. for Summ. J.*, p.8. However, Plaintiffs do not provide any evidence that Shell knew its product was being sent to Nicaragua or purposefully directed its product toward Nicaragua.

The Plaintiffs provide some evidence that Shell's product Nemagon was used in Nicaragua in 1970-1978, including: (1) testimony given during the judicial inspection of a banana plantation made by the Nicaraguan Court in this case, (2) affidavits of plantation workers witnessing barrels of Shell's product arriving in Nicaragua from Honduras (and testifying that this was a normal procedure for Standard), and (3) Standard's correspondence detailing the application of Nemagon at banana plantations in Nicaragua. *Sanchez Osorio SOAF*, ¶¶16-18 citing Exh. 58, Exh. 49 (Declaration of Mr. Fernando Mendoza, an industrial mechanic at Standard in Nicaragua who recalls both Fumazone and Nemagon being delivered, with Nemagon arriving by truck), Exh. 51 (Declaration of Mr. Alvarez, an industrial mechanic at Standard in Nicaragua who also recalls both Fumazone and Nemagon being delivered, with Nemagon arriving by truck), and Exh. 16 (a Standard memo detailing quantities of Nemagon distributed at certain plantations).

Shell argues that there is no evidence that its product, Nemagon, was used in Nicaragua and that all documents referring to Nemagon are not probative because the brand name Nemagon took on generic status and has been used to refer to any brand of DBCP since at least 1970. *Shell SOF*, ¶3. However, viewing the evidence in light most favorable to the Plaintiffs, the testimony of the workers stating that they witnessed Shell's product arriving (in "barrels with a shell, the same one as the Shell gas stations") from trucks in Honduras refutes Shell's contention that their product was not used in Nicaragua. [11] *Sanchez Osorio SOAF*, ¶¶16-18 citing Exh. 58 (Nicaraguan Court decision) and Exh. 49 (Declaration of Mr. Fernando Mendoza). Shell also states that it was unaware of any use of its product there, citing to the testimony of Shell Oil's product manager for Nemagon, Donald

---

[11] In *Shell Oil Co. v. Franco, et al.*, a similar action to enforce a Nicaraguan judgment, the Central District of California held that a Nicaraguan court did not have personal jurisdiction over Shell. 2005 WL 6184247 at *7 (C.D.Ca. Nov. 10, 2005). The *Franco* court found that the Nicaraguan court did not have jurisdiction over Shell because the plaintiffs had not provided credible evidence that Shell's DBCP product was present in Nicaragua. *Id.* at *2. The court found that testimony from ten Nicaraguan banana plantation workers who testified as to the presence of DBCP products on plantations lacked credibility because the statements were given on the same date, in the same location, used the same language verbatim and were poorly translated for the court. *Id.* at *8. Moreover, none of those affiants claimed to have seen the Shell logo associated with DBCP in Nicaragua; rather, both the barrel affiants and a Nicaraguan court inspection referred to a "rhomboid shape." *Id.* at *7. In contrast, Plaintiffs in this case have presented sworn affidavits from three industrial mechanics who state that they worked on banana plantations in Nicaragua and saw the Shell logo on barrels that arrived by truck. In accordance with this Court's finding, the *Franco* court also found that even if the declarations of those affiants had been credible, that evidence only proved the presence of the product in Nicaragua and did not provide evidence that Shell marketed its product in Nicaragua or that its presence was part of a regular and anticipated flow of the product. *Id.* at *8.

Miner, who stated that "Shell Oil was never informed and had no reason to believe that the DBCP product it sold to [Dole] under the Honduras contract or at any other time, was shipped from Honduras or any other country into Nicaragua." *Shell SOF*, ¶5, 7 citing to Decl. 5, Exh. 4 (Miner Dep.). The Plaintiffs do not provide any evidence to show that Shell was at all aware of the use of its product in Nicaragua or that such use was part of the regular and anticipated flow of the product.

Shell further argues, and the Court agrees, that whether or not its products were present in Nicaragua, it did not direct any DBCP-related activity toward Nicaragua. *Shell SOF*, ¶5 citing to Decl. 5, Exh. 7 (Pyatt Dep.), Decl. 3 (Miner Dep.), Decl. 5, Exh. 4 (Miner Dep.) (depositions of employees with personal knowledge that Shell did not market, promote, or advertise Nemagon in Nicaragua or direct its sales toward Nicaragua in any way). Shell company records, including purchase orders, invoices, and bills of lading related to Standard Fruit, indicated that sales to Standard Fruit were destined for countries other than Nicaragua. *Shell SOF*, ¶7 citing Decl. 5, Exh. 6 (Flynn Dep.). Importantly for this jurisdictional analysis, when Shell was offered an opportunity to bid on Dole's DBCP requirements in Central America, the Philippines, and Hawaii, Shell chose to bid on the Philippines and Honduras only. Shell chose not to bid on Nicaragua. *Shell Mot. for Summ. J.*, pp. 12-13 (citing various Shell and Dole employee declarations). Further, Shell's records do not indicate any sales or shipments destined for Nicaragua. *Shell SOF*, ¶7 citing Decl. 1, Flynn, ¶¶5-6.

Therefore, although the Plaintiffs have provided some evidence that Shell's product Nemagon may have found its way into Nicaragua, the Plaintiffs have provided no evidence that Shell knew it and no evidence that Shell directed its activities toward Nicaragua or otherwise engaged in any additional conduct that would constitute purposeful availment of the Nicaraguan forum. The Court finds that because Shell does not have the requisite minimum contacts with Nicaragua, the Nicaraguan Court did not have personal jurisdiction over Shell and pursuant to the Recognition Act, the Court cannot recognize the Nicaraguan Judgment with respect to Shell.

### C. Occidental

The Plaintiffs provide no evidence of the use or presence of Occidental's DBCP product in Nicaragua. However, the Plaintiffs argue that Occidental "had to expect for its product to reach Nicaragua" because it actively solicited Castle & Cooke's business in 1978, was supplying 75% of Castle & Cooke's DBCP needs in 1980, and was aware that Castle & Cooke made extensive use of the DBCP product in Central America. *Sanchez Osorio, Resp. to Mot. for Summ. J.*, p. 30. The Plaintiffs provide only one piece of evidence that Occidental knew its products would be used in at least some portion of Central America. Specifically, Plaintiffs cite to an Occidental legal

department memo from September 1977 explaining that any sales to Castle & Cooke would have to be for export use only, not domestic U.S. sale. *Sanchez Osorio SOAF*, ¶25. That memo provided that: all sales of the product be F.O.B. at Occidental's California plant, the purchaser not use any labeling or material that identifies the product as Occidental's, the purchaser confirm knowledge of the toxic nature of the product, and the purchaser indemnify Occidental for any lawsuits arising out of the toxicity of the product. *Id.* at Exh. 24. The memo also stated that Occidental was aware that at least some of the pesticide would be shipped to Panama for use on bananas. *Id*. The memo does not provide sufficient evidence that Occidental's product was used in Nicaragua and provides no support for finding that Occidental directed its activities toward Nicaragua.

The Court finds that because the Plaintiffs have not submitted any evidence that Occidental's product was used in Nicaragua and have provided no evidence that Occidental engaged in any additional conduct availing itself of the Nicaraguan forum, the Nicaraguan Court did not have personal jurisdiction over Occidental, thus, pursuant to the Recognition Act, the Court cannot recognize the Nicaraguan Judgment against Occidental.

## VII.   Fair Play and Substantial Justice of the Nicaraguan Court Exercising Personal Jurisdiction

The second prong of the test used to determine whether the Nicaraguan Court's exercise of personal jurisdiction over the Chemical Company Defendants comports with U.S. Constitutional Due Process requires that the exercise of a foreign court's jurisdiction comports with traditional notions of fair play and substantial justice. Essentially, this is a reasonableness test. *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). In determining whether personal jurisdiction comports with traditional notions of fair play and substantial justice, the court looks at: (a) the burden on the defendant, (b) the forum state's interest in adjudicating the dispute, (c) the plaintiff's interest in obtaining convenient and effective relief, (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (e) the shared interest of the several states in furthering fundamental substantive social policies. *McGow v. McCurry*, 412 F.3d 1207, 1216 (11th Cir. 2005).

Applying these factors to the present case, we first examine the burdens on the Chemical Company Defendants to defend themselves in the Nicaraguan Court. The Plaintiffs argue that Chemical Company Defendants had already expressed a preference to adjudicate this dispute in Nicaragua in previous United States litigation, and that therefore the burden on the Chemical Company Defendants should be minimal. However, the Chemical Company Defendants expressed that preference for a limited number of plaintiffs, for a limited time period and prior to the

enactment of Special Law 364. *See* discussion *infra* Part VIII.  The Chemical Company Defendants also indicated their amenability to suit in the United States with respect to the plaintiffs in this case via their invocation of the Article-7 "opt-out" provisions in Special Law 364.  Second, Nicaraguan courts have a greater interest than other courts in adjudicating this dispute because the injuries occurred in Nicaragua and the injured parties are citizens of Nicaragua. Third, the Plaintiffs' interest in obtaining convenient and effective relief weighs towards a finding of jurisdiction in the Nicaraguan Court, because Nicaragua is the location of the injuries and the evidence related to the injuries.  The Plaintiffs themselves, as well as their doctors, medical and employment records, employers, supervisors and information concerning the use of DBCP products on banana plantations (i.e., warnings given and protective measures taken), are all located in Nicaragua. Similarly, the fourth factor requiring consideration of efficiency weighs towards finding jurisdiction in Nicaragua, because it appears most efficient to have litigation in the forum where the injury occurred and where the injured parties and related evidence are located.  Last, the shared interest of the several states in furthering substantive social policies weighs towards a finding of Nicaraguan jurisdiction, based on the social policy of allowing a country to exercise jurisdiction over defendants whose products have injured its citizens.   Further, the litigation of these claims, which present complex questions of agricultural practices, toxicology and medical causation, is best suited for the forum that has the strongest ties to the injuries. Weighing all of these factors, the Court finds that it was reasonable for the Nicaraguan Court to exercise personal jurisdiction over the Chemical Company Defendants; however, as discussed *supra*, Part VI.B-C, Occidental and Shell do not have the requisite minimum contacts for such exercise of jurisdiction to comport with due process.

**VIII.   Judicial Estoppel**

The Plaintiffs argue throughout their pleadings that the Chemical Company Defendants should be judicially estopped from challenging the validity of the Nicaraguan judgments because of a position that the Chemical Company Defendants took in *Delgado, et al., v. Shell Oil Co., Inc, et al.,* 890 F.Supp 1324 (S.D.Tex. 1995). In *Delgado*, which involved different plaintiffs than those involved in the present action, the Chemical Company Defendants, in support of their motions to dismiss, successfully argued that the United States was not the appropriate forum for resolution of DBCP cases and that the plaintiffs' home countries, including Nicaragua, provided adequate and available alternative forums. As part of the dismissal of that matter, the Chemical Company Defendants signed an agreement to "waive and/or ... not assert an objection to the jurisdiction of the Foreign Country's judicial system which is based on lack of in personam jurisdiction."  However, that agreement was prefaced on the following limitations: "Defendants' agreements herein apply

only to a lawsuit that meets the following conditions: (1)...[T]he lawsuit must have been filed by August 21, 1995. (2) The lawsuit must have been brought only by a named plaintiff in *Delgado* [or three other specific cases then being pursued in the United States]." *Dow's Reply in Supp. of Mot. for Summ. J.*, Exh. 2 (*Defendants' Amended Agreements Regarding Conditions of Dismissal for Forum Non Conveniens*). The Plaintiffs argue that although they were not directly the subject of the Chemical Company Defendants' agreements in *Delgado*, this Court should nevertheless estop the Chemical Company Defendants from now arguing that Nicaragua did not have personal jurisdiction over them and that Nicaragua was not an appropriate forum for these cases.

### A.    Legal Standard

As an initial matter, this Court applies Florida law on the issue of judicial estoppel. *See Original Appalachian Artworks, Inc. v. S. Diamond Assoc., Inc.,* 44 F.3d 925, 930 (11th Cir. 1995) (holding that that the application of judicial estoppel is governed by state law in diversity of citizenship cases). Under Florida law, judicial estoppel precludes a party from taking an inconsistent position in a subsequent judicial proceeding, where the parties are the same in both actions. *Grau v. Provident Life & Accident Ins. Co.,* 899 So.2d 396, 400 (Fla. Dist. Ct. App. 2005). However, Florida law has an exception to that mutuality requirement when there are "special fairness and policy considerations." *Id.* Because the plaintiffs in *Delgado* were all different individuals than the Plaintiffs in this present case, in order to estop the Chemical Company Defendants from challenging the Nicaraguan judgment this Court would have to find both that the Chemical Company Defendants took an inconsistent position in the *Delgado* case and that there are "special fairness and policy considerations" that warrant the application of judicial estoppel.

### B.    Inconsistency

The Chemical Company Defendants claim that the position that they took in arguing for *forum non conveniens* dismissal of the *Delgado* claims in 1995 is not inconsistent with the position they are taking now. First, they argue that several changes have occurred in Nicaragua which make that country a less adequate forum than it was thirteen years when *Delgado* was decided. Most importantly, they point to the passage of Special Law 364 which they claim denies them basic fairness protections by imposing automatic liability on them and denying them minimum due process protections. The Chemical Company Defendants also claim that the Nicaraguan judiciary has deteriorated since 1995 to the point that it no longer provides an impartial tribunal because of years of politicization and corruption. The Plaintiffs, however, respond that the Nicaraguan judicial system has actually undergone extensive reforms since 1995 for the very purpose of combating partiality and corruption. Specifically, in 1998, judicial reforms led to the passage of laws designed

to strengthen mechanisms in the judiciary to deal with partiality and corruption.

The Chemical Company Defendants also claim that their position in *Delgado* is not inconsistent with their position in this matter because the Recognition Act requires a system to be fair and impartial, while *forum non conveniens* analysis focuses on whether a different forum is "adequate." In other words, the question presented here is whether the Nicaraguan judicial system is fair and impartial to the Chemical Company Defendants, not whether Nicaragua would provide the Plaintiffs with an adequate alternative forum. *See Bank Melli Iran v. Pahlvai*, 58 F.3d 1406 (9th Cir. 1995) (holding that defendant's challenge of an Iranian judgment was not inconsistent with defendant's prior argument for dismissal of claims to Iran based on *forum non conveniens* grounds). In light of the alleged changes in Nicaragua since 1995, particularly the passage of Special Law 364, it is unclear whether the positions that the Chemical Company Defendants took in *Delgado* and in this case are inconsistent. It appears at least that they are not patently inconsistent. However, the Court need not decide this because, as discussed in the following section, this case does not involve sufficient "special fairness and policy considerations" that require the Chemical Company Defendants to be estopped from taking their current position.

### C.    Special Fairness and Policy Considerations

Even if the Chemical Company Defendants' positions taken in this case and in *Delgado* were inconsistent, the "special fairness and policy considerations" come into play only if the Chemical Company Defendants were using "intentional self-contradiction to obtain an unfair advantage in litigation." *Grau,* 899 So.2d at 401. For example, in *Blumberg v. USSA Casualty Insurance Co.*, 790 So.2d 1061, 1066 (Fla. 2001), although the plaintiff had agreed in a settlement against his insurance company to dismiss his claim with prejudice, he later attempted to sue the insurance company's agent for the same claim under a different legal theory. The *Blumberg* court held that although those two defendants were not the same, "special policy considerations" should prevent the plaintiff from asserting essentially the same claim that he had agreed to dismiss with prejudice against the insurance company itself. The application of the judicial estoppel doctrine in that case was to prevent parties from "mak[ing] a mockery out of justice." *Id.*

Here the court finds that the Plaintiffs were not actually prejudiced and that this is not a case involving any special policy or fairness considerations. No later than June 2004, the Chemical Company Defendants' Special Law 364 Article 7 "opt-out" pleadings in the Nicaraguan proceedings put the Plaintiffs on notice that the Chemical Company Defendants were going to challenge the Nicaraguan Court's personal jurisdiction. Those pleadings indicated that the Chemical Company Defendants advised the Plaintiffs at that time that they would voluntarily submit to jurisdiction in

the United States and would waive their *forum non conveniens* defenses here. Therefore, any degree to which the Plaintiffs were initially misled by the position that the Chemical Company Defendants had taken in *Delgado* ceased when the Chemical Company Defendants made clear to the Plaintiffs that they would in fact be challenging personal jurisdiction in this case and indicated that they were amenable to suit in the United States. Furthermore, the fact that the Chemical Company Defendants specifically waived personal jurisdiction in Nicaragua in the *Delgado* action as to certain individuals for a certain period of time should, if anything, have put the Plaintiffs on notice that, without such a waiver, the Chemical Company Defendants might challenge personal jurisdiction as to new plaintiffs or as to claims brought after the waiver period.

The Plaintiffs also claim they have been prejudiced because the statute of limitations may have now expired on their claims in U.S. courts. However, during a hearing regarding these Motions for Summary Judgment held on December 12, 2008 in this Court, all of the Defendants stipulated that they were willing to waive any statute of limitations or other time-bar defenses that would not have been available to them on the date of the filing of the underlying Nicaraguan action.  Thus, Plaintiff's statute of limitations concerns are now moot.

**D.     Conclusion on Judicial Estoppel Issue**

In light of the alleged changes in Nicaragua since 1995, particularly the passage of Special Law 364, it is unclear whether the positions that the Chemical Company Defendants took in *Delgado* and in this case are inconsistent. It appears that they are not patently inconsistent. However, even if the positions were inconsistent, since the plaintiffs in the two cases are not the same, this Court would need to find special fairness and policy considerations in order to apply judicial estoppel.  The Court does not find such unfairness here because: (i) the Chemical Company Defendants' agreement in *Delgado* to waive personal jurisdiction was explicitly limited to certain plaintiffs, for a set period of time and (ii) the Plaintiffs were notified at the beginning of the Nicaraguan litigation that the Chemical Company Defendants were challenging personal jurisdiction and were willing to waive any *forum non conveniens* arguments in the United States.  Further, the Defendants' agreement to waive any time-bar or statute of limitations defenses from the date of the filing of the Nicaraguan action though the resolution of this case moot the Plaintiffs' concerns that their claims may now be barred in the United States due to the duration of the Nicaraguan proceedings.  Thus, the Court finds that Defendants are not judicially estopped from arguing that Nicaragua was not the appropriate forum for bringing suit in this case.

**IX. <u>Conclusion</u>**

For the foregoing reasons, it is hereby

ORDERED AND ADJUDGED that Defendant Occidental and Defendant Shell's Motions for Summary Judgment Based on Traditional Personal Jurisdiction Defenses are GRANTED. Defendant Dow's Motion for Summary Judgment Based on Traditional Personal Jurisdiction Defenses is DENIED.

DONE AND ORDERED in Chambers, Miami, Florida, this January 5, 2009.

_____
Paul C. Huck
United States District Judge

**<u>Copies furnished to</u>:**
All Counsel of Record