# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: 07-22693-CIV-HUCK

MIGUEL ANGEL SANCHEZ
OSORIO, et al.,

   Plaintiffs,

vs.

DOLE FOOD COMPANY, et al.,

   Defendants.

_____/

## ORDER DENYING RECOGNITION OF JUDGMENT

   This is an action to enforce a $97 million Nicaraguan judgment under the Florida Uniform Out-of-country Foreign Money-Judgments Recognition Act (Florida Recognition Act). FLA. STAT. §§ 55.601-55.607 (2009). Plaintiffs are 150 Nicaraguan citizens alleged to have worked on banana plantations in Nicaragua between 1970 and 1982, during which time they were exposed to the chemical compound dibromochloropropane (DBCP). DBCP is an agricultural pesticide that was banned in the United States after it was linked to sterility in factory workers in 1977. Nicaragua banned DBCP in 1993. Defendants are Dole Food Company and The Dow Chemical Company, both Delaware corporations.[1] Dow manufactured DBCP from 1957 until 1977, and Dole used DBCP on its banana farms in Nicaragua until the farms were expropriated by the Sandinista regime that came to power in 1979.

   The judgment in this case was rendered by a trial court in Chinandega, Nicaragua. The trial court awarded Plaintiffs approximately $97 million under "Special Law 364," enacted by the Nicaraguan legislature in 2000 specifically to handle DBCP claims. The average award was approximately $647,000 per plaintiff. According to the Nicaraguan trial court, these sums were awarded to compensate Plaintiffs for DBCP-induced infertility and its accompanying adverse psychological effects. Defendants have

---

[1]    In a previous order, the Court granted motions for summary judgment by defendants Occidental Chemical Corporation and Shell Oil Company because they were not subject to personal jurisdiction in Nicaragua. *See Osorio v. Dole Food Co.*, No. 07-22693-CIV, 2009 WL 48189, 2009 U.S. Dist. LEXIS 713 (S.D. Fla. Jan. 5, 2009).

appealed the judgment to an intermediate appellate court in Nicaragua.  That appeal is still pending.

Defendants raise several objections to domesticating the judgment.  They contend that under the Florida Recognition Act this Court cannot enforce the judgment because (1) the Nicaraguan trial court lacked personal and/or subject matter jurisdiction under Special Law 364,[2] (2) the judgment was rendered under a system which does not provide procedures compatible with due process of law, (3) enforcing the judgment would violate Florida public policy, and (4) the judgment was rendered under a judicial system that lacks impartial tribunals.[3]   For the reasons set forth below, the Court holds that Defendants have clearly established their entitlement to non-recognition on each of these independent grounds.

## I.       BACKGROUND

### A.      FACTUAL HISTORY

#### 1.       Overview of DBCP Litigation

This is not the first DBCP case brought in the United States.  The first DBCP lawsuits were brought in the mid-1990s, when thousands of plaintiffs from over 23 different countries filed DBCP suits in Texas against various defendants.  Those cases were consolidated and the defendants, who included Dole and Dow, won dismissal on *forum non conveniens* grounds after arguing that the plaintiffs' various home countries provided adequate alternative forums.  *See Delgado v. Shell Oil Co.*, 890 F. Supp. 1324, 1362 (S.D. Tex. 1995) (finding that Nicaragua provided adequate remedies for Nicaraguan plaintiffs).  None of the plaintiffs in *Delgado* are plaintiffs in this action.

In response to *Delgado*, which resulted in plaintiffs filing numerous DBCP claims in Nicaragua, the Nicaraguan National Assembly passed the "Special Law for the

---

[2]       The Court's prior decision granted Occidental and Shell's motions for summary judgment, but denied Dow's motion for summary judgment, based on traditional personal jurisdiction defenses under the Due Process Clause of the Constitution of the United States.  The decision did not address whether the Nicaraguan trial court properly exercised jurisdiction pursuant to the provisions of Special Law 364.

[3]       Defendants also contend that the judgment is the offspring of a conspiracy by American and Nicaraguan plaintiffs' attorneys to manufacture fraudulent DBCP claims in Nicaragua and the United States.  The Court bifurcated the fraud issue from the rest of this case, and provided that it would be addressed only in the event Defendants fail to prevail on their other defenses.

Conduct of Lawsuits Filed By Persons Affected By the Use of Pesticides Manufactured with a DBCP Base," commonly referred to as "Special Law 364."  Since the passage of Special Law 364 in October 2000, over 10,000 plaintiffs have filed approximately 200 DBCP lawsuits in Nicaragua, most of which are still pending.  To date, however, Nicaraguan courts have awarded over $2 billion in judgments, including the $97 million judgment that is the subject of this case.  In a sister case tried after this one, *Herrera Ríos v. Standard Fruit Co.*, the same trial judge awarded 1248 plaintiffs over $800 million, an average recovery of approximately $648,000 per plaintiff.

Nicaraguan claimants have made one previous attempt to enforce a DBCP judgment in the United States.  In 2003, more than 450 Nicaraguan plaintiffs attempted to enforce a $489 million judgment in California, but their complaint was dismissed on technical and jurisdictional grounds without reaching the merits of the defendants' substantive objections.  *See Franco v. Dow Chemical Co.*, No. CV 03-5094 NM (PJWx), slip op. at 7-16 (C.D. Cal. Oct. 21, 2003).  In a related action, Shell Oil Company obtained a declaratory judgment that it was not subject to personal jurisdiction in the original Nicaraguan lawsuit, which is a requirement for recognizing a judgment under the Uniform Foreign Money-Judgments Recognition Act.  *See Shell Oil Co. v. Franco*, No. CV 03-8846 (PJWx) (C.D. Cal. Nov. 10, 2005).

In an effort to head off multiple enforcement actions in the United States, some DBCP defendants, including Dow, sought declaratory relief in federal court in California against plaintiffs who obtained judgments in Nicaragua but had not yet sought enforcement in the United States.  In *Dow Chemical Co. v. Calderon*, 422 F.3d 827 (9th Cir. 2005), the DBCP defendants asked the Ninth Circuit Court of Appeals to hold that the judgments obtained in Nicaragua could not be enforced in the United States on due process grounds similar to those raised in this case.  The Ninth Circuit did not reach defendants' due process arguments, however, because it found that the Nicaraguans were not subject to personal jurisdiction in the United States and therefore the DBCP defendants could not sue the Nicaraguan plaintiffs in federal district court.  Accordingly, the Ninth Circuit affirmed the district court's dismissal of the action without reaching the merits of whether Nicaraguan judgments obtained under Special Law 364 are enforceable in the United States.

In addition to the Special Law 364 litigation in Nicaragua, a few Nicaraguan plaintiffs have brought DBCP suits in the United States in recent years.  In *Tellez v. Dole Food Co.*, brought by 12 Nicaraguan plaintiffs and tried in 2007 in Los Angeles Superior Court, a jury awarded six plaintiffs over five million dollars and found that the defendants were not liable to the remaining plaintiffs.  *See Tellez v. Dole Food Co.*, Los Angeles Superior Court Case No. BC312852 (Nov. 5, 2007) (special verdict form).

Shortly after the verdict in *Tellez*, Dole alleged to the California trial court that some of the *Tellez* plaintiffs never worked on a banana farm, perjured themselves during the trial, and presented false documents as evidence.  At the time, two other DBCP lawsuits, *Mejia v. Dole Food Co.* and *Rivera v. Dole Food Co.*, were pending before the same California court, and Dole's fraud allegations implicated the *Mejia* and *Rivera* plaintiffs as well.  To determine the veracity of Dole's fraud allegations, the court established procedures for gathering and presenting evidence from Nicaragua, and to ensure the safety of Nicaraguan witnesses, entered a protective order that permitted the defendants to take dozens of anonymous "John Doe" depositions to investigate the fraud claims.

After an evidentiary hearing, the California trial court concluded that the DBCP claims before it were the direct result of a widespread conspiracy to commit fraud by attorneys in Nicaragua and the United States, Nicaraguan doctors and judges (including the Nicaraguan trial judge who issued the judgment in this case), and the plaintiffs themselves.  As a result, the California court dismissed with prejudice the fraud-tainted claims in *Mejia* and *Rivera*.  *See Mejia v. Dole Food Co.* & *Rivera v. Dole Food Co.*, Los Angeles Superior Court Case Nos. BC340049, BC379820 (June 17, 2009) (order terminating two DBCP lawsuits for fraud on the court).  A California appellate court recently remanded *Tellez*, with instructions that the trial court may vacate the judgment in light of the fraud findings in *Mejia* and *Rivera*.  *See Dole Food Co. v. Tellez*, Los Angeles Superior Court Case No. B216182, B216264 (July 7, 2009) (order to show cause).

The DBCP claims of over 5,000 plaintiffs from various countries in Central America and Africa are currently pending in California Superior Court in Los Angeles. The plaintiffs in *Herrera Ríos*, *Osorio's* sister action in Nicaragua, have not yet attempted to enforce their $800 million judgment in the United States.  This Court now

turns to the background issues relevant to determine whether the Nicaraguan judgment at issue in this case may be enforced under the Florida Recognition Act.

### 2.        Special Law 364

At the heart of this case lies Special Law 364.  Despite the availability of an agreed upon English translation, the parties contest the import of practically every clause in this law.[4]  Their disagreements focus on whether Special Law 364's provisions can be waived, whether they were applied in this case, and whether they are consistent with due process and public policy.  Special Law 364 is unique in that its provisions apply only to DBCP litigation, and only against specific defendants such as Dole and Dow.  Nicaragua has no comparable law that only applies to a specific type of litigation and a narrowly defined class of defendants.

Special Law 364's stated purpose is to regulate procedures for DBCP lawsuits "with regard to compensation" of persons injured by the pesticide.  Article 1.  To accomplish this goal, the law contains some notable provisions which to a great extent are the crux of this litigation.  Article 2 states that DBCP defendants, defined as companies that manufactured, imported, distributed, marketed, or applied the pesticide, acted with full knowledge of DBCP's harmful effects, which the law says include sterility and kidney, liver, and spleen damage.

Plaintiffs can establish the defendants' liability with the benefit of an irrefutable presumption that their sterility was caused by DBCP exposure.  Article 9 provides that plaintiffs who prove that (1) they were exposed to DBCP and (2) are now sterile, are entitled to an "irrefutable presumption" that DBCP exposure caused their sterility.  Proof of sterility is established by two certified medical examinations from nationally accredited institutions.

Each prevailing plaintiff is entitled to minimum damages of $125,000 ($100,000 under Article 3 and $25,000 under Article 11), but the law permits the trial court to award sums in excess of the mandatory minimums that it finds are comparable to similar personal injury verdicts obtained by plaintiffs in foreign countries such as the United States.  *See* Article 12.

---

[4]        The full translated text of Special Law 364 is attached to this order as Appendix I.

With regards to litigation costs, Special Law 364 presumes that the plaintiffs are indigent and provides that the Nicaraguan government will cover their costs. *See* Article 9. In contrast, the law imposes several burdens on the defendants' right to participate in the proceedings. For example, defendants are required to post a $100,000 bond "as a procedural prerequisite for being able to take part in the lawsuit." Article 4. The law provides that the bond will be used to cover court costs and provide compensation to the plaintiffs. *See* Article 5. Defendants are also required to deposit 300,000,000 córdobas, approximately $15 million, within 90 days after receiving notice of the complaints, "to guarantee payment of the possible compensation to the workers and other costs of the lawsuit." Article 8.

Article 12 requires the presiding trial judge to enforce a "3-8-3" summary proceeding upon pain of punishment. In a 3-8-3 proceeding, "defendants have three days to answer the complaint, the parties have eight days to present their evidence, and the court has three days to issue a verdict." *Shell Oil Co.*, slip op. at 5. Special Law 364 also eliminates any relevant statutes of limitations, retroactively applies to pending cases, and provides that judgments are immediately executable notwithstanding the pendency of an appeal. *See* Articles 6, 14, & 15.

Another notable provision, Article 7, appears to give the defendants the right to select their venue and opt out of Special Law 364 by agreeing to defend themselves in the United States:

> Companies that, within ninety (90) days of being given notice of this Law by the plaintiff and service of process through the corresponding channel, have not deposited the sum established in Article 4 hereof, must subject themselves unconditionally to the jurisdiction of the courts of the United States of America for the final judgment of the case in question, expressly waiving the defense of *forum non conveniens* invoked in those courts. In the event that the defendants decide that the proceedings are to continue in the Nicaraguan courts, they are to deposit the amount established in Article 4 of this Law.

Because they elected not to make the Article 4 deposits, Dole and Dow argue that the Nicaraguan trial court improperly exercised jurisdiction over them in clear contravention of Article 7. Moreover, they contend that Special Law 364's other provisions, which apply only to them—the bond and deposit requirements, minimum damages, irrefutable presumptions of knowledge and causation, 3-8-3 summary

proceedings, abolition of statutes of limitations, and effective curtailment of appellate review—are incompatible with due process of law and violate Florida public policy. Defendants also assert that Special Law 364 impermissibly targets a narrowly defined group of foreign companies for disparate treatment.

Plaintiffs counter that the Nicaraguan trial court did not impose Special Law 364's most onerous provisions on Defendants. According to Plaintiffs, any deficiencies in Special Law 364 were ameliorated in this case, first, because they were waived, and second, because the case was tried under general negligence laws in addition to Special Law 364. Plaintiffs also contend that the law is broadly applicable and does not discriminate against specific foreign companies. They contend that Article 7 gives *plaintiffs* the choice of venue but does not allow defendants to opt out of Nicaragua's jurisdiction.

### 3. Legal Opinion of the Attorney General of Nicaragua Finding that Special Law 364 is Unconstitutional

After the passage of Special Law 364, the Nicaraguan Attorney General rendered a legal opinion that the law violated Nicaragua's constitution. The Attorney General sent his opinion to the Supreme Court of Justice of Nicaragua and asked the court to forward his opinion to all civil judges in Nicaragua so that when rendering judgments they would be guided by his analysis of Special Law 364's constitutional infirmities. The Attorney General singled out several provisions of Special Law 364 which he thought were inconsistent with Nicaragua's constitution. *See* Attorney General's Legal Opinion on Law No. 364 (Oct. 23, 2002) ["Attorney General's Opinion"].

First, the Attorney General argued that it was inappropriate to try a complex lawsuit that could potentially produce large damage awards under a 3-8-3 summary proceeding. He noted that the provisions of Nicaragua's Code of Civil Procedure which would normally govern a DBCP case do not provide for summary proceedings. He also concluded that a 3-8-3 summary proceeding was inappropriate because, in addition to the large amount of money at stake, the defendants are not afforded sufficient time to refute the evidence against them.

Second, the Attorney General found that Special Law 364 was unconstitutional because it does not allow an appeal to the Supreme Court. This curtailment of appellate

review violated the constitutional rule that the right to appeal to a court of last resort cannot be restricted in cases involving large sums.

Third, the Attorney General found that the law was unconstitutional because it treats plaintiffs and defendants unequally, which "violates the Constitutional right of equality of conditions of parties in proceedings or actions."  Attorney General's Opinion, at 4.  Under Special Law 364, the plaintiffs enjoy all the rights of indigent parties while the defendants are required to make deposits as a prerequisite for being able to participate in the proceedings.  According to the Attorney General, this contradicts the Nicaraguan codes, which provide that a trial judge has discretion to determine whether a surety must be posted and the amount of the surety.

The Attorney General also noted that several other provisions of Special Law 364 meaningfully depart from settled Nicaraguan law.  For instance, the law breaks with Nicaragua's constitutional framework by incorporating criminal liability into a special law.  It also provides that a law of public order concerning workers' rights will be tried in civil courts, even though litigation involving workers' rights is generally heard by labor courts.  Further, the Attorney General opined that Special Law 364 violates the principle against retroactivity embedded in the Nicaraguan constitution, which provides that retroactive laws cannot be used to impose liability.

One additional passage from the Attorney General opinion is notable.  Under the Attorney General's reading of Special Law 364, the law assumes that the plaintiffs will automatically prevail and does not even contemplate the possibility that DBCP defendants might succeed in defeating plaintiffs' claims.   The Attorney General explained: "The deposit shall be used as part of future compensations, which together with the eight-day period granted for evidence-production purposes[,] including all charges and the accepted means [of evidence] (two certified medial examinations), means that a ruling in favor of the Plaintiffs is taken for granted."  Attorney General's Opinion, at 4.  This statement appears to provide several reasons why defendants cannot prevail under Special Law 364.  First, it notes that that Special Law 364 explicitly provides that the deposits will be held as part of the plaintiffs' future compensation, and therefore does not contemplate the possibility that the plaintiffs might lose.  Moreover, the law also guarantees that the defendants cannot rebut the plaintiffs' evidence because the

defendants are denied ample time to put on a case of their own. The Attorney General's final reference to the "accepted means [of evidence]" appears to be a reference to the irrefutable presumption of causation afforded to plaintiffs under Special Law 364. According to Article 9, this presumption is established if the plaintiffs (1) show that they were exposed to DBCP (by simply proving that they worked at a banana plantation) and (2) submit medical examinations (sperm sample analyses) demonstrating their infertility. As the Court explains below in its analysis of Special Law 364, this crucial provision operates to establish legal liability without any reliable proof that the defendants actually caused the plaintiffs' injuries.

### 4. Consultation of the Supreme Court of Justice of Nicaragua Upholding the Constitutionality of Special Law 364

Following the Attorney General's opinion challenging Special Law 364's constitutionality, the Nicaraguan Supreme Court issued an advisory opinion upholding the law. Because the Supreme Court disagreed with the Attorney General's legal conclusions, it did not comply with his request to disseminate his opinion to Nicaragua's civil judges. *See* Consultation to the Magistrates of the Supreme Court of Justice of Nicaragua on Law 364 (Oct. 16, 2003) ["Consultation"].

In its analysis, the Nicaraguan Supreme Court first evaluated Special Law 364 under a Nicaraguan legal doctrine known as the "Principle of Equality," or "Positive Discrimination." Consultation, at 4. Unlike the Attorney General's opinion, which described the constitutional right of equality as a principle that ensures an even playing field between plaintiffs and defendants in the same action, the Supreme Court equated the "Principle of Equality" with an affirmative duty to discriminate in favor of a socioeconomically disadvantaged party. According to the Supreme Court, "the Principle of Equality is based on the social reality of [Nicaragua]" and is designed to ameliorate inequality in the political, social, and economic life of Nicaragua by providing procedural advantages to putatively disadvantaged elements of society. Consultation, at 5. The court explained that "in procedural terms, [the Principle of Equality] consists of the lawmaker's obligation to treat as equals those who are in an equal situation and as unequal those who are in different situations[.]" Consultation, at 5. In effect, the Nicaraguan Supreme Court acknowledged that Special Law 364 provides unequal treatment to DBCP defendants because Special Law 364 is an attempt to level the

litigation playing field by giving the DBCP plaintiffs, termed "peasants" by the court, disproportionate advantages which are not available in other Nicaraguan litigation.

After finding that Special Law 364 complied with the "Principle of Equality," the Supreme Court turned to the Attorney General's contention that the unique procedures of Special Law 364 deprive defendants of constitutional due process.  The court found that Special Law 364 was constitutional in view of the defendants' right to choose to litigate in the United States instead of Nicaragua.   Without dealing with each individual provision of Special Law 364 that the Attorney General found unconstitutional, the court simply noted that the defendants could avoid the strictures of Special Law 364 altogether by exercising their right to choose to defend themselves in the United States instead of Nicaragua:

> As for the constitutional guarantees of the defendant, Special Law No. 364 offers respect for due process or Due process of law *beginning with the opportunity to choose the jurisdiction most convenient to it* (Nicaragua or the United States of America), the right to be heard, to present evidence and the recourse of appeal, for which reason the Principle of Equality is not violated.

Consultation, at 6 (emphasis added).   Accordingly, the Nicaraguan Supreme Court reasoned that Special Law 364's provisions did not offend due process precisely because the law allows the defendants to avoid them by opting out of Nicaragua's jurisdiction and litigating in the United States.[5]

Defendants' right to opt out of Nicaragua's jurisdiction is also acknowledged in another passage of the Supreme Court's opinion.  In analyzing Special Law 364's deposit requirements, the court stated that "the deposit required of the defendant companies *in case they subject themselves* to Nicaraguan jurisdiction does not violate the Principle of Equality."  Consultation, at 5-6 (emphasis added).  From its opinion, therefore, it is clear that the Nicaraguan Supreme Court of Justice recognized that Special Law 364 gives defendants the right to decline to litigate in Nicaragua.   At the time the Nicaragua Supreme Court issued its opinion, in October 2003, the *Osorio* plaintiffs had filed suit in Nicaragua but the defendants had not yet been served.

---

[5]   As discussed below, the Ninth Circuit has also interpreted Special Law 364 to provide the defendants with the right to choose to be sued in Nicaragua or in the United States.  *See Calderon,* 422 F.3d at 832-33.

5.     The *Osorio* Litigation in Nicaragua

a.     Defendants' Jurisdictional Challenge and Appeal

The underlying lawsuit in this case for personal injuries resulting from the use of DBCP was filed by 201 Nicaraguan plaintiffs in February 2002 in the Second Civil and Labor District Court of Chinandega.  The Nicaraguan trial court ordered Defendants to appear and deposit the bond and guarantee monies required by Articles 4 and 8 of Special Law 364.  Dole and Dow declined to make the deposits.  Instead, they consented to jurisdiction in the United States and waived their defenses under the *forum non conveniens* doctrine.  Their initial pleadings contested the trial court's jurisdiction and attempted to exercise their opt-out rights under Article 7.

In December 2004, 14 months after the Nicaraguan Supreme Court issued its opinion clarifying that Special Law 364 was constitutional because it permitted defendants to opt out of Nicaragua's jurisdiction, the trial court denied Dole and Dow's jurisdictional challenges.  In its order, the trial court did not cite the Supreme Court's opinion.  Apparently, the court interpreted Article 7 to provide plaintiffs with a choice of venue, but permit defendants to argue *forum non conveniens* in the United States only if they first comply with the deposit requirements of Article 4.[6]  In the same order, the trial court reversed its previous ruling and exempted Defendants from posting the bonds and deposits required by Articles 4 and 8, because of an "express waiver of the Plaintiffs."

Defendants appealed the trial court's interlocutory order denying their jurisdictional challenge to the Western Court of Appeals, an intermediate appellate court in Leon, Nicaragua.  The Western Court of Appeals issued a notification in April 2005 that it had received all the briefs and the appeal was ripe for decision.  However, four and a half years later, the appeal is still pending.  This Court has asked for and received numerous reports regarding the status of the appeals in Nicaragua, and there is no indication that these appeals will be resolved in the near future.

---

[6]     "[Article 7] means that if [the Defendants] did not make the deposit, they are hindered from arguing the unsuitable jurisdiction in the United States should the Plaintiffs decide to file their complaint in that country in view of the impossibility of processing the complaint in Nicaragua due to the lack of the referred deposit."  Order in Case No. 214-02, Second Civil and Labor Court of the District of Chinandega (Dec. 2, 2004).

During the pendency of Defendants' jurisdictional appeal, the proceedings in the trial court continued.  After failing in its jurisdictional argument before the trial court, Dow declined to participate further in the trial proceedings because it did not want its continued participation to be interpreted as a waiver of its jurisdictional objections.  Dole remained in Nicaragua and defended itself under protest.

### b.      The Evidentiary Period

During the evidentiary period, the trial court heard oral testimony from ten out of 201 plaintiffs.  Of the 150 plaintiffs who prevailed, 148 submitted microscopic sperm samples, known as spermograms, which were taken *ex parte*.  Most plaintiffs submitted one or two spermograms with diagnoses from two "specialized doctors."  The diagnoses categorized the spermograms according to six different types of sperm impairments, which the Court discusses below.  The plaintiffs also submitted psychological exam reports purporting to link various psychological ailments to DBCP exposure.  All of the medical evidence, including the evaluations by the specialized doctors, was examined by Dr. Roger Pereira Umaña, the court appointed medical examiner, who reported his findings to the trial court.

The trial court denied Dole's request for an independent doctor to examine individual plaintiffs, as well as Dole's request to depose the laboratory technicians who took the spermograms.  Dole attempted to offer 151 birth certificates into evidence to show that many of the allegedly sterile or infertile plaintiffs had fathered children after their last exposure to DBCP.  (According to Dole, one plaintiff fathered as many as nine children.)  Defendants claim that this evidence is particularly significant because successfully initiating a pregnancy following DBCP exposure severs the causal link between DBCP exposure and any subsequent sperm impairment.  In other words, evidence showing that the plaintiffs fathered children in the years following their last exposure to DBCP conclusively negates a finding that the plaintiffs' fertility problems were caused by DBCP.  If true, this contention undermines the logical underpinnings behind Special Law 364's irrefutable presumption of causation, because it demonstrates that exposure to DBCP plus sterility is not sufficient, as a matter of medical and scientific fact, to demonstrate that the former caused the latter.  The trial court rejected Dole's attempt to introduce the birth certificates into evidence on procedural grounds.

According to Plaintiffs, the court rejected the birth certificates because Dole's counsel did not sufficiently explain the purpose for which they were offered.

Pursuant to Article 12 of Special Law 364, which permits the calculation of damages based on similar foreign judgments, Plaintiffs submitted copies of three judgments in tort suits for chemical exposure in the United States, in which the recoveries were $350,000; $909,000; and $1,923,740 respectively.  After eight days had elapsed since the plaintiffs began offering evidence, Dole, apparently believing that the plaintiffs had not yet carried their burden of proof, tried to invoke the evidentiary period of the 3-8-3 format and moved to close the evidentiary period.  This motion was also denied, thereby permitting plaintiffs to continue offering evidence beyond the eight days mandated in a 3-8-3 summary proceeding.

### c.　　The Judgment

The trial court awarded the 150 prevailing plaintiffs a total of $97.4 million.  The average award was approximately $650,000 and the minimum award was $188,500.  According to the birth certificates Dole presented to this Court, 32 plaintiffs who fathered children after their alleged exposure to DBCP collectively recovered over $21 million.  *See* Judgment entered in Case No. 214-02 *Miguel Sanchez Orsorio v. Standard Fruti [sic] Company*, Second Civil and Labor District Court of Chinandega, at 37-87 (Aug. 8, 2005) ["Judgment"].  The Judgment lists each plaintiff with a summary of the evidence that was submitted on his behalf, usually two spermograms and two diagnoses prepared by specialized doctors.  In many cases the Judgment notes that a psychological exam was also submitted.  The Judgment indicates that the plaintiffs who did not recover failed to submit *any* evidence of sperm damage (that is, they submitted no spermograms at all), or *any* evidence of work on a banana plantation.  Some of the plaintiffs who did not recover submitted psychological evaluations purporting to link their DBCP exposure to, for example, depressive episodes, but the trial court denied recovery to these plaintiffs because they did not produce evidence of physical damage.

For each of the 150 plaintiffs who recovered, the Judgment contains a conclusory statement that in the opinion of Dr. Umaña "[the plaintiff] *is infertile*" and states there is a "possible link" between DBCP exposure and various psychological problems or, in a few cases, physical problems.  Judgment, at 37-87.  The Judgment does not explain how

the sperm samples were evaluated to determine the causes of individual plaintiffs' sperm impairments, it does not indicate that the doctors obtained or considered the plaintiffs' medical histories, and it does not explain how DBCP is linked to the plaintiffs' infertility or psychological damage.   In one passage, the Judgment explains that the doctors' statements "do not show the damage to the plaintiffs or the link between the damages and DBCP, [but] they do illustrate the various diseases that the plaintiffs claim they suffered and the level of seriousness."   Judgment, at 37.   This passage is significant because it indicates that the trial court, by its own admission, had no evidence before it demonstrating a causal relationship between DBCP exposure and the individual plaintiffs' injuries.

At one point, the Judgment also addresses Defendants' constitutional challenges to Special Law 364.   Here, the Judgment cites to the Nicaraguan Supreme Court's advisory opinion from October 2003 upholding the constitutionality of Special Law 364. The Judgment specifically states that the trial court rejects Defendants' arguments that Special Law 364 is unconstitutional in deference to the views of the Nicaraguan Supreme Court.   Judgment, at 87.   The Judgment does not mention, however, that the Supreme Court's rationale for upholding the law rested on defendants' right to opt out of litigating in Nicaragua, a rationale which the trial court previously rejected.

Additionally, while the Judgment acknowledges that Special Law 364 "has a heavy impact on the case," it states that Defendants' liability would arise under other provisions of Nicaraguan law even in the absence of Special Law 364.   It also states that the deposit requirements and the irrefutable presumption of causation were not applied because the plaintiffs waived them.   The Judgment explains that the presumption of causation was not necessary to establish liability because "the quality and quantity of evidence provided by the Plaintiffs make it unnecessary to reach the presumption set forth in Article 9 of Law 364, as there is full evidence on the matters in the Complaint to which reference has already been made in the preceding [section]."   Judgment, at 88.

Thus, the Judgment reveals both that the evidence before the trial court did not demonstrate causation and that the trial court purportedly did not apply the irrefutable presumption of causation.   As the Court will explain, however, it is clear that without Special Law 364's presumption of causation there was no evidence before the

Nicaraguan trial court sufficient to determine that DBCP exposure caused the plaintiffs' injuries.  Defendants appealed the final judgment from August 2005, and that appeal is also still pending before the intermediate appellate court in Nicaragua.

### B.    PROCEDURAL HISTORY OF ENFORCEMENT ACTION

The prevailing plaintiffs in the Nicaraguan litigation brought this action to enforce the judgment in the Circuit Court of Miami-Dade County in August 2007, and the defendants removed it to this Court pursuant to 28 U.S.C. § 1441.  The Complaint alleges that the lawsuits giving rise to the Nicaraguan trial court's Judgment were "based upon" Special Law 364 but does not allege any other Nicaraguan causes of action.  *See* Compl. ¶ 10.  Although multiple appeals are still pending in this case in Nicaragua, neither Special Law 364 nor the Florida Recognition Act requires that appeals be completed before a judgment is enforceable.

The parties in this case filed cross-motions for summary judgment on the enforceability of the $97 million verdict under the Florida Recognition Act. Thereafter, Defendants alleged an additional basis for non-recognition: that the judgment was obtained as part of the fraudulent scheme that led to the dismissal of DBCP claims by the California court in *Mejia* and *Rivera*.  At a hearing before the Court to determine how best to proceed on the motions for summary judgment, Plaintiffs argued that they were entitled to an evidentiary hearing to resolve disputed material facts.  Defendants sought fraud discovery similar to that obtained in *Mejia* and *Rivera*.  As an initial step in resolving the allegations that Plaintiffs' underlying claims were fraudulent, the Court proposed that, rather than embarking on an extensive and expensive discovery process similar to that used by the California trial court in *Mejia* and *Rivera*, a sample of ten or fewer plaintiffs come to Miami for independent evaluations of the validity of their claims, including their exposure to DBCP and medical conditions.  Defendants agreed to the Court's proposal.  Plaintiffs objected, arguing that the validity of their claims had already been resolved by the Nicaraguan proceedings.  At that point, the Court decided to bifurcate the case.  The Court granted Plaintiffs' request for an evidentiary hearing, denied the cross-motions for summary judgment without prejudice, and set aside the

issue of fraud in the event that Defendants do not prevail on any other defenses to recognition.[7]

The Court held an evidentiary hearing on September 1-4, 2009. The purpose of the hearing was to determine whether, as Defendants contend, (1) the Nicaraguan trial court lacked personal and subject matter jurisdiction over the Defendants, (2) the underlying judgment was rendered under a system which does not provide procedures compatible with the international concept of due process of law, (3) the cause of action or claim of relief on which the judgment is based is repugnant to the public policy of the State of Florida, and (4) the judgment was rendered under a system without impartial tribunals. Any of these grounds, if proven, constitute an independent basis for this Court to deny recognition of the $97 million Nicaraguan judgment. Both sides submitted substantial expert testimony and documentary evidence concerning whether the procedures in place for trying DBCP claims in Nicaragua complied with basic notions of international due process, as well as evidence on the Nicaraguan judicial system, Special Law 364, and the specific Nicaraguan trial proceedings in this case.

## II.     ANALYSIS

### A.     JURISDICTION AND GOVERNING LEGAL STANDARDS

This Court has subject matter jurisdiction under the federal diversity statute. *See* 28 U.S.C. § 1332. Because the Court's jurisdiction is based on diversity, the standard for recognizing a judgment rendered abroad is governed by the Florida Recognition Act. *See* 28 U.S.C. § 1652; *Goodwin v. George Fischer Foundry Sys. Inc.*, 769 F.2d 708, 711 (11th Cir. 1985).

Federal Rule of Civil Procedure 52(a) provides that in "an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Whether a foreign judgment should be recognized is not strictly a question of fact or law. *See Society of Lloyds v. Ashenden*, 233 F.3d 473, 477 (7th Cir. 2000). To a large extent, "it is a question about the laws of a foreign nation," *id.*, and the Court has broad discretion to consider "any relevant material or source, including testimony" in determining foreign law, irrespective of whether such materials would be admissible

---

[7]     Accordingly, the Court has no occasion to consider, and does not consider, the California court's findings of facts in *Mejia* and *Rivera* in its decision to deny enforcement of the judgment in this case.

under the Federal Rules of Evidence.  *See* Federal Rule of Civil Procedure 44.1. Accordingly, for the most part, the line between findings of fact and conclusions of law is not clearly drawn.  The Court's findings on the medical and scientific effects of DBCP, the causes of male sterility, and on the presence of corruption and political interference in the Nicaraguan judiciary, however, constitute special findings of fact under Rule 52(a).

### 1.    Standard for Recognition of Foreign Judgments

States are not required to recognize judgments rendered in foreign countries under the Full Faith and Credit Clause of the Constitution of the United States.  U.S. CONST. art. IV, § 1; *Guinness PLC v. Ward*, 955 F.2d 875, 883 (4th Cir. 1992).  In the absence of a treaty, the effect given to a foreign judgment has historically been governed by the more flexible doctrine of comity, which, though often couched in the language of mutual respect and obligation, is most accurately described as a matter of grace.  *See, e.g.*, *Hilton v. Guyot*, 159 U.S. 113, 166 (1895) ("No sovereign is bound, unless by special compact, to execute within his dominions a judgment rendered by the tribunals of another State.") (quoting Wheaton's International Law, (8th ed.) § 147; *U.S. v. Nippon Paper Indus. Co.*, 109 F.3d 1, 8 (1st Cir. 1997) ("Comity is more an aspiration than a fixed rule, more a matter of grace than a matter of obligation.").  A state's decision to recognize a foreign judgment will inevitably "depend on a variety of circumstances which cannot be reduced to any certain rule" but it is understood that "no nation will suffer the laws of another to interfere with her own to the injury of her citizens[.]"  *Hilton*, 159 U.S. at 164 (quoting Story's Conflict of Laws, § 28; Saul v. His Creditors, (1827) 5 Martin (N.S.) 569, 596).

The recognition of foreign judgments in Florida is governed by the Florida Recognition Act, FLA. STAT. §§ 55.601-55.607, a variant of the Uniform Foreign Money-Judgments Recognition Act, which Florida adopted in 1994.  *See Nadd v. Le Credit Lyonnais, S.A.*, 804 So. 2d 1226, 1228 (Fla. 2001) (the Florida Recognition Act "replaced common law principles of comity relating to the recognition of foreign judgments").  The Supreme Court of Florida has noted that the Florida Recognition Act was adopted to "ensure the recognition abroad of judgments rendered in Florida."  *Id.*  Accordingly, the Florida Recognition Act attempts to guarantee the recognition of Florida judgments in foreign countries by providing reciprocity in Florida for judgments rendered abroad.  But even though the Florida Recognition Act presumes that foreign judgments are *prima facie*

enforceable, the Act is clearly also designed to preclude Florida courts from recognizing foreign judgments in certain prescribed cases where the legislature has determined that enforcement would be unjust or inequitable to domestic defendants.

The Florida Recognition Act specifically provides three mandatory and eight discretionary circumstances where a foreign judgment is not entitled to recognition:

**55.605 Grounds for nonrecognition.--**

(1) A foreign judgment is not conclusive if:

(a) The judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law.

(b) The foreign court did not have personal jurisdiction over the defendant.

(c) The foreign court did not have jurisdiction over the subject matter.

(2) A foreign judgment need not be recognized if:

(a) The defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him or her to defend.

(b) The judgment was obtained by fraud.

(c) The cause of action or claim for relief on which the judgment is based is repugnant to the public policy of this state.

(d) The judgment conflicts with another final and conclusive order.

(e) The proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court.

(f) In the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action.

(g) The foreign jurisdiction where judgment was rendered would not give recognition to a similar judgment rendered in this state.

(h) The cause of action resulted in a defamation judgment obtained in a jurisdiction outside the United States, unless the court sitting in this state before which the matter is brought first determines that the defamation law applied in the foreign court's adjudication provided at least as much

18

> protection for freedom of speech and press in that case as would be
> provided by the United States Constitution and the State Constitution.

FLA. STAT. § 55.605.[8]  In this case, Defendants contend that each mandatory ground, as well as the discretionary public policy and fraud grounds, bar enforcement of the judgment.  As previously mentioned, the Court does not evaluate the merits of Defendants' fraud claims and limits its consideration to the other defenses to recognition raised by Defendants.

### 2.   Burden of Proof

Under the Florida Recognition Act, a foreign judgment is *prima facie* enforceable if it "is final, conclusive, and enforceable where rendered, even though an appeal therefrom is pending or is subject to appeal."  FLA. STAT. § 55.603.  Once the party seeking to enforce the judgment follows the filing and notice requirements of Fla. Stat § 55.604, the judgment will be enforced unless the judgment debtor objects within 30 days.

The party seeking enforcement has the initial burden of proof that the judgment is final, conclusive, and enforceable where rendered.  The Court finds that Plaintiffs have satisfied this burden based on their showing that the judgment would be enforceable in Nicaragua under Article 14 of Special Law 364.   The burden therefore shifts to Defendants to establish one or more grounds for non-recognition.  *See Kramer v. Von Mitschke-Collande*, 5 So. 3d 689, 690 (Fla. 3d DCA 2008); *Kam-Tech Sys., Ltd. v. Yardeni*, 774 A.2d 644, 650 (N.J. Super. Ct. App. Div. 2001).  *But see Shen v. Leo A. Daly Co.*, 222 F.3d 472, 476 (8th Cir. 2000); *Ackermann v. Levine,* 788 F.2d 830, 842 n.12 (2d Cir. 1986).  As explained below, the Court finds that Defendants have met their burden on multiple, independent grounds for non-recognition.

### B.   THE NICARAGUAN TRIAL COURT'S JURISDICTION OVER DOLE AND DOW

The Florida Recognition Act requires that the rendering court possess both subject matter jurisdiction and personal jurisdiction over the defendants.  *See* FLA. STAT. § 55.605(1)(b)-(c).   Defendants argue that because they opted out of Nicaragua's jurisdiction under Section 7 of Special Law 364, the Nicaraguan trial court lacked jurisdiction over them.  Plaintiffs, on the other hand, argue that Section 7 does not allow

---

[8]    Section 2(h) was added as a ground for non-recognition in 2009 during the pendency of this case; it has no affect on the merits.

defendants to opt out of Nicaragua's jurisdiction, but merely provides plaintiffs with a choice of venue. The issue the Court must decide is whether Defendants were subject to jurisdiction in Nicaragua under Section 7 of Special Law 364. *See* Restatement (Third) of Foreign Relations § 482 cmt. c (1987) ("The most common ground for refusal to recognize or enforce a foreign judgment is lack of jurisdiction . . . . If the rendering court did not have jurisdiction over the defendant *under the laws of its own state*, the judgment is void and will not be recognized or enforced in any other state.") (emphasis added).

Section 7 is an unusual provision. Special Law 364 is a law which, as acknowledged by the Nicaragua Supreme Court, deliberately tilts the scales of justice in the plaintiffs' favor. But Section 7 appears to provide defendants with a way to avoid Special Law 364 altogether by refusing to make the required deposits in Nicaragua and waiving defenses based on *forum non conveniens* in the United States. In light of the onerous conditions imposed on DBCP defendants by Special Law 364, the history of the DBCP litigation, the Nicaraguan legislature's reaction to the dismissal of DBCP claims in *Delgado*, and the acknowledged discriminatory treatment of DBCP defendants in Nicaragua, it is not undue speculation to infer that Special Law 364 may not have been primarily intended for the actual litigation of cases in Nicaragua, but instead to provide Nicaraguan plaintiffs with a forum in the United States. The law accomplishes this by effectively eliminating *forum non conveniens* defenses in the United States in DBCP litigation because it makes the foreign forum so unattractive from a defendant's perspective. One commentator has opined that the law is an attempt to restore the plaintiffs' traditional rights under Latin American law, where the plaintiff always has the "unfettered right to choose [to litigate] in the defendant's court." Henry Saint Dahl, Forum Non Conveniens, *Latin America and Blocking Statutes*, 35 U. Miami Inter-Am. L. Rev. 21, 26 (2003).

Accordingly, Special Law 364 may be properly viewed as a "blocking statute." In this context, a blocking statute is a law that closes the doors of a foreign country's courts to prevent a United States court from finding that an alternative forum exists under the *forum non conveniens* doctrine. *Scotts Co. v. Linda*, 2 So. 3d 1013, 1015 n.2 (Fla. 3d DCA 2008); Walter W. Heiser, *Forum Non Conveniens and Retaliatory Legislation: The Impact on the Available Alternative Forum Inquiry and on the Desirability of Forum Non*

*Conveniens as a Defense Tactic*, 56 Kan. L. Rev. 609, 622 (2008) (explaining that a "blocking statute is intended specifically to prevent courts in the United States from finding that an alternative forum is 'available' to hear the plaintiff's lawsuit"). Some blocking statutes also operate after the fact by extinguishing "the jurisdiction of their [country's] courts with respect to any tort claim first filed against a foreign defendant in a [United States] court but later dismissed on grounds of *forum non conveniens*." Heiser, 56 Kan. L. Rev. at 623. Special Law 364 appears to be somewhat unique among blocking statutes in that it operates by establishing onerous conditions under which defendants would litigate and then providing the defendants with the right to opt out of Nicaragua's jurisdiction. *See* Saint Dahl, 35 U. Miami Inter-Am. L. Rev. at 24 (classifying Special Law 364 as a blocking statute and stating that it "offers defendants the possibility of opting out of Nicaragua's jurisdiction by subjecting them[selves] to [United States] jurisdiction, provided they waive the defense of [*forum non conveniens*]").

It is beyond dispute that Special Law 364 provides ample incentives for the defendants to exercise their opt-out rights by, as the Court will explain, effectively depriving them of due process in their effort to mount a defense. As the Nicaraguan Supreme Court rationalized in responding to the Attorney General's opinion that Special Law 364's was unconstitutional, the constitutionality of Special Law 364 rests in large part on the defendants' right to choose to litigate in the jurisdiction most convenient to them. In other words, either DBCP defendants have a right to opt out of Nicaragua's jurisdiction, which requires that the Court deny recognition under FLA. STAT. 55.605 § (1)(b)-(c), or they are subject to a legal regime that does not provide due process, which requires denying recognition under FLA. STAT. 55.605 § (1)(a). In practical terms, it does not matter which of these is actually the case because either circumstance constitutes a mandatory ground for refusing to recognize this judgment under the Florida Recognition Act. This is Plaintiffs' "Catch-22." *See* JOSEPH HELLER, CATCH-22 46 (Simon & Schuster ed. 2004) (1961) ("There was only one catch and that was Catch-22 . . . . If he flew [bombing missions] he was crazy and didn't have to; but if he didn't want to he was sane and had to. Yossarian was moved very deeply by the absolute simplicity of this clause of Catch-22 and let out a respectful whistle.").

Plaintiffs and the Nicaraguan trial court claim that Article 7 does not give defendants a right to opt out of Nicaragua's jurisdiction by refusing to make the deposits. Instead, they argue, the defendants' failure to make the deposits simply precludes them from arguing *forum non conveniens* if the plaintiffs decided to sue in the United States. But plainly, Nicaraguan law cannot prescribe the legal effect that defendants' actions in Nicaragua will have in United States courts. Nicaraguan law can only determine what effect such actions will have in Nicaragua's own courts. Here, Special Law 364 provides that defendants' refusal to make the deposits and waiver of *forum non conveniens* defenses has the legal effect, *in Nicaragua*, of removing the case from the jurisdiction of Nicaragua's trial courts. Special Law 364 does not dictate what legal effect the defendants' actions will have in subsequent proceedings in the United States, nor does it purport to do so. What happened in this case, therefore, is that Defendants expressly opted out of Special Law 364 by refusing to make the required deposits and by waiving their *forum non conveniens* arguments in United States courts. These actions had the legal effect of depriving the Nicaraguan courts of jurisdiction.

In addition to the clear terms of Special Law 364 and the Nicaraguan Supreme Court's Consultation, the Court is also persuaded by the Ninth Circuit's opinion in *Calderon*, which, in dictum, found that Article 7 is most reasonably read to provide DBCP defendants with a right to elect jurisdiction. *Calderon*, 422 F.3d at 832-33 (interpreting Article 7 to allow a company to "*refuse*[] to submit to the jurisdiction of the Nicaraguan Courts by *electing* not to deposit the required sum" and giving defendants the "*option* of posting the requisite bond . . . and defending the case in the Nicaraguan courts") (emphasis added). Of course, Article 7 does not enable the defendants to compel the plaintiffs to sue in the United States, but it does allow the defendants to divest the Nicaraguan courts of their jurisdiction by refusing to make the deposits otherwise required by Special law 364 and waiving their *forum non conveniens* defenses.

The Court finds that Article 7 is a jurisdictional provision because it affects the courts' power to resolve the issues before it. *See* BLACK'S LAW DICTIONARY 927 (9th ed. 2009) (defining jurisdiction as a "court's power to decide a case or issue or decree"); *see also U.S. v. Morton*, 467 U.S. 822, 828 (1984) (stating that "Subject-matter jurisdiction defines the court's authority to hear a given type of case"); BLACK'S LAW DICTIONARY

931 (defining "subject-matter jurisdiction" as the court's jurisdiction "over the nature of the case and the type of relief sought; the extent to which a court can rule on the conduct of persons or the status of things").   Ultimately, it does not matter whether the impact of Article 7 is stated in terms of subject matter or personal jurisdiction because either interpretation results in a mandatory ground for non-recognition under the Florida Recognition Act.   FLA. STAT. § 55.605(1)(b)-(c).

Of course, comity will ordinarily require United States courts to defer to foreign courts on the interpretation of their own jurisdictional statutes.   In this case, however, the trial court did not follow the interpretation of the Nicaraguan Supreme Court, and Article 7 expressly provides that it is the defendant's right to "decide that the proceedings are to continue in the Nicaraguan courts," or not.   The conclusion that the defendants can opt out of Nicaragua's jurisdiction is not only the finding of this Court, but also that of Nicaragua's highest court, the Ninth Circuit, and at least one legal commentator.   *See* Saint Dahl, 35 U. Miami Inter-Am. L. Rev. at 24.   Accordingly, the Court finds that Defendants effectively invoked their opt-out rights under Article 7 of Special Law 364. This act divested the Nicaraguan trial court of jurisdiction.   Therefore, the Florida Recognition Act does not permit the Court to enforce this judgment because the foreign court lacked subject matter and/or personal jurisdiction over Defendants.   *See* FLA. STAT. § 55.605(1)(b)-(c).

### C.    SPECIAL LAW 364'S COMPATIBILITY WITH THE "INTERNATIONAL CONCEPT OF DUE PROCESS"

A foreign judgment cannot be recognized in Florida if it was "rendered under a system which does not provide . . . procedures compatible with the requirements of due process of law."   FLA. STAT. § 55.605(1)(a).   The term "due process" in this context does not refer to the "latest twist and turn of our courts" regarding procedural due process norms, because it is not "intended to reflect the idiosyncratic jurisprudence of a particular state."   *Ashenden*, 233 F.3d at 476-77 (interpreting an identical provision of the Uniform Foreign Money-Judgments Recognition Act under Illinois law).   Rather, it is meant to embody an "international concept of due process," defined as "a concept of fair procedures simple and basic enough to describe the judicial processes of civilized nations, our peers."   *Id.* at 477.   Both parties have agreed that the Seventh Circuit's definition of "due process" in *Ashenden* accurately defines the term as it is used in the

Florida Recognition Act.   Accordingly, the Court will apply the Seventh Circuit's definition and evaluate the provisions of Special Law 364 to determine whether they are "'fundamentally fair' and do not offend against 'basic fairness.'"   *Id.* (quoting *Ingersoll Milling Mach. Co. v. Granger*, 833 F.2d 680, 687-88 (7th Cir. 1987)).

Defendants argue that the procedures under which this case was tried are incompatible with the requirements of due process because numerous provisions of Special Law 364 fail to provide "basic fairness" to the DBCP defendants subject to its provisions.   The Court takes up this issue as follows: First, it examines the scientific basis for the irrefutable presumption of causation afforded to plaintiffs who establish DBCP exposure and sperm damage, and evaluates whether the presumption constitutes a procedure consistent with due process in light of the medical testimony in this case. Second, the Court analyzes the remaining provisions of Special Law 364 under the rubric of disparate or discriminatory treatment of foreign defendants.

### 1.        Special Law 364's Irrefutable Presumption of Causation

Defendants argue that Special Law 364's irrefutable presumption of causation fails to comport with due process because it is inconsistent with medical and scientific facts and it deprives DBCP defendants of the opportunity to defend themselves.   The irrefutable presumption of causation has the effect, according to Defendants, of making any causation defense they might have offered in the Nicaraguan trial court futile because, by definition, one cannot refute an irrefutable presumption.   Plaintiffs suggest, however, that the Court should not examine whether the findings of the Nicaraguan trial court are in accord with the body of medical and scientific facts relating to the causes of sterility in men, because the Nicaraguan trial court's medical findings are entitled to deference in this Court.   Plaintiffs also claim that the Nicaraguan trial court did not actually apply the irrefutable presumption of causation and that this case was tried under legal theories other than Special Law 364, and, therefore, the issue of the irrefutable presumption's fairness (or lack thereof) is not before the Court.   Alternatively, Plaintiffs cite several cases which they argue support the proposition that Special Law 364's irrefutable presumption of causation does not offend due process.

As an initial matter, the Court rejects Plaintiffs' contention that the medical conclusions of the Nicaraguan trial court are beyond this Court's consideration.   This

position cannot be reconciled with the Court's obligations under the Florida Recognition Act, because the Act requires that the rendering court's procedures comply with due process, which necessarily requires the Court to examine the procedures, including any applicable legal presumptions, which were in place or were applied by the rendering court.[9]

In order to evaluate whether the irrefutable presumption of causation in Article 9 of Special Law 364 comports with basic fairness under the international concept of due process it is necessary to understand the underlying medical causes of sterility.  As a general rule, the validity of a statutory presumption depends on the extent with which it conforms to the universe of scientific fact and the parties' ability to fairly rebut it.  The Connecticut Supreme Court has aptly explained that

> A presumption of law must be based upon facts of universal experience and be controlled by inexorable logic. . . . Even in the case of a rebuttable presumption, the fact which is specified to be *prima facie* evidence of the fact to be inferred or presumed must be a fact which in common experience leads naturally and logically to the fact inferred or presumed.

*Ducharme v. Putnam*, 285 A.2d 318, 321 (Conn. 1971) (quotations and citations omitted).  Additionally, statutes that condition the payment of substantial sums on a set of facts which the defendant is unable to controvert are presumptively unfair.  *Cf. Heiner v. Donnan*, 285 U.S. 312, 325 (1932) ("[A] statute which imposes a tax upon an assumption of fact which the taxpayer is forbidden to controvert, is so arbitrary and unreasonable that it cannot stand under the Fourteenth Amendment.").  Special Law 364 does not permit defendants to rebut the presumption that DBCP exposure caused the plaintiffs' sterility.  Therefore, for the presumption to be fundamentally fair there must be a scientifically and medically valid causal relationship between the predicate facts and the fact to be presumed; otherwise, the presumption will operate to impose liability irrespective of fault.

According to Article 9, the predicate facts of the irrefutable presumption are (1) the plaintiff's exposure to DBCP and (2) two medical analyses of spermograms

---

[9]      It important to note, however, that the Court limits its reliance on the credible and unrefuted medical testimony of Dr. Larry Lipshultz, who has spent his entire adult life studying urology and male reproduction, to the factual findings on the nature and causes of sterility and its relationship to DBCP exposure.  Dr. Lipshultz's legal conclusions on Special Law 364 are given no weight whatsoever.

indicating that the plaintiff is sterile, and the fact to be presumed is that DBCP exposure caused the plaintiff's sterility.  This irrefutable presumption of causation attached without regard for the circumstances which clearly impact the potential for DBCP to cause sterility, including the nature, intensity, and duration of exposure to DBCP.  Moreover, in practice, the Nicaraguan trial court found exposure to DBCP simply from the fact that a plaintiff purportedly worked on a banana farm, without regard for the type of work performed (and whether it involved exposure to DBCP) or the duration of the work.  Further, as the Court will explain below, the requisite evidence accepted as proof of sterility was factually inadequate.

The Nicaraguan trial court's application of Special Law 364's irrefutable presumption of causation resulted in findings that are incompatible with medical and scientific facts in several ways.  First, the evidence before the trial court was sufficient to conclude that only six percent (9 out of 150) of the prevailing plaintiffs possessed sperm impairments medically consistent with a finding of sterility.  Second, a majority of the plaintiffs (78 out of 150) were awarded damages even though they suffered exclusively from conditions not scientifically linked to DBCP exposure.  And third, approximately a fifth of the prevailing plaintiffs (32 out of 150), whom the trial court found exhibited various types of sperm impairments as a result of DBCP, could not, according to the unrefuted medical testimony in this case, have suffered from sperm impairments caused by DBCP, because they fathered children in the years since their last alleged exposure to DBCP and before their spermograms were taken.  Finally, the Nicaraguan trial court did not employ procedures capable of isolating the causes of sperm impairment in any particular plaintiff, even though such procedures are medically necessary because of the many varied causes of sterility and other sperm impairments that commonly afflict the general male population.

### a. Medical Definitions of Infertility, Sterility, and Impaired Sperm Conditions

At the outset, the Court notes that the Judgment inappropriately refers to the prevailing plaintiffs as "infertile."  This term, although commonly applied to any individual incapable of producing children, is technically defined as the inability of a couple to procreate after twelve months of continuous intercourse.  Scientifically and medically, sterility is something different.  A male is considered sterile when his

ejaculate completely lacks the presence of sperm or contains only dead sperm.  It appears, therefore that the term "sterile" (which is used in Special Law 364), as opposed to "infertile" (which is used in the Judgment), is the correct term for use in the context of DBCP litigation because only sterility appropriately refers to the individual plaintiffs' alleged impaired sperm conditions.

The Judgment identifies six types of impaired sperm conditions in the plaintiffs which are properly defined as follows:

(1) azoospermia: a complete lack of sperm in the ejaculate (studies show that 5% to 14% of the male population at-large is afflicted with this condition);

(2) oligospermia: sperm density of less than 20 million per milliliter;

(3) teratozoospermia: significant impairment in sperm shape;

(4) asthenozoospermia: a decrease in sperm mobility of greater than 50%;

(5) necrozoospermia: the presence of only dead sperm in the ejaculate; and

(6) hypospermia: a low volume of seminal fluid in the ejaculate.

Of the six conditions identified in the Judgment, however, only azoospermia actually constitutes clinical sterility, because men with the other conditions are often capable of producing sperm of sufficient quality and quantity to procreate.  It is true that technically both azoospermia and necrozoospermia define clinical sterility; however, while properly diagnosed necrozoospermia (defined as no live sperm in the ejaculate) constitutes clinical sterility, the Judgment uses this term to refer to plaintiffs with unusually high rates of death or loss of motility in the first hour.  The Judgment's designation of certain plaintiffs' as necrospermic, therefore, is inconsistent with the correct medical definition of necrozoospermia.  As such, it cannot be definitively said that the plaintiffs identified by the Judgment as necrozoospermic are actually sterile because their ejaculate may contain sperm of sufficient quality and quantity to initiate a pregnancy.

Curiously, the Judgment also identifies 62 plaintiffs as possessing both astenozoospermia and necrozoospermia, often in combination with other sperm impairments as well.  This diagnosis is somewhat of a medical contradiction because asthenozoospermia means that the sperm are not moving well while necrozoospermia means that the sperm are completely dead.  This contradiction can only be explained if

27

the Judgment refers to sperm that had an unusually high rate of death or lack of movement in the first hour as necrozoospermic, even though true necrozoospermia only exists when sperm motility is 100% impaired.   This further demonstrates that the plaintiffs classified as necrozoopermic in the Judgment are not sterile under the accepted medical definition of sterility.

Therefore, according to the medical classifications used in the Judgment, only plaintiffs diagnosed with azoospermia possessed impaired sperm consistent with a finding of sterility.   Just nine of the 150 prevailing plaintiffs were classified with azoospermia; the rest are said to possess some combination of the remaining types of sperm impairments that fall short of clinical sterility.[10]

Other than the nine plaintiffs identified as azoospermic, it cannot be said from a medical and scientific standpoint that the plaintiffs did not possess sperm of sufficient quality and quality to initiate a pregnancy.   Thus, in light of the scientific and medical data regarding sterility and based on the evidence before it, the most favorable conclusion for the plaintiffs that the Nicaraguan trial court could have rendered is that no more than nine of the 150 prevailing plaintiffs suffered from conditions consistent with the medical definition of sterility.

### b.  Relationship Between DBCP and Impaired Sperm Conditions

The Nicaraguan trial court also attributed various sperm impairments to DBCP exposure without a scientific basis for doing so.   Because nine of the prevailing plaintiffs

---

[10]      One explanation for this may be that the term "sterility," as used in Special Law 364, was not meant to comport with clinical sterility under accepted medical definitions. The provision for awards under Article 11 for "severe oligosperm[ia]" and "other damage," which fall short of clinical sterility, indicates that a "condition of sterility" under Article 9 is not the same as actual medical sterility.   Article 11 provides for additional awards for sperm impairments ($50,000 for severe oligospermia and $25,000 for other damage) that do not constitute actual sterility because individuals with these conditions may possess sperm of sufficient quality and quantity to initiate a pregnancy. Under this interpretation, Special Law 364 declares that plaintiffs who are capable of fathering children are nonetheless "sterile."

Further, a draft of Special Law 364 defines sterility as "such condition provoked by the chemical agent DBCP."   The Judgment is consistent with this definition of "sterility" because it essentially defines the term to include any injury suffered by a plaintiff, including sperm impairments that do not constitute sterility.

were classified as azoospermic, and two submitted no spermograms, the remaining 139 plaintiffs were classified with sperm impairments other than azoospermia.  To date, over 20 medical studies have attempted to analyze the relationship between DBCP and male sterility.  But of the six types of sperm impairments listed in the Judgment, only azoospermia has been linked to DBCP exposure, and only in the factory setting—never to farm workers.  At the hearing, Defendants presented unrefuted testimony that there is no medical evidence that DBCP can cause hypospermia or necrozoospermia, and that it has never been linked to asthenozoospermia as an isolated finding.  Yet, according to the Judgment, a majority of the plaintiffs (78 out of 150) suffered exclusively from these three conditions, 134 were diagnosed with either necrozoospermia or hypospermia, and 19 were diagnosed exclusively with necrcozoospermia or hyspospermia.  It appears, therefore, that the majority of plaintiffs who recovered in this case suffered from injuries for which, according to the unrefuted medical testimony presented to the Court, there is no medical evidence that DBCP is capable of causing.

### c.        Proximate Effects of DBCP Exposure

The Judgment awarded damages to a number of plaintiffs whose injuries could not have been caused by DBCP because they fathered children in the years between their last alleged exposure to DBCP and the time their sperm samples were taken in this case. According to unrefuted medical testimony, the effects of DBCP on sperm quality are proximate to exposure, which means that they are greatest immediately following exposure and decrease over time.  This means that it is possible for plaintiffs who were at one time sterile because of DBCP exposure to later have children.  (Indeed, some medical studies have shown that workers exposed to DBCP experience an improvement in sperm production 18-21 months after their exposure to DBCP ceases.)  But, more important for the Court's consideration here, it also means that any reoccurrence of sterility following childbirth cannot, as a matter of medical and scientific fact, be the result of prior DBCP exposure.

During the evidentiary hearing, there was substantial discussion about a particular plaintiff named Miguel Antonio Bonilla Rivera, whom Defendants have identified as an example of how the irrefutable presumption in Article 7 operates in violation of the unrefuted medical testimony in this case.  Bonilla Rivera was awarded $574,880 based on

absolutely inexplicable scientific premises.  It appears that he submitted one spermogram and a psychological exam report, but was not otherwise examined by a doctor.  Without discussing the specifics of his claims, the Judgment found that Bonilla Rivera was "infertile" and awarded him damages.

Bonilla Rivera claimed to have worked on one of Dole's banana farms from 1972 through 1974 (meaning his last possible exposure to DBCP was in 1974).  But, he fathered his second child in 1974 and his third in 1977.  According to the birth certificates obtained by Dole, Bonilla Rivera has fathered nine children in all, though he only admitted to fathering five in his trial testimony.  He also stated on the record that he had only been sterile since 1995, when his last son was born.  In the opinion of Dr. Umaña, the medical expert in the Nicaraguan trial court, Bonilla Rivera was "infertile" at the time his sperm test was performed in 2005.

Absent the irrefutable presumption of causation, there appears to be no evidence that can demonstrate a causal link between DBCP and Bonilla Rivera's purported sterility since 1995.  To the contrary, it is a scientific certainty that if Bonilla Rivera was "infertile" in 2005 it is not because of any exposure to DBCP before 1975.  Moreover, the Judgment simply concludes, without explanation, that with regard to his psychological damage there was "a possible link with the mixed anxiety-depression disorder resulting from his infertility."  Judgment, at 59.  The trial court awarded Bonilla Rivera $574,880, presumably to compensate him for his "infertility" and for the psychological harm resulting from his inability to have children in addition to his other five or nine.

While it is obvious that Defendants highlight Bonilla Rivera's case because it is particularly egregious, his situation is but one of many that are completely incompatible with scientific reality.  The 32 plaintiffs whom the birth certificates offered by Dole identify as having fathered children in the years since their alleged DBCP exposure received over $21 million.  Even if those plaintiffs were actually sterile in 2005, the unrefuted scientific evidence before the Court is that their sterility could not have been caused by DBCP.

**d.    Evaluation of Special Law 364's Irrefutable Presumption of Causation Under the International Concept of Due Process**

"Statutes creating permanent irrebuttable presumptions have long been disfavored[,]" *Vlandis v. Kline*, 412 U.S. 441, 445 (1973), because "a presumption which operates to deny a fair opportunity to rebut it" is a denial of due process. *Heiner*, 285 U.S. at 329.  In *Bell v. Burson*, 402 U.S. 535 (1971), for example, the Supreme Court held that a law requiring the suspension of drivers licenses for all drivers who were involved in accidents violated due process because it did not provide a hearing at which the driver could contest his fault or responsibility.  Of course, the typical two-car accident, in which one vehicle back-ends another, presents a binary choice: either driver A or driver B is at fault.  But the unrefuted evidence here establishes that the causes of male sterility are legion; they can be genetic, hormonal, or environmental.  In addition to DBCP exposure, sterility can be caused by cigarette smoking, alcohol abuse, marijuana and cocaine use, prescription medication, paint exposure, and radiation.  And this is not an exclusive list.  However, environmental factors constitute only a small percentage of the causes of male sterility, and within those environmental factors, all chemical exposures (such as exposure to DBCP) constitute an even smaller percentage.

The policy against irrefutable presumptions has particular force in the context of causation in personal injury lawsuits, because the causation element ensures that a defendant is required to compensate only those whom he has actually harmed.  The Florida Supreme Court has explained that in all negligence actions, the plaintiff

> must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result.  A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture . . . it becomes the duty of the court to direct a verdict for the defendant.

*Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1019 (Fla. 1984) (quoting Prosser, Law of Torts § 41 (4th Ed. 1971)).  Without proof of causation, the link the between the plaintiff's injury and the defendant's conduct is purely speculative, and any damages awarded necessarily occur without due consideration for the defendant's fault.  *Cf. Noblesville Casting Div. of TRW, Inc. v. Prince*, 438 N.E.2d 722, 731 (Ind. 1982)

("[C]ivil liability or an award of damages may not be predicated purely on speculation[.]").

In this case, it is undisputed that Special Law 364 exempts plaintiffs from proving causation. Indeed, it goes further than that, by stating that the defendants cannot rebut the presumption and that they knowingly caused the plaintiffs' injuries. The defendants are effectively precluded from offering scientific evidence that conclusively rebuts this presumption. Or, to be more precise, the defendants can offer such evidence but it will have no effect on the outcome of the litigation. In this way, Special Law 364 deprives defendants of any meaningful opportunity to contest the essential allegation against them—that DBCP caused a plaintiff's sterility. If Article 9's irrefutable presumption of causation bore some reasonable relationship to known scientific and medical facts, this might be a different case. But the evidence before the Court is that the presumption simply legislates into existence a set of facts based on little more than speculation. Moreover, the application of this presumption in the Nicaraguan trial court flies in the face of the unrefuted medical and scientific evidence before the Court.

In essence, the credible and unrefuted medical testimony in this case is that it is factually impossible for what is represented in the Judgment to have occurred. At best, the only thing a medical expert can actually determine from the samples of impaired sperm provided to the doctors in the Nicaraguan trial court is that the plaintiffs had some type of testicular impairment. But because many types of testicular impairments occur at significant rates in the general population irrespective of any chemical agent, not to mention DBCP alone, this limited evidence cannot remotely prove that DBCP caused the injuries of a single plaintiff in this case. For example, varicocles (varicose veins in the scrotum) occurs, without any exposure to DBCP, in approximately 15% of the general male population and can cause azoospermia, oligospermia, and teratozoospermia. Moreover, to determine the causes of sperm impairment in a particular man, a fertility specialist must conduct an individualized examination, including laboratory tests of both blood and semen, and a complete medical history. But this was done for any plaintiff in this case. As a result, the Nicaraguan trial court did not have before it sufficient evidence to establish a medical basis for concluding that any plaintiff's sterility was caused by

DBCP and not by any of the multitude of factors which regularly cause sterility in the general male population.

Given the unrefuted medical evidence before the Court that it is scientifically and medically impossible for DBCP to cause most of the impaired sperm conditions represented in the Judgment, and that the medical procedures employed in Nicaragua were scientifically inadequate to isolate the causes of individual plaintiffs' purported sterility, the only plausible explanation for what occurred in the Judgment is that the Nicaraguan trial court applied the irrefutable presumption of causation provided by Article 9 of Special Law 364.  It is therefore irrelevant whether, as Plaintiffs contend, this case was also tried under other legal theories or procedures, because applying an irrefutable presumption of causation would be a manifest denial of due process in those as well.  Moreover, having reviewed all of the evidence presented, including the Judgment itself, the Court finds that Plaintiffs' contention is not credible and that the Nicaraguan trial court would have had to, and did, rely on the irrefutable presumption of causation to support its findings and awards.

This Court's consideration of medical testimony is not intended to be, and is not, a mini retrial of the *Osorio* action.  The Court neither examined plaintiffs' individual spermograms and medical histories (such as they were) nor reevaluated the medical evidence that was submitted to the trial court in Nicaragua for each plaintiff.  Rather, the Court has evaluated the medical testimony only to the extent that it is necessary to determine whether the *procedures* under which the underlying case was tried are "compatible with the requirements of due process of law."  FLA. STAT. § 55.605.  It is simply not possible to fully understand the procedures set forth in Special Law 364 without also examining their scientific basis, if any, and their application in practice.

Accordingly, it also helpful to understand how Article 9 has been applied in other DBCP lawsuits.  In *Herrera Ríos*, the same Nicaraguan trial judge who presided over *Osorio* heard medical testimony similar to that before this Court (for example, that there are many causes of "infertility" in men and the procedures set forth in Article 9 are insufficient to establish a causal link between DBCP exposure and sterility) but nonetheless permitted the plaintiffs to recover $809 million, an average recovery of approximately $648,000 per plaintiff.  In *Herrera Ríos*, the trial court rejected the

medical testimony proffered by the defendants—that the presumption of causation does not accord with known scientific fact—simply because "plaintiffs have shown that this chemical had already been banned in the United States."  Judgment entered in Case No. 215-02 *Herrera Ríos v. Standard Fruit Company*, Second Civil and Labor District Court of Chinandega, at 7 (Dec. 1, 2006) ["Judgment in *Herrera Ríos*"].  In another crucial passage, the trial court found that

> while it is true that said medical tests, on their own, do not show causality between DBCP and the infertility of plaintiffs, said medical opinions fulfill each of the requirements set forth in Art. 9 of Law 364, therefore, they can be used as evidence in the instant case and do show plaintiffs' physical and psychological harm . . . .

Judgment in *Herrera Ríos*, at 9.  In effect, the Nicaraguan trial court admitted what is abundantly clear to this Court: Special Law 364 permits significant tort recoveries without any proof of causation, and in many instances in direct contravention of unrefuted medical evidence.

Plaintiffs' reliance on *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976), which they claim supports the proposition that irrefutable presumptions of causation are consistent with due process, is particularly misplaced for several reasons.  Most strikingly, the law challenged in *Usery*, the Black Lung Act of 1972, 30 U.S.C. § 901 *et seq.*, entitled a claimant to a *maximum* benefit of $4,732.20 per year, which may have approximated the yearly salary of coal miners at that time, plus medical costs.  *Id.* at 9 n.8.  This is a far cry from the $125,000 in *minimum* damages mandated by Special Law 364, and the average recovery of almost $650,000 in this case.  Moreover, the Black Lung Act did not provide for substantive tort liability but set up a cost-spreading scheme that provided for limited statutory benefits, somewhat akin to workers compensation statutes.  This distinction was critical to the Supreme Court's determination that the Act did not violate due process.  *See id.* at 15, 17-18 (finding the imposition of retrospective liability was justified as a cost-spreading measure but stating that the Court would "hesitate to approve the retrospective imposition of liability on any theory of deterrence or blameworthiness") (citations omitted).

Additionally, the limited presumption of causation that the Supreme Court approved in *Usery* applied only to former coal miners who were dead or afflicted with complicated pneumoconiosis, a severe and irreversible condition that no one disputed

was caused by inhaling coal dust.  *Id.* at 6-7, 10-11, 28.  The presumption of causation in *Usery* was therefore based on sound medical science because the appearance of coal in the human lungs, the acknowledged cause of pneumoconiosis, requires prolonged exposure to coal mines.  Even so, the Black Lung Act still required that miners demonstrate 10 years of employment before they were entitled to a presumption that their condition arose out of such employment.  *Id.* at 11.  Special Law 364, on the other hand, requires only *de minimus* evidence of exposure to DBCP (one day on a banana farm would presumably suffice) before the irrefutable presumption of causation applies.  But unlike the sound scientific presumption that the presence of coal in the human lungs can only be caused by prolonged exposure to coal mines, Special Law 364 contains a scientifically unsupportable presumption, because DBCP exposure is only a small contributor to the many causes of sterility in men.

If anything, the limited presumptions that sparked a searching constitutional inquiry in *Usery* serve only to highlight the dissimilarity between the extreme provisions of Special Law 364 and the comparatively modest and scientifically sound provisions that the *Usery* Court found constitutional.  None of the other cases Plaintiffs cite even remotely support the proposition that substantive tort liability may be based on an irrefutable presumption of causation, especially a presumption as inconsistent with scientific fact as this one.  *See, e.g.*, *Weinberger v. Salfi*, 422 U.S. 749 (1975); *Milks v. State*, 894 So. 2d 924 (Fla. 2005); *Butler v. State*, 923 So. 2d 566 (Fla. 4th DCA 2006).

An irrefutable presumption violates due process when it is "not necessarily or universally true in fact, and when the State has reasonable alternative means of making the crucial determination."  *Vlandis*, 412 U.S. at 452.  The irrefutable presumption in Special Law 364 is not true in fact because it does not account for the proximate effects of DBCP exposure, it does not take into account the nature and extent of exposure, and it does not consider that chemical exposure constitutes only a very small percentage of the causes of male sterility.  Instead, the procedures set up for determining "infertility" under Article 9 allow DBCP plaintiffs to avoid the procedures that are medically necessary to isolate the causes of their alleged "infertility."

The case law cited in this section addresses the standard for due process under the Constitution of the United States.  But the Court is confident that the international due

process norms described in *Ashenden* do not permit awarding damages, especially of the magnitude awarded here, without proof of causation. And those norms certainly do not permit awarding damages in the face of clear scientific proof of the absence of causation. To do so would require defendants to pay huge sums without proof of fault, indeed, in this case, with proof that they are not at fault. This, in the Court's view, is not a close question. Special Law 364 "constitutes an attempt, by legislative fiat, to enact into existence a fact which here does not, and cannot be made to, exist in actuality." *Heiner*, 285 U.S. at 329. The Court does not hesitate to conclude that awarding damages without regard for fault is the antithesis of basic fairness both in domestic and international litigation. The Florida Recognition Act contains enumerated, mandatory grounds for non-recognition of foreign judgments precisely to prevent courts in this state from becoming a party to such legal caprice.

### 2. Disparate Treatment of Specific Foreign Companies under Special Law 364

Defendants argue that Special Law 364 targets a handful of foreign companies for discriminatory rules and procedures unique in Nicaraguan law. These include the minimum damages, deposit requirement, limitation of appellate rights, 3-8-3 summary proceedings, and imposition of retrospective liability provided for in Special Law 364. Plaintiffs argue that these rules and procedures do not target Defendants—that Special Law 364 is actually a law of general applicability—and that even if some of them are unfair and discriminatory, Plaintiffs had the power to, and did, waive them during the trial proceedings. But after a close examination of Special Law 364, the proceedings in the Nicaraguan trial court, and with the benefit of live testimony regarding the existence or non-existence of similar rules and procedures in Nicaraguan litigation, the Court concludes that Special Law 364, by design and in operation, targets a handful of United States companies for burdensome and unfair treatment to which domestic Nicaraguan defendants are never subjected.

### a. Special Law 364's Application to a Narrowly Defined Group of Foreign Companies

Defendants argue that Special Law 364 was not designed to be a law of general applicability but instead to target a narrowly defined group of foreign defendants and subject them to discriminatory provisions that do not apply to domestic defendants.

Defendants point to Article 3, which they say restricts Special Law 364's application to a limited number of predetermined foreign companies. Article 3 defines the covered defendants as (1) "companies," (2) "sued in the United States," (3) who have "chosen to have . . . lawsuits transferred to Nicaragua," and (4) "currently are being sued [in Nicaragua]." Additionally, the amounts provided for minimum damages in Articles 3 and 11, and for the bond in Article 4, are given in U.S. dollars rather than the local currency, which is further evidence that Special Law 364 applies only to United States companies.

Plaintiffs, however, point to Article 6, which they claim uses more general terms to define the defendants subject to Special Law 364. Article 6 describes the defendants as "those who authorized use and application [of DBCP], as well as the manufacturing, importing, distributing, marketing and applying companies." Article 6 is the provision that removes any otherwise applicable statutes of limitations for civil and criminal liability. Article 2 contains a description of the defendants similar to that in Article 6. But rather than support Plaintiffs' argument that Special Law 364 does not single out a specific group of defendants, Article 6 indicates that the law does exactly this. Article 6 provides additional limits on the scope of targeted defendants by further describing potential defendants as those involved in various ways with DBCP. Read together, Articles 2, 3, and 6 limit Special Law 364's application to a handful of United States companies.

Plaintiffs also contend that Special Law 364 does not target foreign defendants because explicit references to United States companies were deleted from the final draft. An earlier draft defines the terms "Manufacturer," "Appliers," and "Pesticides," which are the more general terms used in Articles 2 and 6, terms Plaintiffs contend make Special Law 364 generally applicable. A "Manufacturer" is defined as "the United States companies Dow Chemical Company and Shell Oil Company." "Appliers" are defined as "United States companies Standard Fruit Company and Dole Fruit Company." And "Pesticides" are defined as "Nemagon or Fumazone [the trade names of DBCP],

manufactured by United States companies Dow Chemical Company and Shell Oil Company."[11]

This history clearly indicates which specific companies the legislature had in mind and wanted Special Law 364 to cover, and the final version is consistent with this intention. Defendants and similarly situated United States companies constitute the limited targets of Special Law 364. The evidence in this case, and the terms of Special Law 364 itself, demonstrate that the law was meant to apply, and does apply, to the specific DBCP defendants who were parties in *Delgado*.[12] This alone, of course, does not mean that Special Law 364 denies the covered defendants due process. It is the combination of Special Law 364's limited applicability along with its unique discriminatory provisions that together amount to a denial of due process.

### b. Damages

One of the provisions Defendants point to as proof that Special Law 364 targets them for disparate treatment is the minimum damage requirements, which they claim are unique to Special Law 364. Special Law 364 entitles successful plaintiffs to a minimum award of $125,000. Article 3 provides that, once a claim is established, the "companies" shall compensate the plaintiff with a minimum of $100,000. Article 11 sets out a table for additional damages depending on the plaintiff's conditions (for azoospermia, $100,000; severe oligospermia, $50,000; and for any other physical damage, $25,000). Under Article 12, the court is also allowed to award additional damages that correspond to damage awards in a foreign legal system. In this case, the plaintiffs provided the court

---

[11]     The Court also notes (though its decision does not rely on this fact) that the draft law defined a "Plaintiff" as a "person who has been rendered sterile by the use of [DBCP]," a clear indication that Nicaragua's legislature was of the mind that the defendants' liability was a *fait accompli* and the purpose of Special Law 364 was merely to provide procedures for the payment of damages. Indeed, in the final version of Special Law 364, Article I, the law's preamble, states that the purpose of the law is to "regulate and facilitate the procedures for the conduct of lawsuits *with regard to compensation* of persons [affect by DBCP exposure.]" (emphasis added)  This statement suggests that the purpose of Special Law 364 was merely to provide procedures "with regard to compensation," not to determine liability, which the law presumes already exists.

[12]     The defendants in *Delgado* were Shell Oil Company, Chiquita Brands, Chiquita Brands International, Inc., Del Monte Fresh Produce, N.A., Del Monte Tropical Fruit Co., Dole Food Co., Inc., Dole Fresh Fruit Co., Dow Chemical Co., Occidental Chemical Corp., Standard Fruit Co., and Standard Fruit & Steamship Co.  890 F. Supp. at 1336.

with copies of jury verdicts in the United States ranging from approximately $350,000 to $2 million.  The trial court appears to have awarded damages in accordance with Article 12, as the average award in this case was just under $650,000, and the minimum award was $188,500.  Judgment, at 96.

In an effort to justify the statutorily mandated minimum damages in Special Law 364, Plaintiffs argue that damages established by statute are not rare in Nicaragua.  In support of this contention, Plaintiffs offer only one example, from Nicaragua's Aviation Code.  One of Plaintiffs' experts testified that, under Nicaragua's Aviation Code, damages for an airlines passenger's wrongful death or total permanent disability are set at a *maximum* of $5,000 and $6,000 respectively.  Rather than supporting Plaintiffs' argument, however, a comparison between the Aviation Code and Special Law 364 dramatically undermines Plaintiffs' contention that the terms of Special Law 364 are not unusual or discriminatory.  To the contrary, a comparison of the statutes lends credence to Defendants' point that Special Law 364's damage provisions are unique and extraordinary measures that Nicaraguan law reserves for DBCP defendants.  The Aviation Code provides for *maximum* damages that are less than one-twentieth of the *minimum* damages mandated by Special Law 364, and does so for injuries—death and total permanent disability—that are significantly more severe than sterility.  There is no evidence whatsoever that any other defendants in the Nicaraguan legal system are subject to *minimum* damages of the magnitude required by Special Law 364.

Plaintiffs have produced evidence of one Nicaraguan judgment from earlier this year that awarded several plaintiffs approximately $500,000 each for wrongful death.  But this appears to be the exception that proves the rule, and there is no evidence that these sums were awarded pursuant to statutory minimum damage provisions.  Other than this solitary judgment, there is no evidence that Nicaragua awards, much less mandates, judgments of this size.  To the contrary, the Court heard credible expert testimony that judgments in the hundreds of thousands of dollars are unheard of in Nicaragua (other than in DBCP cases) and would never be awarded in, for example, a typical action for negligence arising out of an automobile accident.  In Nicaragua, typical verdicts for *wrongful death* run no more than $10,000.  And caps (but not floors) on damages are not uncommon.  For example, as documented below, Article 121 of the Nicaraguan labor

39

code, which applies to injuries arising out of occupational hazards, contains caps on damages that amount to a very small percentage of the minimum damages mandated by Special Law 364.

In evaluating whether the damage provisions of Special Law 364 discriminate against a few foreign defendants, it appears that "the proof is in the pudding."  Both the minimum awards mandated by Special Law 364, and the actual awards in DBCP cases, are so disproportionate to the damages commonly awarded in Nicaraguan litigation— which include damages awarded for injuries significantly more severe than the ones complained of in this case—that it is clear that the damages provided for in Special Law 364 constitute extraordinary damage provisions unique in Nicaragua's legal system. According to the expert testimony that the Court heard during the evidentiary hearing, the average Nicaraguan subsists on $2 a day.  The Nicaragua's Labor Code, Article 121, provides that if a worker should die or become totally disabled as a result of occupational hazards, his employer must pay 620 days' salary, $1,240 for the average Nicaraguan worker.  This sum, *for death or total disability*, is less than 1% of Special Law 364's required minimum damages and less than one-fifth of 1% of the average award in the Judgment.  For comparative purposes, the Court notes that the gross national product of Nicaragua is somewhere between $6 and 7 billion, meaning that the $2 billion in DBCP judgments rendered to date would, if enforced, increase the size of Nicaragua's total economy by as much as 30%.  Given these facts, the inescapable conclusion, and the conclusion of this Court, is that Special Law 364 subjects a handful of United States companies to minimum damages that have no parallel in Nicaragua's legal system, would never be applied to Nicaraguan defendants, and are unreasonably discriminatory.

### c.      Deposit Requirements

Defendants argue that Special Law 364 also unfairly discriminates against them by requiring them, as a condition to defending DBCP claims, to deposit $100,000 within 90 days after the complaint is filed and $15 million within 90 days of receiving notice of the complaint.  No other litigants in Nicaragua are required to provide deposits which are anywhere near the deposit requirements that Special Law 364 imposes on DBCP defendants.  The plaintiffs' costs, on the other hand, are to be covered by the Nicaraguan government.   Plaintiffs point out that sureties for non-resident defendants are not

uncommon in either the United States or foreign legal systems.  True enough.  But Plaintiffs have not shown the Court any other Nicaraguan statute that requires deposits anywhere near this size ($15 million).  Nor have Plaintiffs shown that Nicaraguan law imposes similar provisions on other classes of defendants.  Even the Nicaraguan Supreme Court acknowledged in its opinion, albeit approvingly, that the disparate treatment resulting from the deposit requirements of Special Law 364 was an example of "Positive Discrimination."[13]

Defendants have also shown the Court how the deposit requirement, in combination with Special Law 364's jurisdictional provisions in Article 7, can place DBCP defendants in an untenable jurisdictional conundrum.   Under Article 7, the defendants' decision to make the $100,000 deposit constitutes a decision to try the case in the Nicaraguan courts, and a refusal to make the deposits constitutes a decision to opt out of Nicaragua's jurisdiction.  Article 4 states that the deposits are a prerequisite for defendants to participate in the ligation, including, according to some Nicaraguan courts, asserting jurisdictional challenges.  In practice, the peculiar interaction between Articles 4 and 7 for a defendant who wants to opt out of litigating in Nicaragua logically plays out in the following scenario: First, the trial court orders the defendant to make the required deposits.  Next, the defendant refuses to make the deposits and attempts to exercise its opt-out right under Article 7.  Ignoring the defendant's opt-out rights, the trial court proceeds to exercise jurisdiction and eventually enters judgment against the defendant. The defendant then appeals to the intermediate appellate court.  But ultimately, the appellate court rules that it cannot hear the defendant's jurisdictional challenge because the defendant has not made the deposits required by Article 4, deposits which, according to Article 7, constitute a decision by the defendant to proceed in Nicaragua's courts.  The appellate court thus instructs the defendant that it will only consider defendant's jurisdictional challenge after the defendant takes steps (makes the deposits) that fatally undermine defendant's position and which, of course, constitute consent to Nicaragua's jurisdiction.

---

[13]     Plaintiffs also contend that they had the power to waive, and did waive, the deposit provisions, thereby eliminating this point from the Court's consideration.  The Court rejects this argument, however, because, as the Court will explain, and Plaintiffs' own Complaint alleges, the deposit provisions of Special Law 364 are not waivable.

The above scenario is not idle fancy.  As evidence of their position that Articles 4 and 7 place DBCP defendants in a jurisdictional bind, Defendants have produced an opinion from a Nicaraguan appellate court in another DBCP case in which the appellate court—without acknowledging the Nicaraguan Supreme Court's opinion to the contrary—rejects defendants' jurisdictional challenge based on Article 7 of Special Law 364 because the defendants had not deposited the monies required by Article 4.  *See* Order of the Court of Appeals for the District of Managua in Case No. 001491-0103-2001-CV (Mar. 11, 2008) (refusing to accept defendants' arguments that they could opt out of Special Law 364 because of defendants' failure to comply with Special Law 364's deposit requirements).  In this case, of course, Defendants have been unable to complete this final move in Nicaragua's jurisdictional two-step because the Nicaraguan court of appeals' apparent refusal to act has stranded them in appellate limbo.  This, of course, is DBCP defendants' Catch-22.  *See* HELLER, *supra*, at 46.

### d. Appellate Review

Another example of Special Law 364's unfair, discriminatory nature is its procedure for appellate review.  In Article 14, Special Law 364 provides for an appeal only to the intermediate appellate court, not to the Supreme Court.  In his opinion, the Nicaraguan Attorney General argued that depriving the defendants of their right to appeal to the Supreme Court violated Nicaragua's Constitution.  According to the Attorney General, the Nicaraguan Constitution provides defendants with a right to appeal verdicts of this magnitude to the Supreme Court.

But even the limited right of appeal provided by Special Law 364 is further discriminatorily restricted because Article 14 provides that the appeal "shall be only without stay of execution."  At the evidentiary hearing, the Court repeatedly asked one of Plaintiff's experts whether a stay of execution is the norm or the exception in typical Nicaraguan tort actions, but his responses were evasive and he would not answer the Court's questions.  The Court concludes that a stay of execution is generally available in Nicaraguan tort actions.

The Court also notes that in this case, Defendants have not yet enjoyed any appellate process in Nicaragua.  The Court heard expert testimony that appeals in Nicaragua normally take six to twelve months, but the Nicaraguan court of appeals has

not acted on any of Defendants' multiple appeals, one of which has been ripe for adjudication for four and a half years.

### e.    Summary Proceedings

Defendants also contend that Special Law 364 discriminates against DBCP defendants by requiring a 3-8-3 summary proceeding for medically complex cases involving hundreds of plaintiffs and circumstances going back almost thirty years.  (Dow ceased manufacturing DBCP in 1977 and Dole involuntary left Nicaragua a few years later.)  The 3-8-3 procedure provides only eight days for the submission of evidence, even though the standard procedure in Nicaragua permits 20 days.  Plaintiffs offered testimony that summary proceedings are common in Latin American, but they did not produce any examples of their application in a case as complex as this one.  This action had over 200 plaintiffs; *Herrera Ríos* had over 1700.  It appears that the clear intent of requiring a 3-8-3 summary proceeding was to unfairly fast track these substantial and complex cases, and thereby deny DBCP defendants sufficient time to present an adequate defense.[14]

Nonetheless, Plaintiffs argue that the 3-8-3 proceeding can be waived and that it was waived here.  The Court rejects this argument because Article 12 specifies that DBCP cases shall be tried "by means of a special trial proceeding, which shall have an *unavoidable* 3-8-3 term under penalty of disciplinary legal action if this term is not respected."  (emphasis added)  In other words, the operation of the 3-8-3 proceeding is mandatory and not waivable.  The Court also heard credible testimony that by declaring itself to be a "special law," a law of "public order," and law of "social and national interest," Special Law 364's provisions override any otherwise applicable provisions in Nicaraguan law and cannot be waived either by the trial court or by a party.

Moreover, the trial court's extension of the eight day timeframe in this case constituted yet another discriminatory procedure that operated to Defendants' disadvantage because, ironically, as this case developed Defendants were the ones who

---

[14]    The application of the 3-8-3 summary procedure is particularly inequitable here because the events giving rise to the plaintiffs' claims took place over thirty years ago and were followed by political upheaval which resulted in the loss of most, if not all, documents relevant to the employment of banana farms workers and the use of DBCP at those farms.

sought to enforce the 3-8-3 proceeding in an attempt to prevent Plaintiffs from offering additional evidence to support their claims, when, in Defendants' view, Plaintiffs had yet to offer sufficient evidence.  The trial court rejected Defendants request and appears to have ignored the express, non-waivable requirements of the law.

**f.      Imposition of Retrospective Civil Liability**

Defendants also argue that the wholesale abolition of statutes of limitations for DBCP defendants by Article 6 of Special Law 364, and the imposition of retrospective liability, is inconsistent with the minimum standards required for the treatment of foreign defendants under the international concept of due process.  The Court heard testimony that statutes of limitations in Nicaragua are usually 10 or 12 years, but the parties' experts disagreed on whether the limitations period had run.  Plaintiffs argue that their claim would have been timely regardless of Special Law 364's repeal of statutes of limitations for DBCP defendants, because under Nicaraguan law the limitations period does not begin to run until the party entitled to bring a claim has constructive knowledge of the facts on which the claim is based.  Plaintiffs also argue that such retrospective liability would not violate due process because the Supreme Court has stated that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations."  *Usery*, 428 U.S. at 16.

The Court rejects both of these arguments.  First, Plaintiffs have not shown, nor does the record indicate, that the Nicaraguan trial court found that Plaintiffs did not have timely notice of their purported injuries such that the usually applicable limitations period would not have run.  Second, given that Dole left Nicaragua approximately 30 years ago, and the unrefuted medical testimony that DBCP's effects on sperm quality are proximate to exposure, plaintiffs rendered sterile by DBCP would have known about it decades ago.  Plaintiffs' claims, therefore, would be time-barred absent Special Law 364's removal of statutes of limitations and imposition of retrospective liability.  Third, as discussed above, Plaintiffs reliance on *Usery* fails to recognize that the law before the *Usery* Court did not provide for retrospective civil liability, and the Court specifically noted the due process problems inherent in imposing liability on a theory other than cost-spreading.  *See id.* at 17-18 (stating that the "retrospective aspects of legislation . . . must meet the test of due process" and noting the due process problems inherent in approving "the retrospective

imposition of liability on any theory of deterrence of blameworthiness") (citations omitted); *see also Deutsch v. Turner Corp.*, 324 F.3d 692, 708 (9th Cir. 2003) (noting that "a revival of liability--even civil liability--is troubling and raises serious due process questions"); *In Re Estate of Smith*, 685 So. 2d 1206, 1210 (Fla. 1996) ("Once a claim has been extinguished by the applicable statute of limitations, the claim cannot be revived because a constitutionally protected property right to be free from the claim has vested in the defendant.").

> **g.      Evaluation of Special Law 364's Disparate Treatment of Foreign Defendants Under the International Concept of Due Process**

Equality before the law is basic to any definition of due process or fair play. *Cf. Slater v. State*, 316 So. 2d 539, 541 (Fla. 1975) ("We pride ourselves in a system of justice that requires equality before the law.  Defendants should not be treated differently upon the same or similar facts.  When the facts are the same, the law should be the same.").  This does not mean that foreign parties cannot be subjected to certain procedural regulations, such as reasonable security requirements, to ensure their compliance with court orders.  *See*, *e.g.*, *Ownbey v. Morgan*, 256 U.S. 94, 111 (1921) (finding that a statute permitting the attachment of property belonging to a foreign defendant did not violate due process).  But it does mean that foreign litigants cannot be subjected to a legal regime unfairly different from that applied to domestic litigants simply because they are foreigners.  *See Ky. Fin. Corp. v. Paramount Auto Exch. Corp.*, 262 U.S. 544, 551 (1923) (holding that a "corporation of one state" litigating in the courts of another "cannot be subjected, merely because it is a corporation, to onerous requirements . . . not laid on other suitors in like situations").

In *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995), the Ninth Circuit found that where a legal system denied a class of defendants due process, recognition of the judgment was precluded under California law.  California, like Florida, has adopted the Uniform Foreign Money-Judgments Recognition Act.  *See* Cal. Civ. Proc. Code §§ 1713-1713.8.  The Ninth Circuit found that a judgment could not be enforced against the sister of the former Shah of Iran because the evidence was that relatives of the former Shah could not receive a fair trial in that country.  The Court finds *Bank Melli Iran* instructive, and agrees with the Ninth Circuit that judicial proceedings that unfairly

discriminate against individual defendants, or a class of defendants, are not compatible with the requirements of due process of law.

Plaintiffs attempt to distinguish *Bank Melli Iran* by characterizing the Ninth Circuit's opinion as holding that the *particular defendant* could not receive impartial and fair treatment in the country where the judgment was rendered. The Court agrees with Plaintiffs' interpretation, but finds that it is equally applicable to this case because Special Law 364 deprives these few targeted defendants of due process in Nicaragua. The substitution of otherwise generally applicable laws with an oppressive legal regime applying only to a few select foreign defendants is the very antithesis of "basic fairness," as contemplated by the international concept of due process.

Plaintiffs also argue that a law regulating a foreign-manufactured pesticide must necessarily apply to foreign companies. This, of course, is true. But it does not follow that the law must incorporate, as Special Law 364 does, a different standard of liability, a different measure of damages, a truncated procedure for hearing evidence, a different procedure for executing the judgment than would apply to domestic defendants, and other notable differences discussed above. Moreover, Special Law 364's application is not limited to manufacturers of DBCP; rather, it also applies to those United States companies which imported, distributed, marketed, and applied DBCP. *See* Article 2.

In sum, Special Law 364 contains numerous unique provisions that apply only to a narrow class of foreign defendants, and operate to their distinct disadvantage in a pronounced discriminatory fashion. According to defense expert Stephen Schwebel, who served as a judge on the International Court in The Hague for 20 years, the unfair, discriminatory nature of Special Law 364 exceeds that of any law of which he is aware. The Court also finds that Special Law 364's disparate treatment of defendants is fatally unfair and discriminatory, fails to provide the minimum level of due process to which all foreign defendants are entitled, and is, therefore, incompatible with the requirements of due process of law under the Florida Recognition Act.

### 3. Application of Special Law 364 to *Osorio* Proceedings

Plaintiffs argue that Special Law 364's onerous procedures were not applied in this case, and therefore the Nicaraguan trial court's proceedings did not deny Defendants due process. As the Court has already explained, however, many of Special Law 364's

unfair, discriminatory provisions were applied, including the provisions providing for an irrefutable presumption of causation and disproportionate damages.   And where the Nicaraguan trial court did not apply Special Law 364's provisions, such as in the case of the 3-8-3 proceeding or defendants' jurisdictional opt-out rights, it worked to Defendants' distinct disadvantage.

In fact, with regard to the specific *Osorio* proceedings in Nicaragua, it appears that they were conducted in an *ad hoc*, unpredictable, discriminatory, and confusing manner.   One example of this is the birth certificates proffered by Dole during the trial. The trial court refused to admit them into evidence.   According to Plaintiffs, the trial court rejected the birth certificates because Dole did not specifically state the purpose for which they were offered.   However, in offering the birth certificates Dole's counsel stated "I am attaching hereto, one hundred fifty-one (151) Birth Certificates.   I request that these Certificates be entered into evidence in support of my case, with notice served on the opposing party.   The attached Certificates refer to children of the following plaintiffs [listing plaintiffs]."   Motion in Case No. 214-02, Second Civil Division District Court for Chinandega (June 7, 2005).   But as Plaintiff's own expert testified, the import of the birth certificates was obvious and the court had discretion to admit them.   Nevertheless, it did not.   It is remotely possible that the trial court did not see the obvious or was waiting for Dole to recite a certain formulaic legal litany before admitting the birth certificates. However, it seems unlikely that a court attempting to find the facts fairly and apply due process would exclude such critical and important evidence, except, of course, if such evidence was excluded solely on the basis that it was irrelevant in view of the irrefutable presumption of causation provided by Article 9.   This, of course, would further undermine Plaintiffs' argument that Article 9's irrefutable presumption was not applied by the trial court.

Further, Plaintiffs arguments that (1) this case was tried under causes of action other than Special Law 364, and (2) that many provisions of Special Law 364 were waived in this case, are undermined by Plaintiffs' own allegations in their Complaint. Specifically, Paragraph 10 of Plaintiffs' Complaint alleges that this Judgment arose out of lawsuits brought under Special Law 364; it does not allege that the Judgment arose out of any other Nicaraguan theories of liability.   In the same paragraph, Plaintiffs state that

"Articles 4 and 8 of Law 364 require defendants to post a monetary bond as a condition of answering the complaint to act as a security for both court costs and payment for any judgment that might be entered."  The Complaint provides no indication that, as Plaintiffs now contend, provisions of Special Law 364 that benefit the plaintiffs are waivable and were waived in this particular action.  To the contrary, Paragraph 10 alleges that the deposits are required.  In any event, the Court rejects Plaintiffs' waiver argument because the *ad hoc* suspension of discriminatory practices does not make them fair, and the evidence in this case shows that Special Law 364's provisions were selectively applied in a discriminatory manner.

### 4.    Judicial Estoppel

The Court previously held that Defendants were not estopped from challenging the validity of Nicaraguan judgments based on their *forum non conveniens* position in the *Delgado* litigation because the plaintiffs in *Delgado* and *Orosio* are different, and because Defendants' legal positions are not technically inconsistent.  *See Osorio* 2009 WL 48189, at *15-17, 2009 U.S. Dist. LEXIS 713, at *49-57; *see also Original Appalachian Artworks v. S. Diamond Assocs.*, 44 F.3d 925, 930 (11th Cir. 1995) (applying state law to questions of judicial estoppel in a diversity action); *Grau v. Provident Life & Accident Ins. Co.*, 899 So. 2d 396, 400 (Fla. 4th DCA 2005) (requiring mutuality of parties under judicial estoppel doctrine, subject to the exception for "special fairness and policy considerations").  Nevertheless, Plaintiffs continue to press this argument.  The Court adheres to its previous ruling, and again rejects Plaintiffs' estoppel argument, but includes and emphasizes an additional reason.

After holding an evidentiary hearing, and with a fuller understanding of the legal framework in Nicaragua, the Court finds that Defendants should not be, and are not, estopped from contesting the fairness of Nicaragua's procedures because the interposition of Special Law 364 into the DBCP litigation fundamentally altered the legal landscape in Nicaragua.  In 1995, Special Law 364 did not exist.  There was no law in place that predetermined Defendants' culpability and held them liable for injuries that it is scientifically impossible for them to have caused; no law that entitled Plaintiffs to a minimum award of $125,000 each and required litigating complex tort actions under procedures one might typically expect for small claims; no law which retroactively

eliminated statutes of limitations and contained the other discriminatory provisions more fully discussed above.  The Court rejects Plaintiffs contention that Defendants' position here, arguing that Nicaragua is an inadequate forum, is inconsistent with their earlier position, because in 1995 no one could have predicted that Nicaragua's legislature would pass, and Nicaragua's courts would implement, Special Law 364, a law which, as acknowledged by the Nicaraguan Supreme Court, singles out the DBCP defendants for "Positive Discrimination."

### 5.      Alleged Malpractice by Defendants

One final argument advanced by Plaintiffs is worth discussion.  Plaintiffs contend that Defendants intentionally sabotaged their own defense in Nicaragua to artificially manufacture a defense to enforcement on due process grounds in a later enforcement action.  Plaintiffs argue that, to further their manufactured due process defense to enforcement, Defendants deliberately failed to properly move for the admission of birth certificates and did not present medical testimony regarding the linkage between DBCP and sterility such as this Court heard during the evidentiary hearing.

The Court rejects this argument for two reasons.  First, given Article 9's irrefutable presumption, such evidence would not be relevant to the Nicaraguan trial court's determination of liability and would not have affected the outcome of the trial.  Defendants cannot be faulted for failing to perform a futile act under the circumstances presented to them by Special Law 364.  By definition, one cannot refute an irrefutable presumption.  Second, as proof that introducing such evidence would not have changed the trial's outcome, Defendants point to the subsequent trial in *Herrera Ríos*, where the same Nicaraguan trial court admitted similar birth certificates and heard Defendants' medical testimony on the causes of sterility.  Despite Defendants' successful introduction of this evidence in *Herrera Ríos*, their additional efforts appear to have been for naught, for, as Defendants showed, the percentage of plaintiffs who recovered in the two actions (75% in *Osorio* and 73% in *Herrera Ríos*) and the average awards (approximately $647,000 in *Osorio* and $648,000 in *Herrera Ríos*) were virtually identical.

### 6.      Special Law 364's Incompatibility With the International Concept of Due Process

The Court, therefore, finds that Defendants have met their burden of proving that the legal regime set up by Special Law 364 and applied in this case does not comport

with the "basic fairness" that the "international concept of due process" requires. *Ashenden*, 233 F.3d at 477 (quoting *Ingersoll Milling Mach. Co.*, 833 F.3d at 687-88). It does not even come close. "Civilized nations" do not typically require defendants to pay out millions of dollars without proof that they are responsible for the alleged injuries. Basic fairness requires proof of a connection between a plaintiff's injury and a defendant's conduct (i.e., causation) before awarding millions of dollars in damages. Civilized nations do not target and discriminate against a handful of foreign companies and subject them to minimum damages so dramatically out of proportion with damage awards against resident defendants. In summary, civilized nations simply do not subject foreign defendants to the type of discriminatory laws and procedures mandated by Special Law 364, and the Court cannot enforce the judgment because it was rendered under a legal system that did not provide "procedures compatible with the requirements of due process of law." FLA. STAT. § 55.605(1)(a).

### D.     PUBLIC POLICY

The Florida Recognition Act provides that the enforcing court need not recognize a judgment if it is based on a cause of action or claim of relief that is repugnant to Florida public policy. FLA. STAT. § 55.605(2)(c). Defendants have identified thirteen different ways in which, they contend, enforcing the $97 million judgment would violate public policy. The Court, however, limits its analysis to Defendants' challenges to the portions of Special Law 364 which the Court has already concluded are inconsistent with the international concept of due process embodied in the Florida Recognition Act, because they discriminate against a narrowly defined group of United States companies and target them for legal rules and procedures unique to Special Law 364.

The discriminatory provisions of Special Law 364, by design and in practice, deprive DBCP defendants of due process under Florida's Constitution. *See* FLA. CONST. art. I, § 9 ("No person shall be deprived of life, liberty or property without due process of law . . . ."). These provisions include Special Law 364's deposit requirements, provisions for minimum and disproportionate damages, requirement of a 3-8-3 summary proceeding, curtailments of appellate rights, and removal of statutes of limitations. Operating in concert, the application of these unfair and discriminatory provisions amounts to a denial of justice under the Florida Constitution, which requires that "justice shall be

administered without sale, denial or delay." FLA. CONST. art. I, § 21. Of particular note, the Court finds that Special Law 364's irrefutable presumption of causation, which the Nicaraguan trial court applied in this case, violates clearly established Florida public policy.

### 1.      Standard for Non-Enforcement on Public Policy Grounds

A judgment should not be enforced on public policy grounds when enforcement would clearly undermine public confidence in the administration of the law or in the security of individual rights. *Somportex, Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 443 (3d Cir. 1971) (quoting *Goodyear v. Brown,* 26 A. 665, 666 (1893)). Plaintiffs correctly point out that a mere difference between Florida law and foreign law is insufficient to merit non-recognition on public policy grounds because the Florida Recognition Act sets a high bar for defendants before they can avail themselves of this basis for non-recognition. *See Sw. Livestock & Trucking Co. v. Ramon,* 169 F.3d 317, 321 (5th Cir. 1999) (noting under the Texas version of the Uniform Foreign Money-Judgments Recognition Act that "the level of contravention of [state] law has to be high before recognition can be denied on public policy grounds") (quotations and alternations omitted); *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994) (foreign judgments violate public policy when they are "repugnant to fundamental principles of what is decent and just"). The Court must therefore determine first, whether the law applied by the Nicaraguan trial court in this action is consistent with Florida law, and second, if the Court finds Nicaraguan law contradicts Florida law, whether the level of contravention is sufficient to warrant non-recognition on public policy grounds.

### 2.      Florida Law on Legislative Presumptions

Defendants argue that the irrefutable presumption of causation relied upon in the Judgment is repugnant to Florida public policy because it deprived them of their basic right to defend themselves. The Court agrees. For a presumption to comport with due process under Florida law (1) "there must be a rational connection between the fact proved and the ultimate fact presumed" and (2) "there must be a right to rebut [the presumption] in a fair manner." *Straughn v. K & K Land Mgmt., Inc.*, 326 So. 2d 421, 424 (Fla. 1976). As the Court has explained, the presumption of causation in Special Law 364 contradicts known scientific fact and affords no opportunity for rebuttal. It

creates liability by legislative fiat and mandates large damage awards without determining whether the defendants actually injured the plaintiffs.  Special Law 364's presumption of causation would, therefore, be unconstitutional in Florida.

In *Agency for Health Care Administration v. Associated Industries of Florida*, 678 So. 2d 1239, 1254 (Fla. 1996), the Florida Supreme Court held that an analogous statutory presumption created an unfair process.  In that case, the court held that a portion of the Medicaid Third-Party Liability Act was unconstitutional because it allowed the state to pursue an action on behalf of Medicaid recipients without identifying the individual recipients.  This created an irrefutable presumption that each recipient was injured by the defendant, and the defendant, unable to identify the individual recipients, had no way to prove that it was not liable for a particular recipient's injuries.  The Florida Supreme Court found that it was "illogical and unreasonable to call this a fair process" because the "defendant cannot rebut [the] presumption" that they caused the recipients' injuries.  *Id.*

Plaintiffs attempt to distinguish *Agency for Health Care Administration* by arguing that the statute in that case denied the defendants the ability to rebut all facts of consequence, whereas Special Law 364 permits the defendants to contest the plaintiffs' claims of exposure to DBCP and sterility.  The Court rejects this argument, however, because those facts (exposure to DBCP and sterility) are scientifically insufficient to prove causation.  As a result, Special Law 364's presumption of causation does not contain the rational relationship between the facts proved and the ultimate fact to be presumed that Florida law requires.  *See Straughn*, 326 So. 2d at 424.  Additionally, as the Court already noted, the trial court accepted as evidence of sterility proof of impaired sperm conditions in over 90% of the plaintiffs that do not constitute clinical sterility.  It is also beyond dispute that Special Law 364's *irrefutable* presumption of causation does not afford defendants an opportunity to rebut it, which Florida law requires.

### 3.   Application of Public Policy Ground for Non-Recognition

The Court must now determine whether the difference between Florida law, which requires plaintiffs to prove causation in accordance with medical science and provides defendants with an opportunity to rebut the plaintiffs' allegations, and Nicaraguan law, which exempts the plaintiffs from offering medically sufficient proof of

causation and denies the defendants an opportunity for rebuttal, is sufficient to warrant non-recognition based on public policy grounds.  The Court does not find this to be a difficult question, and holds that the irrefutable presumption of causation applied in this case is a sufficiently consequential departure from Florida law to warrant non-recognition on public policy grounds.

The application of the irrefutable presumption of causation in this case (1) resulted in Defendants' substantive tort liability without a reasonable basis in fact, and (2) deprived Defendants of a fair opportunity to rebut the allegations against them.  The imposition of liability under these circumstances, without first establishing a logical connection between Defendants' conduct and Plaintiffs' injuries, and without providing Defendants' the ability to rebut Plaintiffs' allegations, denied Defendants' basic and fundamental due process rights under Florida Law.

As the Florida Supreme Court has acknowledged, Florida's law on presumptions exists to ensure that liability is not predicated on presumptions that are illogical or unreasonable, and to ensure defendants' right to rebut the evidence against them.  *See Agency for Health Care Admin.*, 678 So. 2d at 1254.  Florida's law on presumptions, therefore, is designed to ensure a litigants' basic right to a fair judicial process and to provide guarantees that are essential to due process in any adversarial proceeding.  This is not an inconsequential difference between Florida and Nicaraguan law.   It is a fundamental difference, because, as the Florida Supreme has said, without these basic guarantees a presumption deprives defendants of a fair process.

Therefore, the Court finds that Defendants have demonstrated that the irrefutable presumption of causation applied in this case is repugnant to Florida public policy and have clearly established their entitlement to non-recognition on this ground.  The Court finds that enforcing this judgment would undermine public confidence in the tribunals of this state, in the rule of law, in the administration of justice, and in the security of individuals' rights to a fair judicial process.  As such, the Court declines to recognize this judgment because the "cause of action or claim for relief on which the judgment is based is repugnant to the public policy of this state."  FLA. STAT. § 55.605(2)(c).

### E.     IMPARTIAL TRIBUNALS

Finally, the Court reaches the issue of whether Nicaragua has impartial tribunals, as required for recognition by FLA. STAT. § 55.605(1)(a).  The Court admits that it is not entirely comfortable sitting in judgment of another nation's judicial system, but does so in deference to the Florida Recognition Act, which includes the absence of impartial tribunals as a mandatory basis for non-recognition.  After reviewing the evidence and assessing the credibility of live testimony, the Court concludes that the evidence is compelling that Nicaragua lacks impartial tribunals.  This conclusion is based on the credible evidence that, while on paper and in theory Nicaragua has all the trappings of an independent judiciary, in practice the judiciary does not act impartially.

In every year from 1999 through 2008, the Country Reports prepared by experts at the United States State Department have concluded that Nicaragua lacks an effective civil law system.[15]   In 2002, the year *Osorio* was filed in Nicaragua, the State Department found that "Judges' political sympathies, acceptance of bribes, or influence from political leaders reportedly often influenced judicial actions and findings."  The weak state of the Nicaraguan judiciary is largely the result of a compromising pact between the country's two strongmen, Daniel Ortega and Arnoldo Alemán, who lead Nicaragua's two main political parties, the FSLN and the PLC.  Pursuant to the pact, these two men divide control of key governmental institutions, including the Nicaraguan Supreme Court, along partisan lines.  Alemán and Ortega are capable of exercising control of the Supreme Court on a case by case basis.  The justices of the Supreme Court, in turn, can direct proceedings in lower courts because they control the appointment and removal of lower court judges.  The United States State Department has excluded two justices of the Supreme Court from entering the United States because of their purported corruption.  In 2005, the year the *Osorio* judgment was rendered, the State Department concluded that

> Although the law provides for an independent judiciary, the judicial
> system was susceptible to corruption and political influence.  Judges'
> political sympathies or acceptance of bribes or influence from political

---

[15]     The Country Reports on Human Rights Practices are prepared by area specialists at the United States Department of State and submitted annually to the United States Congress.  The Reports from 1999 through 2008 are available at the State Department's website, http://www.state.gov/g/drl/rls/hrrpt/ (last visited Oct. 14, 2009).

leaders often influenced judicial actions and findings. . . . The PLC and FSLN manipulated the judiciary for political purposes.  The FSLN utilized its political control of the judiciary to impede the resolution of property claims.  Both lower courts and the Supreme Court rendered controversial judgments dismissing evidence and convictions against international drug traffickers.

It is noteworthy that the 2005 Report omitted the word "reportedly," which the 2002 Report contained, in its findings regarding political influence and corruption in the judiciary, indicating that in the State Department's opinion the state of judicial independence in Nicaragua worsened in the years immediately preceding this action.  In their most recent Report, from 2008, the State Department's assessment of Nicaragua's judiciary continued to deteriorate:

Although the law provides for an independent judiciary, the judicial system remained susceptible to corruption and politicization, and did not function independently.  The Judicial Career Law requires that new judicial appointments be vetted by the Supreme Court of Justice (CSJ); however, judicial appointments were often based on nepotism, influence, or political affiliation.  Once appointed, many judges were subject to political and economic pressures that affected their judicial independence.

While the Court finds the State Department's Reports particularly persuasive, they are not alone in their critical assessment of Nicaragua's judiciary.  Numerous other reports have concluded that Nicaragua lacks impartial tribunals.  *See, e.g.*, Freedom House Nicaragua, at 5 (2009) (concluding that domination of the judiciary by the FSLN and PLC continues); Global Integrity Scorecard, at 75 (2008) (noting that efforts to reform the judicial system have had little effect in practice); Transparency Int'l Nicaragua Report, at 60 (2007) (concluding that the judicial branch is directly influenced by the pact and is the "weakest point" in Nicaragua's governmental institutions).  In fact, it appears to the Court that the unanimous view among United States government organizations and officials (including United States ambassadors to Nicaragua), foreign governments, international organizations, and credible Nicaraguan authorities, is that the judicial branch in Nicaragua is dominated by political forces and, in general, does not dispense impartial justice.[16]

---

[16]     This is not, as Plaintiffs argue, an indictment of every sitting judge in Nicaragua. It is a generalization, and like all generalizations it is subject to exceptions.  But it is a generalization that is well supported by the evidence in this case, and, moreover, one that

Facing a similar situation, the Second Circuit in *Bridgeway Corp. v Citibank*, 201 F.3d 134 (2d Cir. 2000), affirmed the district court's finding that Liberia lacked a system of impartial tribunals.   The evidence in *Bridgeway* was that Liberia possessed an impartial judiciary in theory—its Constitution and laws were modeled on those of the United States—but that in practice its courts did not operate independently.   Plaintiffs attempt to distinguish *Bridgeway* by arguing that Liberia was engaged in a civil war at the time the judgment in that case was rendered.   The key in *Bridgeway*, however, was not that Liberia was at war when the judgment was rendered but that, as a result of the war, "[t]he Liberian Constitution was ignored" and "corruption and incompetent handling of cases were prevalent."   *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 287 (S.D.N.Y. 1999).   The war, therefore, was simply a cause of Liberia's weak judiciary, just as in this case the political pact between Alemán and Ortega is a cause of Nicaragua's weak judicial system.   Plaintiffs have also demonstrated that, on paper, the laws of Nicaragua, like those of Liberia, provide for an impartial judiciary.   But Plaintiffs have not shown that the Nicaraguan judiciary *actually* operates independently and impartially.   To the contrary, Defendants have presented substantial and compelling evidence that it does not.

Defense expert Omar Garcia-Bolivar credibly testified that the problems in Nicaragua's judiciary exceed those of any other Latin American country.   Garcia-Bolivar is a Latin America specialist who has advised both United States and international agencies on Latin American issues.   As part of the United States Agency for International Development's assessment process under the Central American Free Trade Agreement, Garcia-Bolivar and his colleagues interview over 100 Nicaraguans (Garcia-Bolivar personally conducted 50 interviews).   He testified that of the 100 Nicaraguans interviewed—who included lawyers, businesspeople, academics, and government officials—a group designed to represent a cross-section of Nicaraguan society, not one said that Nicaragua had an independent judiciary.   To the contrary, Garcia-Bolivar's

---

the Court is required to make under the Florida Recognition Act.  Similarly, it would be inconsistent with the Court's obligation under the Florida Recognition Act to adopt, in an action to enforce a judgment, the general proposition that it is inappropriate for United States courts to sit in judgment of foreign judicial systems in the *forum non conveniens* context.  *See, e.g.*, *Warter v. Boston Sec., S.A.*, 380 F. Supp. 2d 1299 (S.D. Fla. 2004).

informed assessment was that the Nicaraguan judiciary does not consistently enforce contracts, political figures routinely determine the outcome of judicial decisions, and lower-court judges can be removed at will by Supreme Court justices, who manage judicial districts as their personal fiefdoms.  In essence, Supreme Court justices have a feudal relationship with lower court judges and can demand of lower court judges particular actions in individual cases in exchange for their continued patronage.  Finally, Garcia-Bolivar testified that, with the exception of the reports prepared by Plainitffs' experts, he has never seen a study or report that expresses the view that Nicaragua has an independent judiciary.

Another defense expert, Gabriel Antonio Alvarez Arguello, a Nicaraguan lawyer and law professor, testified about the difference between Nicaragua's judicial structure on paper and in practice.  Alvarez Arguello testified that in its formal structure, the Nicaraguan judiciary appears to have all the hallmarks one would expect of a classical liberal, democratic state, but in practice its decisions are commonly driven by partisan interests—not the rule of law.  He also traced this development to the pact between Alemán and Ortega, which, since 1999, has degraded the judiciary to the point where it fails to offer even minimal guarantees of impartiality.  Alvarez Arguello explained that the Law on Judicial Career, which Plaintiffs' experts also cite, was adopted in 2004 with the goal of strengthening the independence and impartiality of the judiciary.  But the Nicaraguan Supreme Court declined to implement the law for almost four years, and it did not formally take effect until July 2008.  And, even now, there is evidence that the Law on Judicial Career has not been implemented and that the appointment of judges continues to operate in an unlawful manner.

The Court found that both of these experts were well qualified to render their opinions and their testimony was especially credible.  In response, Plaintiffs have not cited a single report or independent authority, other than their own experts, that claims Nicaragua possessed an impartial judiciary during or after the pendency of the *Osorio* action.  Simply put, Plaintiffs have failed to rebut the substantial evidence that Nicaragua's judiciary lacks impartiality.  Plaintiffs did not produce a single outside expert to testify that Nicaragua has an impartial judiciary.  At times, Plaintiffs' Nicaraguan experts cited to reports to support Plaintiffs' contention that the Nicaraguan

judiciary is impartial.  However, upon closer examination, the Court found that the passages and references in the reports cited by Plaintiffs' experts did not support Plaintiffs' contention.  The reports did not bear on the independence of the judiciary, were not germane to the relevant time period, and, in some cases, were not cited accurately or were out of context.  The Court did not find Plaintiffs' experts to be particularly persuasive of Plaintiffs' position, and views their failure to cite reports which advance Plaintiffs' positions as evidence that there is little or no credible authority to support the proposition that Nicaragua possesses impartial tribunals.

Even Plaintiffs' expert testimony leads to the conclusion that, at best, in Nicaragua judicial independence is an aspirational goal, not an existing condition.  In fact, it appeared to the Court that much of Plaintiffs' expert testimony actually supported Defendants' position.  For example, one of Plaintiffs' experts, Cairo Manuel López Sánchez, was confronted on cross-examination with critical statements that he made in the past on the Nicaraguan judiciary.  He was asked if he made those statements because some Nicaraguan judges are not impartial.  In responding, rather than defend the impartiality of the Nicaraguan judiciary, he admitted that some judges are not impartial or independent and emphasized the need to improve Nicaragua's judiciary.  In fact, at several junctures in his testimony, López Sánchez's refused to vouch for the impartiality of the Nicaraguan judiciary when given the opportunity to do so.  Instead he replied that the judiciary has improved, is improving, or is in need of improvement.  Indeed, López Sánchez has quite commendably been active in the very organizations that are trying to bring much needed reform to Nicaragua's partial tribunals.  But even he acknowledges that Nicaragua's judiciary is in need of urgent reform.  Indeed, one of the organizations with which López Sánchez was closely affiliated emphatically stated that Nicaragua does not have an independent judiciary because the courts "answer to the political powers behind the pact."  María Haydée Brenes, *The Corrupt, Partisan Judicial System in Nicaragua*, El Nuevo Diario (Managua), Oct. 6, 2007.

In view of the persuasive evidence that direct political interference and judicial corruption in Nicaragua is widespread, the Court is compelled to find that the judgment in this case cannot be recognized under the Florida Recognition Act because it "was rendered under a system which does not provide impartial tribunals[.]"  FLA. STAT.

§ 55.605(1)(a).  The Court bases this conclusion on the evidence submitted by the parties regarding the operation of the Nicaraguan judicial system as a whole, and not the particulars of this case.  However, the Court notes that Special Law 364 and its application in the *Osorio* proceedings could well serve as Exhibit A evidencing the lack of independent tribunals in Nicaragua.  The passage of Special Law 364 is itself further evidence of undue political meddling in Nicaragua's judicial process.  The law asks judges to enforce a set of procedures that the Nicaraguan Attorney General found were patently unconstitutional and the Nicaraguan Supreme Court upheld only because the defendants could chose to exempt themselves from the law.  Nevertheless, as explained above, the trial court in this case applied Special Law 364's provisions in an *ad hoc* and discriminatory manner, including the law's most inequitable provision, the irrefutable presumption of causation, which, as discussed above, operates to prevent DBCP defendants from mounting a defense, and awarded damages far in excess of the norm.  Further, it is apparent that the trial court attempted to make it appear that the law's unfair and discriminatory provisions were not applied when in fact they were.  It is also troubling that the intermediate court of appeals has not ruled on the appeals in this case even though they have been pending for almost half a decade, a clear departure from their normal practice of deciding cases in six to twelve months.

## III.    CONCLUSION

"Nations are not inexorably bound to enforce judgments obtained in each other's courts.  However, our courts will enforce foreign judgments that arise out of proceedings which comport with basic principles of due process."  *Bank Melli Iran*, 58 F.3d at 1413.  The evidence before the Court is that the judgment in this case did not arise out of proceedings that comported with the international concept of due process.  It arose out of proceedings that the Nicaraguan trial court did not have jurisdiction to conduct.  During those proceedings, the court applied a law that unfairly discriminates against a handful of foreign defendants with extraordinary procedures and presumptions found nowhere else in Nicaraguan law.  Both the substantive law under which this case was tried, Special Law 364, and the Judgment itself, purport to establish facts that do not, and cannot, exist in reality.  As a result, the law under which this case was tried stripped Defendants of their basic right in any adversarial proceeding to produce evidence in their favor and

rebut the plaintiffs' claims.  Finally, the judgment was rendered under a system in which political strongmen exert their control over a weak and corrupt judiciary, such that Nicaragua does not posses a "system of jurisprudence likely to secure an impartial administration of justice."  *Id.* (quoting *Hilton*, 159 U.S at 202).

This Court holds that Defendants have established multiple, independent grounds under the Florida Recognition Act that compel non-recognition of the $97 million Nicaraguan judgment.  Because the judgment was "rendered under a system which does not provide impartial tribunal or procedures compatible with the requirements of due process of law," and the rendering court did not have jurisdiction over Defendants, the judgment is not considered conclusive, and cannot be enforced under the Florida Recognition Act.  FLA. STAT. § 55.605(1)(a)-(c).  Additionally, the judgment will not be enforced because "the cause of action or claim for relief on which the judgment is based is repugnant to the public policy of this state."  FLA. STAT. § 55.605(2)(c).  The Court, therefore, orders that Plaintiffs' judgment shall be neither recognized nor enforced.

DONE and ORDERED in Chambers, Miami, Florida, October 20, 2009.


_____
Paul C. Huck
United States District Judge


Copies furnished to:
Counsel of Record